EXHIBIT 1

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

NORTHPOINTE TOWNHOMES CONDOMINIUM
ASSOCIATION,
 a Michigan nonprofit corporation,

        Plaintiff,                        Case No. 22-      -CH

v.                                           Hon.

MEGMAD FAMILY TRUST,

        Defendant.

_____ /

MAKOWER ABBATE GUERRA WEGNER
VOLLMER PLLC
Todd Skowronski    P74301
Attorneys for Plaintiff
30140 Orchard Lake Road,
Farmington Hills, MI 48334
248 671 0140
_____ /

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this complaint pending in this court, nor has any such action been assigned to a judge, nor do I know of any other civil action not between these parties, arising out of the same transaction or occurrence as alleged in this complaint that is either pending or was previously filed and dismissed, transferred or otherwise disposed of after having been assigned to a judge in this court.

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES

Plaintiff, NORTHPOINTE TOWNHOMES CONDOMINIUM ASSOCIATION (the "Association"),

through its undersigned counsel, MAKOWER ABBATE GUERRA WEGNER VOLLMER PLLC, states

for its Complaint for Injunctive Relief and Money Damages as follows:

1.      This is a case involving the Defendant Co-owner making extensive and

substantial unapproved modifications to condominium common elements within their Unit that

must be immediately enjoined, in particular as the Unit's ceiling is currently open to a non-

climate controlled attic and freezing weather is here.

2.      Pre-suit demands for compliance were completely ignored.

3.      Defendants have already caused two water damage incidents by damaging piping

and, upon further inspection, have performed extensive interior renovations and modifications of

1

Common Elements all without first obtaining required Association written approval. These unapproved modifications include without limitation, opening the ceiling for the purpose of installing an HVAC system within the attic space – attic space that is NOT part of the Unit but is, instead, entirely a General Common Element in which no Co-owner has the right to do any work, period, without Association prior written approval.

4.     The Association was at all times pertinent hereto and is presently a duly-constituted Michigan nonprofit corporation created and existing under the provisions of Act 162 of the Public Act of 1982, as amended.

5.     The Association is empowered by Section 60 of the Michigan Condominium Act of 1978, Act No. 59 of the Public Acts of Michigan, 1978, MCL 559.160, and by the Condominium Documents, to bring this action on its own behalf and on behalf of the Co-owners comprising the Condominium.

6.     Northpointe Townhomes Condominium (the "Condominium") and all units therein were at all times pertinent hereto subject to the Master Deed, recorded in Liber 37283, Page 1 *et seq.*, as amended (the "Master Deed"), Wayne County Records, the Master Deed (the "Bylaws"), and other condominium documents for the Condominium (as amended, the "Condominium Documents").

7.     Defendant MegMad Family Trust (the "Defendant") is the record co-owner of a unit in the Condominium, commonly known as c/o Julie Goldberg, 3373 Reeves Dr., Melvindale, Michigan 48122 (the "Unit"), and more particularly described in the Warranty Deed attached as **Exhibit A.**

8.    This matter is within the jurisdiction of this Court because it involves equitable

relief, and venue is proper because the occurrences complained of herein took place in the City

of Melvindale, Wayne County, Michigan.

9.    Pursuant to MCL 559.165 of the Michigan Condominium Act, the Defendant is

required to comply with the terms and conditions of the Master Deed, Bylaws and Rules and

Regulations governing the Condominium. **[Exhibit B - Bylaws]**

<div align="center">

### COUNT I – BREACH OF CONTRACT/CONDOMINIUM DOCUMENTS

</div>

10.    The Association incorporates and re-alleges the foregoing Paragraphs as if fully

restated herein.

11.    The Condominium Documents provide, among other things, that the restrictions,

limitations, and provisions of the Condominium Documents are a burden and a benefit to those

persons acquiring an interest in the units of the Condominium, which includes the Defendant.

12.    Bylaws, Article VI, Section 3, provide, **Exhibit B**, with added emphasis:

> **No Co-owner shall** make alterations in the exterior appearance of
> their Unit, including the address plaque placed by the Developer,
> or **make structural modifications (including interior walls
> through or in which there exist easements for support or
> utilities), or make changes in any of the Common Elements,
> without the express written approval of the Board of Directors**
> . . . .

13.    Bylaws, Article VI, Section 10 provides the Association with access into any

Unit for the purpose of maintenance, repair and replacement of any Common Elements

accessible therein, to wit the Association

> shall have access to each Unit and Limited Common Elements
> appurtenant thereto from time to time, during reasonable working
> hours, upon notice to the Co-owners thereof, as may be necessary
> for the maintenance, repair or replacement of any of the Common
> Elements. . . . It shall be the responsibility of each Co-owner to
> provide the Association means of access to his Unit and any
> Limited Common Elements appurtenant thereto during all periods

<div align="center">3</div>

of absence, and in the event of the failure of such Co-owner to provide means of access, the Association may gain access in such manner as may be reasonable under the circumstances and shall not be liable to such Co-owners for any necessary damage to his Unit and any Limited Common Elements appurtenant thereto caused thereby or repair or replacement of any doors or windows damaged in gaining such access.

14.     Bylaws, Article XIX, Section 3 provides that

Removal and Abatement. The violation of any of the provisions of the Condominium Documents shall also give the Association or its duly authorized agents the right, in addition to the rights set forth above, to enter upon the Common Elements and summarily remove and abate, at the expense of the Co-owner in violation, any structure, thing or condition existing or maintained contrary to the provisions of the Condominium Documents. The Association shall have no liability to any Co-owner arising out of the exercise of its removal and abatement power authorized herein.

15.     Master Deed, Article VII, **Exhibit E**, Sections (e)-(f) also speak to the

Association's easements for access into Units:

(e)     There shall be easements to and in favor of the Association, and its officers, directors, agents and designees directors, agents and designees (and the Developer prior to the First Annual Meeting), in, on and over all Units, for access to the Units to conduct any activities authorized by this Master Deed or the Condominium By-Laws.

(f)     The Developer, the Association and all public and private utility companies shall have such easements over, under, across and through the Condominium, including all Units and Common Elements, as may be necessary to develop, construct, market and operate any Units within the land described in Article II hereof, to fulfill their responsibilities of maintenance, repair and replacement of common amenities or improvements (whether or not such common amenities or improvements are integrated into the Condominium) and also to fulfill any responsibilities of maintenance, repair, decoration or replacement which they or any of them are required or permitted to perform under the Condominium Documents or by law or to respond to any emergency or common need of the Condominium.

4

16.    The Master Deed defines various items within the Condominium as either General Common Elements, *see* Master Deed, Article IV, Section (a) generally, or Limited Common Elements, *see* Master Deed, Article IV, (b).

17.    As most relevant here, General Common Elements include but are not limited to per Master Deed, Article IV, Section (a)(10) of

> The structural members, materials and components which comprise the exterior walls, the roof, furnace chimneys, the foundations (including support components), the basement foundations, walls and floors, the ceilings and the floors which envelop the air space within the Unit **and the air space within the attics**, if any, the crawl spaces, if any, outside of a Unit, and Unit perimeter walls). The air space outside of a Unit but within the structural items which envelop a Unit is a General Common Element.

18.    In most relevant part, General Common Elements also include but are not limited to per Master Deed, Article IV, Section (a)(5) of "The water distribution system throughout the Condominium up to the point where service is connected or enters each Unit."

19.    Note as well that each Co-owner's Unit is defined with reference to the "Condominium Subdivision Plan," **Exhibit C**, and per the Master Deed at Article VI, **Exhibit E**, Unit

> shall consist of the interior air space measured from the entire interior surface enveloping the Unit air space, including basement and garage areas; including (i) interior unpainted surfaces of inside walls (ii) the inside surfaces of windows, doorwalls, doors and access panels; (iii) the unpainted interior surfaces of ceilings; and (iv) the interior and unfinished surfaces of the sub/floors and/or basement floor.

20.    All of this background is necessary to fully understand the substantial and myriad unapproved changes Defendant has made to various Common Elements.

5

21.     On October 18, 2022, following multiple reports of water damage originating from the Unit, the Association through legal counsel issued the attached Cease and Desist letter demanding all work halt, an inspection be provided immediately, and before anything continue, the Co-owner had to apply for and obtain written approval.

22.     The Co-owner ignored this completely.

23.     On or about November 11, 2022, and pursuant to its abatement and easement access power (access the Co-owner refused to provide), the Association's property manager entered the Unit to ascertain the scope of the unapproved work, and what was found was shocking. **Exhibit D**.

24.     The pictures speak for themselves, but there are numerous instances of (A) the Co-owners have dug into the subfloor (which is *outside of their Unit and is a Common Element*), have worked on plumbing located within the subfloor (which by definition is a *General Common Element)*, have knocked out interior walls (the Association does not know whether these were load bearing), appear to have modified electrical lines (which are *General Common Elements* up to the point of connect with an outlet), performed work in attic space (which is a *General Common Element*), run or modified pipes through the attic which is a *General Common Element*), and appear to have installed electrical and wiring in the attic (again, a *General Common Element space*.

25.     Perhaps most egregiously, the Co-owners appear to have opened up the attic space and installed a furnace in the General Common Element attic. **Exhibit D**.

26.     Upon information and belief, the Co-owner did not cause their contractor to pull all necessary permits.

27.    At no time did the Co-owner seek prior written approval before modifying these General Common Elements.

28.    Defendant's conduct in violation of the Condominium Documents constitutes a breach of their obligations and, unless restrained, will cause irreparable and incompensable damage to the Association and to the owners of units in the Condominium, who otherwise have no adequate remedy at law.

29.    The Association requires the assistance of this court in issuing a permanent injunction against the violations set forth herein, specifically: (A) Permanent injunction against all unapproved work, and (B) an injunction requiring the Co-owner entirely restore all affected Common Elements to their original condition.

30.    The Association comes to this Court with clean hands.

31.    The Association seeks, among other things, injunctive relief, which is within the jurisdiction of this court, and which is provided for by MCL 559.206 (and by Article XIX, Section 1 of the Bylaws, the language of which is nearly identical), which provides in pertinent part as follows:

> Failure to comply with any of the terms or provisions of the condominium documents, shall be grounds for relief, which may include without limitations, an action to recover sums due for damages, injunctive relief, foreclosure of lien if default in payment of assessment or any combination thereof.

32.    The Association is entitled, pursuant to MCL 559.206 (and by Article XIX, Section 2 of the Condominium Bylaws, the language of which is nearly identical), to recoup the costs and attorneys' fees sustained as a result of this action. MCL 559.206 provides in pertinent part:

> In a proceeding arising because of an alleged default by a co-owner, the Association, if successful, shall recover the costs of the proceeding and reasonable attorney fees, as determined by the

7

court, to the extent the condominium documents expressly so provide.

33. Article XIX, Section 2 of the Bylaws [**Exhibit B**] in turn provides:

In any proceeding arising because of an alleged default by any Co-owner, the Association, if successful, shall be entitled to recover the costs of the proceeding and such reasonable attorneys' fees (not limited to statutory fees) as may be determined by the court, but in no event shall any Co-owner be entitled to recover such attorney's fees.

WHEREFORE, Plaintiff Northpointe Townhomes Condominium Association respectfully requests that this Honorable Court grant it the following relief:

A. The entry of the Temporary Restraining Order attached as **Exhibit F**.

B. Require Defendant by Order of this Court to Show Cause why a Preliminary Injunction should not issue requiring Defendant to comply with all of the applicable covenants and restrictions contained in the Condominium Documents during the pendency of this matter, including cessation of all unapproved construction upon Common Elements;

C. Enter an injunction permanently restraining and forever enjoining Defendant, their agents and those in active concert or participation with them, from further violating all of the applicable provisions in the Condominium Documents;

D. Enter an injunction requiring Defendant to restore all affected Common Elements to their original condition, subject to inspection and confirmation by the Association for compliance;

E. Enter a judgment against the Defendant and award Plaintiff its actual costs, damages, interest and attorneys' fees in pursuing this action; and

F. Grant such other and further relief as justice and equity may require.

Dated: November 17, 2022                  Respectfully submitted,

                                          MAKOWER ABBATE GUERRA
                                          WEGNER VOLLMER PLLC

8

By: _____
   Todd Skowronski P74301
   Attorneys for Plaintiff
   30140 Orchard Lake Road
   Farmington Hills, MI 48334
   248 671 0140

9

A.    The entry of the Temporary Restraining Order attached as **Exhibit F**.

B.    Require Defendant by Order of this Court to Show Cause why a Preliminary Injunction should not issue requiring Defendant to comply with all of the applicable covenants and restrictions contained in the Condominium Documents during the pendency of this matter, including cessation of all unapproved construction upon Common Elements;

C.    Enter an injunction permanently restraining and forever enjoining Defendant, their agents and those in active concert or participation with them, from further violating all of the applicable provisions in the Condominium Documents;

D.    Enter an injunction requiring Defendant to restore all affected Common Elements to their original condition, subject to inspection and confirmation by the Association for compliance;

E.    Enter a judgment against the Defendant and award Plaintiff its actual costs, damages, interest and attorneys' fees in pursuing this action; and

F.    Grant such other and further relief as justice and equity may require.

Dated: November 17, 2022                 Respectfully submitted,

MAKOWER ABBATE GUERRA
WEGNER VOLLMER PLLC

By: _____
Todd Skowronski P74301
Attorneys for Plaintiff
30140 Orchard Lake Road
Farmington Hills, MI 48334
248 671 0140

**VERIFICATION**

STATE OF MICHIGAN )
                          ) ss
COUNTY OF Wayne )

I, [Print Name] Jonathon J Bennett, being first sworn, deposes and says that I am the property manager for Northpointe Townhomes Condominium Association. I have read the foregoing Complaint and if called as a witness herein, could testify competently that the facts stated therein are true to my own personal knowledge.

Signed: _____

[Print Name]: Jonathon J Bennett

Sworn to and subscribed before me
this 21 day of November, 2022:

Douglas P Moores Notary Public
Wayne County, Michigan

**DOUGLAS P MOORES**
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires Sept 27, 2023
Acting in the County of Wayne

Acting in _Wayne_ County, Michigan
My Commission Expires: 09-27-2023

1



2020041571 L: 55591 P: 350 WD
02/19/2020 08:46:21 AM Total Pages: 2
Bernard J. Youngblood, Register of Deeds - Wayne County, MI
ELECTRONICALLY RECORDED

MICHIGAN REAL ESTATE TRANSFER TAX
Wayne County County Tax Stamp #548310
02/19/2020
Receipt# 20-36031 L: 55591 P: 350
State Tax: $712.50 County Tax: $104.50

# WARRANTY DEED

## Statutory Form

---

**KNOW ALL MEN BY THESE PRESENTS:** That, **Ray Arfan**, Grantor(s)
Whose address is 4507 South Roy Rogers Way, Gilbert, Arizona 85297

Conveys and Warrants to **MegMad Family Trust,** Grantee(s)
Whose address is 3373 Reeves Dr, Melvindale, MI 48122

The following described premises situated in the **City of Melvindale, County of Wayne, State of Michigan,** to-wit:

Unit No. 58, Northpointe Townhomes Condominium, according to the Master Deed recorded in Liber 37283, Page 1, as amended, and designated as Wayne County Condominium Subdivision Plan No. 686, together with rights in the general common elements and the limited common elements as shown on the Master Deed and as described in Act 59 of the Public Acts of 1978, as amended.

More commonly known as **3373 Reeves Dr., Melvindale, Michigan 48122**
Parcel ID No.: **47-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-000**

The Grantor grants to the Grantee the right to make ________ divisions under section 108 of the Land Division Act, Act No. 288 of the Public Acts of 1967, as amended.

This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices that may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

For the full consideration of $95,000.00.

Subject to existing building and use restrictions, easements, and zoning ordinances, if any.

Effective Date: **February 5, 2020**

This is to certify that there are no delinquent property taxes owed to our office on this property for five years prior to the date of the Instrument. No representation is made as to the status of any tax liens or or titles owed to any other entities. Taxes in process of local collection or before PRE denial are NOT EXAMINED
Eric R Sabree, Wayne County Treasurer
No. E - 93242 Date: 02/19/2020 Clerk: CB

**File #: 44431**

Signed & Sealed:

Ray Arfan

STATE OF  ARIZONA      )
                       ) ss.
COUNTY OF  MARICOPA    )

The foregoing instrument was acknowledged before me this **February  05 , 2020** by **Ray Arfan.**

My commission expires: 03 / 31 /2023

Notary Public

MICHAEL MENZIE DOUGLAS
Notary Public - Arizona
Maricopa County
Commission # 563784
My Commission Expires March 31, 2023

Drafted by:
**Ray Arfan**
**4507 South Roy Rogers Way**
**Gilbert, Arizona 85297**

Return to: **Kara L. Gresser**
**Leading Edge Title Agency**
**37000 Grand River Ave., Ste. 100**
**Farmington Hills, MI 48335-2880**
**Phone: (248) 352-0022 | Fax: (888) 391-4048**

B

LI-37283      Pa-23

## NORTHPOINTE TOWNHOMES CONDOMINIUM

### EXHIBIT A

### BY-LAWS

### ARTICLE I
### ASSOCIATION OF CO-OWNERS

Northpointe Townhomes Condominium, a residential Condominium Project located in the City of Melvindale, Wayne County, Michigan, shall be administered by an Association of Co-owners which shall be a nonprofit corporation, hereinafter called the "Association", organized under the applicable laws of the State of Michigan, and responsible for the management, maintenance, operation and administration of the Common Elements, easements and affairs of the Condominium Project in accordance with the Condominium Documents and the laws of the State of Michigan. These By-Laws shall constitute both the By-Laws referred to in the Master Deed and required by Section 3(8) of the Act and the By-Laws provided for under the Michigan Nonprofit Corporation Act. Each Co-owner shall be entitled to membership and no other person or entity shall be entitled to membership. The share of a Co-owner in the funds and assets of the Association cannot be assigned, pledged or transferred in any manner except as an appurtenance to his Unit. The Association shall keep current copies of the Master Deed, all amendments to the Master Deed, and other Condominium Documents for the Condominium Project available at reasonable hours to Co-owners, prospective purchasers and prospective mortgagees of Units in the Condominium Project. All Co-owners in the Condominium Project and all persons using or entering upon or acquiring any interest in any Unit therein or the Common Elements thereof shall be subject to the provisions and terms set forth in the aforesaid Condominium Documents.

### ARTICLE II
### ASSESSMENTS

All expenses arising from the management, administration and operation of the Association in pursuance of its authorizations and responsibilities as set forth in the Condominium Documents and the Act shall be levied by the Association against the Units and the Co-owners thereof in accordance with the following provisions:

Section 1.      Assessments for Common Elements. All costs incurred by the Association in satisfaction of any liability arising within, caused by, or connected with the General Common Elements or the administration of the Condominium Project shall constitute expenditures affecting the administration of the Condominium Project, and all sums received as the proceeds of, or pursuant to, any policy of insurance securing the interest of the Co-owners against liabilities or losses arising within, caused by, or connected with the General Common Elements or the administration of the Condominium Project shall constitute receipts affecting the administration of the Condominium Project, within the meaning of Section 54(4) of the Act.

Section 2.      Determination of Assessments.   Assessments shall be determined in accordance with the following provisions:

LI-37283          Pa-24

(a)     Annual Budget. The Board of Directors of the Association shall establish an annual budget in advance for each fiscal year and such budget shall project all expenses for the forthcoming year which may be required for the proper operation, management and maintenance of the Condominium Project, including a reasonable allowance for contingencies and reserves. An adequate reserve fund for maintenance, repairs and replacement of those General Common Elements that must be repaired or replaced on a periodic basis shall be established in the budget and must be funded by regular payments as set forth in Section 3 below rather than by special assessments. At a minimum, the reserve fund shall be equal to ten (10%) percent of the Association's current annual budget on a noncumulative basis. Since the minimum standard required by this subparagraph may prove to be inadequate for this particular project, the Association of Co-owners should carefully analyze the Condominium Project to determine if a greater amount should be set aside, or if additional reserve funds should be established for other purposes from time to time. Upon adoption of an annual budget by the Board of Directors, copies of the budget shall be delivered to each Co-owner and the assessment for said year shall be established based upon said budget, although failure to deliver a copy of the budget to each Co-owner shall not affect or in any way diminish the liability of any Co-owner for any existing or future assessments. Should the Board of Directors at any time decide, in the sole discretion of the Board of Directors, that the assessments levied are or may prove to be insufficient (1) to pay the costs of operation and management of the Condominium, (2) to provide repairs or replacements of existing General Common Elements, (3) to provide additions to the General Common Elements not exceeding Five Thousand ($5,000.00) Dollars annually for the entire Condominium Project, or (4) in the event of emergencies, the Board of Directors shall have the authority to increase the general assessment or to levy such additional assessment or assessments as it shall deem to be necessary. The Board of Directors also shall have the authority, without a Co-owner's consent, to levy assessments pursuant to the provisions of Article V, Section 3 hereof regarding the Association's responsibilities for repair and maintenance. The discretionary authority of the Board of Directors to levy assessments pursuant to this subparagraph shall rest solely with the Board of Directors for the benefit of the Association and the members thereof, and shall not be enforceable by any creditors of the Association or of the members thereof.

(b)     Special Assessments. Special assessments, in addition to those required in subparagraph (a) above, may be made by the Board of Directors from time to time and approved by the Co-owners as hereinafter provided to meet other requirements of the Association, including, but not limited to: (1) assessments for additions to the General Common Elements of a cost exceeding Five Thousand ($5,000.00) Dollars for the entire Condominium Project per year, (2) assessments to purchase a Unit upon foreclosure of the lien for assessments described in Section 5 hereof, or (3) assessments for any other appropriate purpose not elsewhere herein described. Special assessments referred to in this subparagraph (c) (but not including those assessments referred to in subparagraph 2(a) above, which shall be levied in the sole discretion of the Board of Directors) shall not be levied without the prior approval of more than sixty (60%) percent of all Co-owners. The authority to levy assessments pursuant to this subparagraph is solely for the benefit of the Association and the members thereof and shall not be enforceable by any creditors of the Association or of the members thereof.

2

Li-37283      Pa-25

Section 3.    Apportionment of Assessments and Penalty for Default. Unless otherwise
provided herein or in the Master Deed, all assessments levied against the Co-owners to cover
expenses of administration shall be apportioned among and paid by the Co-owners in
accordance with the percentage of value allocated to each Unit in Article VI of the Master Deed,
without increase or decrease for the existence of any rights to the use of Limited Common
Elements appurtenant to a Unit.  Annual assessments as determined in accordance with Article
II, Section 2(a) above shall be payable by Co-owners in twelve equal monthly installments,
quarterly, semi-annually or annually in the discretion of the Board of Directors, subject to Section
7 below, commencing with acceptance of a deed to or a land contract vendee's interest in a Unit,
or with the acquisition of fee simple title to a Unit by any other means. The payment of an
assessment shall be in default if such assessment, or any part thereof, is not paid to the
Association in full on or before the due date for such payment.  A late fee of Twenty Five
($25.00) Dollars per month shall be imposed on each installment which is in default for ten (10)
or more days.  The Association may increase or assess such other reasonable automatic late
charges or may, pursuant to Article XX hereof, levy additional fines for late payment of
assessments as the Association deems necessary from time to time. Each Co-owner (whether
one or more persons) shall be, and remain, personally liable for the payment of all assessments
(including fines for late payment and costs of collection and enforcement of payment) pertinent
to his Unit which may be levied while such Co-owner is the owner thereof, except a land contract
purchaser from any Co-owner including Developer shall be so personally liable and such land
contract seller shall not be personally liable for all such assessments levied up to and including
the date upon which such land contract seller actually takes possession of the Unit following
extinguishment of all rights of the land contract purchaser in the Unit.  Payments on account of
installments of assessments in default shall be applied as follows: first, to costs of collection and
enforcement of payment, including reasonable attorneys' fees; second, to any interest charges
and fines for late payment on such installments; and third, to installments in default in order of
their due dates.

Section 4.  _  Waiver of Use or Abandonment of Unit.  No Co-owner may exempt himself
from liability for his contribution toward the expenses of administration by waiver of the use or
enjoyment of any of the Common Elements or by the abandonment of his Unit.

Section 5.    Enforcement.

(a)    Remedies.  In addition to any other remedies available to the Association,
the Association may enforce collection of delinquent assessments by a suit at law for a
money judgment or by foreclosure of the statutory lien that secures payment of
assessments. In the event of default by any Co-owner in the payment of any installment
of the annual assessment levied against his Unit, the Association shall have the right to
declare all unpaid installments of the annual assessment for the pertinent fiscal year
immediately due and payable. The Association also may discontinue the furnishing of
services to a Co-owner in default upon seven (7) days' written notice to such Co-owner
of its intention to do so.  A Co-owner in default shall not be entitled to utilize any of the
General Common Elements of the Condominium and shall not be entitled to vote at any
meeting of the Association so long as such default continues; provided, however, this
provision shall not operate to deprive any Co-owner of ingress or egress to and from his
Unit. In a judicial foreclosure action, a receiver may be appointed to collect a reasonable
rental for the Unit from the Co-owner thereof or any persons claiming under him. The

3

Li-37283    Pa-26

Association may also assess fines for late payment or non-payment of assessments in accordance with the provisions of Article XX of these By-Laws. All of these remedies shall be cumulative and not alternative.

(b)    Foreclosure Proceedings.  Each Co-owner, and every other person who from time to time has any interest in the Condominium, shall be deemed to have granted to the Association the unqualified right to elect to foreclose the lien securing payment of assessments either by judicial action or by advertisement. The provisions of Michigan law pertaining to foreclosure of mortgages by judicial action and by advertisement, as the same may be amended from time to time, are incorporated herein by reference for the purposes of establishing the alternative procedures to be followed in lien foreclosure actions and the rights and obligations of the parties to such actions.

(c)    Power of Sale.  Further, each Co-owner and every other person who from time to time has any interest in the Condominium shall be deemed to have authorized and empowered the Association to sell or to cause to be sold the Unit with respect to which the assessment(s) is or are delinquent and to receive, hold and distribute the proceeds of such sale in accordance with the priorities established by applicable law. Each Co-owner of a Unit in the Condominium acknowledges that at the time of acquiring title to such Unit, he was notified of the provisions of this subparagraph and that he voluntarily, intelligently and knowingly waived notice of any proceedings brought by the Association to foreclose by advertisement the lien for nonpayment of assessments and a hearing on the same prior to the sale of the subject Unit.

(d)    Notice of Action.  Notwithstanding the foregoing, neither a judicial foreclosure action nor a suit at law for a money judgment shall be commenced, nor shall any notice of foreclosure by advertisement be published, until the expiration of ten (10) days after mailing, by first class mail, postage prepaid, addressed to the delinquent Co-owner(s) at his or their last known address, a written notice that one or more installments of the annual assessment levied against the pertinent Unit is or are delinquent and that the Association may invoke any of its remedies hereunder if the default is not cured within ten (10) days after the date of mailing. Such written notice shall be accompanied by a written affidavit of an authorized representative of the Association that sets forth (i) the affiant's capacity to make the affidavit, (ii) the statutory and other authority for the lien, (iii) the amount outstanding (exclusive of interest, costs, attorneys' fees and future assessments), (iv) the legal description of the subject Unit(s), and (v) the name(s) of the Co-owner(s) of record. Such affidavit shall be recorded in the office of the Register of Deeds of Wayne County prior to commencement of any foreclosure proceedings, but it need not have been recorded as of the date of mailing as aforesaid. If the delinquency is not cured within the ten (10) day period, the Association may take such remedial action as may be available to it hereunder or under Michigan law. In the event the Association elects to foreclose the lien by advertisement, the Association shall so notify the delinquent Co-owner and shall inform him that he may request a judicial hearing by initiating suit against the Association.

(e)    Expenses of Collection.  The expenses incurred in collecting unpaid assessments, including interest, costs, actual attorneys' fees (not limited to statutory fees)

4

Li-37283      Pa-27

and advances for taxes or other liens paid by the Association to protect its lien, shall be chargeable to the Co-owner in default and shall be secured by the lien on his Unit.

Section 6.   Liability of Mortgagee.   Notwithstanding any other provisions of the Condominium Documents, the holder of any first mortgage covering any Unit in the Condominium Project which comes into possession of the Unit pursuant to the remedies provided in the mortgage or by deed (or assignment) in lieu of foreclosure, or any purchaser at a foreclosure sale, shall take the property free of any claims for unpaid assessments or charges against the mortgaged Unit which accrue prior to the time such holder comes into possession of the Unit (except for claims for a pro rata share of such assessments or charges resulting from a pro rata reallocation of such assessments or charges to all Units including the mortgaged Unit).

Section 7.   Developer's Responsibility for Assessments; Responsibility of Certain Designated Residential Builders.   Until the First Annual Meeting is held in accordance with the provisions of Article IX, Section 2 of these By-Laws, the Developer, even though a member of the Association, shall not be responsible for payment of the regular assessments of the Association established pursuant to subsection 2(a) above.  The Developer, however, shall during the period up to the First Annual Meeting pay a proportionate share of the Association's current maintenance expenses actually incurred from time to time based upon the ratio of completed Units owned by the Developer at the time the expense is incurred to the total number of completed Units in the Condominium.  In no event shall the Developer be responsible for payment, until after the First Annual Meeting, of any assessments for deferred maintenance, reserves for replacement, capital improvements or other special assessments, except with respect to occupied Units owned by it.  Any assessments levied by the Association against the Developer for any purposes shall be void without Developer's consent.  Further, the Developer shall in no event be liable for any assessment levied in whole or in part to purchase any Unit from the Developer or to finance any litigation or other claims against the Developer, any cost of investigating and preparing such litigation or claim or any similar or related costs.  After the First Annual Meeting, Developer shall be responsible for payment of the full amount of any regular Association assessments for all completed Units owned by it.  Developer shall not be responsible at any time for payment of regular assessments or payment of any expenses whatsoever with respect to unbuilt Units notwithstanding the fact that such unbuilt Units may have been included in the Master Deed.  "Completed Unit" shall mean a Unit with respect to which a certificate of occupancy has been issued by the local public authority, with the exception of any Unit being used as a model or any "spec" Unit owned by either the Developer of any builder designated by the Developer, which shall not be deemed to be a "Completed Unit" notwithstanding that a temporary or final certificate of occupancy has been issued.  Residential builders licensed as such under the Michigan State Occupational Code that acquire from the Developer the right to construct one or more of the Units in the Condominium for purposes of resale shall, for purposes of determining liability for assessments imposed by the Association, be treated in the same manner as set forth herein for the Developer.

Section 8.   Property Taxes and Special Assessments.   All property taxes and special assessments levied by any public taxing authority shall be assessed in accordance with Section 131 of the Act.

Section 9.   Personal Property Tax Assessment of Association Property.   The Association shall be assessed as the person or entity in possession of any tangible personal

5

LI-37283          Pg-28

property of the Condominium owned or possessed in common by the Co-owners, and personal property taxes based thereon shall be treated as expenses of administration.

Section 10.   Construction Lien.  A construction lien otherwise arising under Act No. 497 of the Michigan Public Acts of 1980, as amended, shall be subject to Section 132 of the Act.

Section 11.   Statement as to Unpaid Assessments.  The purchaser of any Unit may request a statement of the Association as to the amount of any unpaid Association assessments thereon, whether regular or special.  Upon written request to the Association accompanied by a copy of the executed purchase agreement pursuant to which the purchaser holds the right to acquire a Unit, the Association shall provide a written statement of such unpaid assessments as may exist or a statement that none exist, which statement shall be binding upon the Association for the period stated therein. The written statement from the Association shall also disclose the amounts of any interest, late charges, fines, costs and/or attorneys' fees due and owing with respect to the Unit (the "Related Costs").  Upon the payment of the sums set forth in the Association's written statement within the period stated, the Association's lien for assessments and Related Costs as to such Unit shall be deemed satisfied; provided, however, that the failure of a purchaser to request such statement at least five (5) days prior to the closing of the purchase of such Unit shall render any unpaid assessments and Related Costs and the lien securing the same fully enforceable against such purchaser and the Unit itself, to the extent provided by the Act. Under the Act, unpaid assessments and Related Costs constitute a lien upon the Unit and the proceeds of sale thereof prior to all claims except real property taxes and first mortgages of record.

<div align="center">

ARTICLE III
ARBITRATION

</div>

Section 1.  .  Scope and Election. Disputes, claims or grievances arising out of or relating to the interpretation or the application of the Condominium Documents, or any disputes, claims or grievances arising among or between Co-owners and the Association shall, upon the election and written consent of the parties to any such disputes, claims or grievances and written notice to the Association, be submitted to arbitration and the parties thereto shall accept the arbitrator's decision as final and binding.  At the exclusive option of the Association, a contract to settle by arbitration shall be executed by the Developer with respect to any claim that might be the subject of a civil action against the Developer, which claim arises out of or relates to the Common Elements of the Condominium Project if the amount of the claim is Ten Thousand ($10,000.00) Dollars or less. At the exclusive option of a Co-owner, any claim which might be the subject of a civil action against the Developer which involves an amount less than Two Thousand Five Hundred ($2,500.00) Dollars and arises out of or relates to a Co-owner's Unit or the Condominium Project, shall be settled by binding arbitration. The Commercial Arbitration Rules of the American Arbitration Association as amended and in effect from time to time hereafter shall be applicable to any such arbitration.

Section 2.   Judicial Relief.  In the absence of the election and written consent of the parties pursuant to Section 1 above, no Co-owner or the Association shall be precluded from petitioning the courts to resolve any such disputes, claims or grievances.

<div align="center">

6

</div>

Li-37283     Pg-29

Section 3.  .  Election of Remedies.  Such election and written consent by Co-owners or
the Association to submit any such dispute, claim or grievance to arbitration shall preclude such
parties from litigating such dispute, claim or grievance in the courts.

Section 4.     Binding Effect of Election and Consent in Purchase Agreement or Land
Contract.  If the purchase agreement, land contract or other document used by a Co-owner to
purchase a Unit in the Condominium (the "Purchase Document") includes an election and
consent to arbitration by the Co-owner, either in his or her individual capacity or as a member
of the Association, with respect to claims by the Co-owner against the Developer for amounts
equal to or more than Two Thousand Five Hundred ($2,500.00) Dollars or claims by the
Association against the Developer for amounts equal to or more than Ten Thousand
($10,000.00) Dollars, such election and consent shall survive the closing of Co-owner's purchase
of the Unit and shall thereafter continue to bind the electing and consenting Co-owner and his
or her heirs, successors and assigns in accordance with the terms and conditions of the
Purchase Document.  Such election and consent by a Co-owner to arbitration as may be
included in a Purchase Document shall not be rendered invalid by the conditioning of arbitration
of specific claims on the future election and consent of the Developer.

ARTICLE IV
INSURANCE

Section 1.     Association Coverage.  The Association shall carry all risk insurance
covering all commonly insured occurrences against all risks of direct physical loss; and against
all occurrences commonly insured against for death, bodily injury, and property damage arising
out of or in connection with the use, ownership or maintenance of the Common Elements,
including the roads and walks within the Condominium.  Such insurance shall include, but not
be limited to, fire and extended coverage, vandalism and malicious mischief, host liability, all
inclusive liability insurance and worker's compensation insurance, where applicable and
available.

(a)     Basic Policy Provisions.  Insurance policies carried by the Association shall,
if available without extraordinary premium charges, provide that:

(i)     Each Unit Owner is an insured person under the policy with respect
to liability arising out of his interest in the Common Elements or membership in the
Association.

(ii)     The insurer waives its right to subrogation under the policy against
any Co-owner or member of such Co-owner's household.

(iii)     No act or omission by any Co-owner, unless acting within the scope
of his authority on behalf of the Association, will void the policy or be a condition for
recovery under the policy.

(iv)     If, at the time of a loss under the policy, there is other insurance in
the name of a Co-owner covering the same risk covered by the policy, the Association's
policy shall provide primary insurance.

7

Li-37283      Pa-30

(v)     That insurance proceeds must be disbursed first for repairs or restoration of the damaged property, unless and subject to the following:

A.     The Condominium is terminated;

B.     Repair or replacement would be illegal under any state or local health or safety statute or ordinance; or

C.     More than eighty (80%) percent of the Co-owners of all of the Units in the Condominium vote not to rebuild. The cost of repair or replacement in excess of insurance proceeds and reserves is a common expense. If the entire Condominium is not repaired or replaced, then: (1) the insurance proceeds attributable to the damaged Common Elements must be used to restore the damaged area to a condition compatible with the remainder of the Condominium; (2) the insurance proceeds attributable to Units and Limited Common Elements which are not rebuilt must be distributed to the Co-owners of those Units and the Co-owners of the Units to which those Limited Common Elements were assigned, or to lien holders, as their interests may appear; and (3) the remainder of the proceeds must be distributed to all of the Co-owners or lien holders, as their interests may appear, in proportion to the Common Element interest of all of the Units. If the Co-owners vote not to rebuild any Unit, that Unit's allocated interests are automatically reallocated as if the Unit had been condemned under Article V, Section 5 of these By-Laws, and the Association shall promptly prepare, execute, and record an amendment to the Master Deed reflecting the reallocations.

(b)     <u>Insurance Replacement Values for Common Elements</u>.   All General Common Elements of the Condominium shall be insured against all risks, in an amount equal to the current insurable replacement value, excluding foundation and excavation costs, as determined annually by the Board of Directors of the Association or by an insurance agent retained by the Board of Directors at each anniversary renewal date of said insurance. The Board may engage professional appraisers for this purpose.

(c)     <u>Insurance for Standard Improvements Located Within Unit Interiors and Limited Common Elements</u>. The standard interior improvements in all Units (including the Limited Common Elements appurtenant to a Unit) shall be covered by all risk insurance procured and paid for by the Association as part of its policy of insuring the Common Elements in amounts equal to the insurable replacement value of all of the interior structural and attendant and related building materials required to establish a structure for the Unit at the points and surfaces where it begins, including, without limitation, the finished subfloors; basement floors; basement walls; drywall; cabinets, finished carpentry; electrical and plumbing conduits, supplies and fixtures; tile; lighting fixtures; doors; door jams; glass doorwalls; hardware and all other materials as may be defined as standard by the Board of Directors of the Association from time to time in a published set of specifications (the "Standard Specifications"). Should the Board fail to publish such specifications, the Standard Specifications to be used for repair and replacement shall be determined by reference to the original installations, given the passage of time, as a standard.

8

Li-37283     Pu-31

(d)     Premium Expenses.   All premiums of insurance purchased by the Association pursuant to these By-Laws shall be expenses of administration.

(e)     Receipt and Distribution of Proceeds of Insurance Policies.  Proceeds of all insurance policies owned by the Association shall be received by the Association, held in a separate account and distributed to the Association and the Co-owners and their mortgagees, as their interests may appear; provided, however, that whenever repair or reconstruction of damaged portions of the Condominium shall be required as provided in Article V of these By-Laws, the insurance proceeds received by the Association shall be first applied to such repair or reconstruction unless the other provisions of the Condominium Documents mandate otherwise.

Section 2.     Authority of Association to Maintain Insurance and Settle Claims.  Each Co-owner appoints the Association as his true and lawful attorney-in-fact to act in connection with all matters concerning the maintenance for all insurance for the Condominium Project, including the insurance to be carried by such Co-owner under this Article IV, Section 3 below, if the Co-owner fails to meet his responsibilities thereunder.  The Association as said attorney shall have full power and authority to purchase and maintain such insurance, to collect and remit premiums therefor, to collect proceeds and to distribute the same to the Association, the Co-owners and respective mortgagees, as their interests may appear (subject to limiting or defining provisions of the Condominium Documents), to execute releases of liability and to execute all documents and to do all things on behalf of the Association and any of its Co-owner members as shall be necessary to accomplish the foregoing.

Section 3.     Insurance Responsibilities of Co-Owners.  Each Co-owner shall be obligated and responsible for:

(a)     Obtaining all risk liability and property insurance (generally in the form of an HO(6) policy, or such other specifications as the Association may prescribe or as may be commonly extant from time to time, and herein sometimes referred to as "Co-owner's Insurance") with respect to the improvements, decorations and any other personal property in his Unit which have been added to the Standard Improvements defined (or to be defined) in Section 1(c) of this Article IV or any other property contained within his Unit which is not covered by the Association's policy.  This provision shall not preclude the Association from acquiring a blanket policy which covers the contents within a Unit under terms and conditions acceptable to the Association and the insurance carrier.

(b)     Providing insurance coverage for all risk liability for injury to property and persons occurring in the Unit to the limits prescribed from time to time by the Board of Directors of the Association, but in amounts not less than $100,000.00 for damage to property and $500,000.00 for injury to persons on a per event basis.

(c)     Insuring his personal property located within his Unit or elsewhere on the Condominium project.

All Co-owner property insurance shall be carried in an amount equal to the maximum insurable replacement value of said improvements.  A Co-owner's failure to fully insure his contents shall be a risk which he solely carries.  Each Co-owner shall, on or before the annual

9

Li-37283       Pg-32

anniversary dates of the issuance of his Co-owners' insurance, deliver certificates of such insurance to the Association. The Co-owner's policy of insurance shall also name the Association as an insured under his liability coverage. If a Co-owner fails to obtain such insurance (which may be assumed to be the case if the Co-owner fails to timely provide evidence thereof to the Association), the Association may obtain such insurance on behalf of such Co-owner and the premiums therefor (if not reimbursed by the Co-owner on demand) shall constitute a lien against the Co-owners's Unit which may be collected from the Co-owner in the same manner that Association assessments may be collected in accordance with Article II hereof. The Association shall under no circumstance have any obligation to obtain any of the insurance coverage described in this Section 3 or incur any liability to any person for failure to do so. The Association may, on its own or through its paid agents, maintain a roster of Co-owners's insurance setting forth such relevant data as it deems helpful and useful to monitor the implementation of this Section 3.

The Co-owner's policy hereunder shall contain a thirty (30) day non-cancelable clause with mandatory thirty (30) day notice of cancellation to be mailed to the Association.

Section 4.    Waiver of Rights of Subrogation. The Association and all Co-owners shall use their best efforts to cause all property and liability insurance carried by the Association or any Co-owner to contain appropriate provisions whereby the insurer waives its right of subrogation as to any claims against any Co-owner or the Association.

Section 5.    Additional Insurance.    The Association may, as an expense of administration, purchase an umbrella insurance policy which covers any risk required hereunder which was not covered due to lapse or failure to procure.

Section 6.    Modifications to Insurance Requirements and Criteria.  The Board of Directors of the Association may, with the consent of thirty-three and one-third (33-1/3%) percent of the Co-owners, revise the types, amounts, provisions, specifications and other provisions of this Article IV, except where prohibited by the Act.

ARTICLE V
RECONSTRUCTION, INSPECTION OR REPAIR

Section 1.    Responsibility for Reconstruction or Repair. If any part of the Condominium Premises shall be damaged as a result of fire, vandalism, weather or other natural or person caused phenomenon or casualty, the determination of whether or not it shall be reconstructed or repaired, and the responsibility therefor, shall be as follows:

(a)    General Common Elements.  If the damaged property is a General Common Element, the damaged property shall be rebuilt or repaired.

(b)    Unit or Improvements Thereon. If the damaged property is a Unit or an improvement thereon or appurtenance thereto, the Association shall expeditiously rebuild and/or repair the damaged property to the specifications set forth in these By-Laws. Pending rebuilding or repair, the Co-owner shall remove all debris and maintain the Unit and improvements thereon in a clean and sightly manner and in the best condition reasonable efforts can achieve. The Co-owner shall be responsible for the determination

10

Li-37283    Pg-33

and coordination of the rebuilding of internal improvements beyond the Standard Specifications established pursuant to Article IV, Section 1(c) above if the Co-owner elects to exceed the Standard Specifications. The Association may reject any changes to the Standard Specifications which it deems not to be in the best interest of the Condominium Project. No change to the exterior appearance of any building shall be permitted. The Association and Co-owner shall cooperate in coordinating their respective responsibilities.

Section 2.    Repair in Accordance with Master Deed. Reconstruction or repair shall be substantially in accordance with the Master Deed, the Condominium Subdivision Plan attached thereto as Exhibit B, and the original plans and specifications for the Condominium as updated by the published Standard Specifications.

Section 3.    Association Responsibility for Inspection and Repair.

(a)    Immediately after the occurrence of a casualty causing damage to property for which the Association has the responsibility of maintenance, repair and reconstruction, the Association shall obtain reliable and detailed estimates of the cost to place the damaged property in a condition as good as that existing before the damage. If the proceeds of insurance are not sufficient to defray the estimated cost of reconstruction or repair required to be performed by the Association, or if at any time during such reconstruction or repair, or upon completion of such reconstruction or repair, the funds for the payment of the cost thereof are insufficient, assessment shall be made against all Co-owners for the cost of reconstruction or repair of the damaged property in sufficient amounts to provide funds to pay the estimated or actual cost of repair. This provision shall not be construed to require replacement of mature trees and vegetation with equivalent trees or vegetation.

(b)    Certain parts of the Common Elements and Units (including without limitation roofs, utility equipment, the irrigation system, and landscaping) are covered by various manufacturers warranties and, in certain cases, warranty(ies) from the Developer. The Association shall be responsible to conduct inspections of the Common Elements and Units at least once per year, but in any event no less frequently than are required by the warranty(ies), to preserve any and all rights and make claims thereunder. In addition, the Association. In the event that the Association does not conduct such inspections or promptly notify the Developer within fifteen (15) days of the discovery of any alleged defects, the Developer will not be liable for replacement or repair of the alleged defects.

Section 4.    Timely Reconstruction and Repair. If damage to the Common Elements adversely affects the appearance of the Condominium, the Association shall proceed with replacement of the damaged property without delay.

Section 5.    Eminent Domain. The following provisions shall control upon any taking by eminent domain:

(a)    Taking of Unit or Improvements Thereon. In the event of any taking of all or any portion of a Unit by eminent domain, the award for such taking shall be paid to the Co-owner of such Unit and the mortgagee thereof, as their interests may appear,

11

LI-37283        Pa-34

notwithstanding any provision of the Act to the contrary. If a Co-owner's entire Unit is taken by eminent domain, such Co-owner and his mortgagee shall, after acceptance of the condemnation award therefor, be divested of all interest in the Condominium Project.

(b)      Taking of Common Elements. If there is any taking of any portion of the Common Elements, the condemnation proceeds relative to such taking shall be paid to the Co-owners and their mortgagees in proportion to their respective interests in the Common Elements and the affirmative vote of more than 50% of the Co-owners shall determine whether to rebuild, repair or replace the portion so taken or to take such other action as they deem appropriate.

(c)      Continuation of Condominium After Taking. In the event the Condominium Project continues after taking by eminent domain, then the remaining portion of the Condominium Project shall be resurveyed and the Master Deed amended accordingly, and, if any Unit shall have been taken, then Article VI of the Master Deed shall also be amended to reflect such taking and to proportionately readjust the percentages of value of the remaining Co-owners based upon the continuing value of the Condominium of 100%. Such amendment may be effected by an officer of the Association duly authorized by the Board of Directors without the necessity of execution or specific approval thereof by any Co-owner.

(d)      Notification of Mortgagees. In the event any Unit in the Condominium, or any portion thereof, or the Common Elements or any portion thereof, is made the subject matter of any condemnation or eminent domain proceeding or is otherwise sought to be acquired by a condemning authority, the Association promptly shall so notify each institutional holder of a first mortgage lien on any of the Units in the Condominium.

(e)      Applicability of the Act. To the extent not inconsistent with the foregoing provisions, Section 133 of the Act shall control upon any taking by eminent domain.

Section 6.      Priority of Mortgagee Interests. Nothing contained in the Condominium Documents shall be construed to give a Co-owner or any other party priority over any rights of first mortgagees of Condominium Units pursuant to their mortgages in the case of a distribution to Co-owners of insurance proceeds or condemnation awards for losses to or a taking of Condominium Units and/or Common Elements.

Section 7.      Notification of FHLMC, FNMA, Etc. In the event any mortgage in the Condominium is held by the Federal Home Loan Mortgage Corporation ("FHLMC"), Federal National Mortgage Association ("FNMA"), Government National Mortgage Association ("GNMA"), the Michigan State Housing Development Authority ("MSHDA"), or insured by the Veterans Administration ("VA"), Department of Housing and Urban Development ("HUD"), Federal Housing Association ("FHA") or any private or public mortgage insurance program, then the Association shall give the aforementioned parties written notice, at such address as they may from time to time direct, of any loss to or taking of the Common Elements of the Condominium if the loss or taking exceeds Ten Thousand and 00/100 ($10,000.00) Dollars in amount or damage to a Condominium Unit or dwelling covered by a mortgage purchased, held or insured by them.

12

Li-37283    Pu-35

## ARTICLE VI
## RESTRICTIONS

Section 1. __ Uses Permitted. No Unit shall be used for other than single-family __ residential purposes; provided, however, that from time to time a Unit may also be occupied by a reasonable number of guests (which may include all of the members of another family). In no event may any Unit be used as a residence for more than one family and no Unit shall be used _ to conduct any business, trade or profession; provided, however, that any Co-owner may maintain a professional library in a Unit, maintain personal records and conduct personal business within a Unit, and participate in business or professional telephone calls from within the Unit.

Section 2.    Architectural and Aesthetic Control; Rules and Regulations.

(a)    Aesthetic and Architectural Control. The Board of Directors of the Association, on its own initiative, acting through the Architectural Control Committee, may issue and enforce reasonable rules and uniform rules which deal with one or more of the following:

(i)    Posting of "For Sale" signs;

(ii)    The exterior appearance of exterior and interior (which are visible from the exterior) window treatments;

(iii)    The display, maintenance or placement of any plants, furniture, decorations or any other item on balconies, patios or decks;

(iv)    The establishment and publication of Standard Specifications consistent with the Condominium Documents for the rebuilding, repair or renovation of the exteriors and interiors of each Unit and the Common Elements;

(v)    Any other rules and regulations permitted by the Act and the Condominium Documents which are reasonable and promulgated for the common benefit of the Co-owners.

The Architectural Control Committee may establish and publish other rules and regulations which deal with the implementation of the criteria it establishes for architectural and aesthetic controls which shall be uniformly, fairly and reasonably applied.

(b)    General Rules and Regulations. Reasonable regulations consistent with all laws and the Condominium Documents concerning the use of the Common Elements, including any recreational facilities constructed within the Condominium, or the rights and responsibilities of the Co-owners and the Association with respect to the Condominium or the manner of operation of the Association and of the Condominium may be made and amended from time to time by the Architectural Control Committee. Copies of all such rules, regulations and amendments thereto shall be furnished to all Co-owners or posted on a General Common Element.

13

L1-37283     Pa-36

Section 3.    Proscribed Activities.  No noxious or offensive activity shall be performed within any Unit or upon the Common Elements, nor shall anything be done thereon that tends to cause embarrassment, discomfort, annoyance or nuisance to the occupants or Co-owners's of Units within the Condominium.  No charcoal grills or grills using any other type of fuel, other than propane gas, shall be used anywhere within the Condominium, including, without limitation, on any deck, balcony, patio or porch.  There shall not be maintained any animal or device or thing of any sort whose normal activities or existence is in any way noxious, noisy, dangerous, unsightly, unpleasant or of a nature as may diminish or destroy the reasonable enjoyment of Units.  The Architectural Control Committee shall be the final arbiter of whether a particular animal, device or thing is in violation of the foregoing restrictions.  No Co-owner shall do or permit anything to be done or keep or permit to be kept in the Co-owner's Unit or on the Common Elements anything that will increase the cost of insurance on the Condominium without the written approval of the Architectural Control Committee, and each Co-owner shall pay to the Association the increased cost of insurance premiums resulting from any such activity or the maintenance of any such condition even if approved, which increased cost may be assessed to and collected from the Co-owner in the manner provided in Article II hereof.

Section 4.    Animals or Pets.  No animals or fowl (except animals normally kept as household pets) shall be kept or maintained on any Unit at any time.  Any pets kept in the Condominium shall have such care and restraint as not to be obnoxious on account of noise, odor or unsanitary conditions.  No savage or dangerous animal shall be kept.  No animal may be permitted to run loose upon the Common Elements, and any animal shall at all times be on a leash and attended to  by a responsible person while on the Common Elements, and shall immediately remove all fecal material from the Condominium.  Any person who causes or permits an animal to be brought or kept on the Condominium property shall indemnify the Association and hold it harmless for any loss, damage or liability which the Association may sustain as a result of the presence of such animal on the Condominium property.  The Association will have the right to levy fines against Co-owners who do not comply with these provisions and the right to pursue injunctive relief for the removal of any animal kept or maintained in violation of this Section 4.

Section 5.    Vehicles.

(a)    No trailers, boats, aircraft, commercial vehicles, boat trailers, boats, camping vehicles, camping trailers, snowmobile trailers, jet skis, jet ski trailers or other recreational vehicles, or any other vehicles, other than passenger cars, passenger vans, pick-up trucks and sport utility vehicles shall be parked or maintained within the Condominium unless in an attached garage included within a Unit.

(b)    No vehicle that is used to promote a commercial enterprise, or used in connection with such an enterprise, shall be parked in the Condominium, or on any Unit, unless parked in a garage as provided above, except while making deliveries or pickups in the normal course of business.  Parking on the roadways and streets within the Condominium is expressly prohibited; except that on special occasions, such as a graduation party, Co-owners may request permission from the Association to permit parking on the streets within the Condominium for a specified number of vehicles for a specified period of time.  The Association, through its Board of Directors, shall have the right to adopt reasonable rules and regulations governing the granting of permission for

14

LI-37283     Pg-37

temporary parking on the streets of the Condominium for the purpose of limiting the number of times that Co-owners may request such permission or restricting the areas in which such temporary parking is permitted.

Section 6.  Signs, Advertising.  No commercial signs of any kind shall be placed or maintained within or upon any Unit except with the written permission of the Architectural Control Committee or except as may be required by legal proceedings.  If such permission is granted, the Board of Directors shall have the right to restrict the size, color and content of such signs.

Section 7.  Co-owner Maintenance.  Each Co-owner shall maintain his or her Unit and any Limited Common Elements appurtenant thereto for which the Co-owner has maintenance responsibility in a safe, clean and sanitary condition.  All vacant Units must be kept free of debris, litter and trash and appropriate measures must be taken to protect such Units from winter weather-caused damage.  The photocell- or timer-operated exterior porch light on the garage of each Unit must be maintained in operable condition by the Co-owner of the Unit.  Each Co-owner shall be responsible for damages or costs to the Association resulting from negligent damage to or misuse of any of the Common Elements by the Co-owner or the Co-owner's family, guests, agents or invitees, unless such damages or costs are covered by insurance carried by the Association in which case there shall be no such responsibility, unless reimbursement to the Association is excluded by virtue of a deductible provision, in which case the responsible Co-owner shall bear the expense to the extent of the deductible amount.  Any costs or damages to the Association may be assessed to and collected from the responsible Co-owner in the manner provided in Article II hereof.

Section 8.  Common Elements.  The Common Elements shall not be obstructed in any way nor shall they be used for purposes other than for which they are reasonably and absolutely intended.  No Co-owner may leave personal property of any description (including by way of example and not limitation: bicycles, vehicles, chairs and benches) unattended on or about the Common Elements.  Use of all Common Elements may be limited to such times and in such manner as the Architectural Control Committee shall determine by duly adopted regulations.

Section 9.  Alterations and Modifications of the Common Elements.  No Co-owner shall make changes in any of the Common Elements, limited or general (including, without limitation, the addition or removal of any plants, trees, shrubs or flowers), without the express written approval of the Architectural Control Committee.  The Architectural Control Committee may adopt reasonable rules permitting the addition and maintenance of plants and flowers to such limited common element deck and/or patio areas as may be situated within the Condominium.  No Co-owner shall construct or maintain any improvement of any sort upon any General or Limited Common Elements, including the storm water detention areas and the landscaped buffer area near the eastern boundary of the Condominium.

Section 10.  Weapons.  No Co-owner shall use, or permit the use by any occupant, agent, employee, invitee, guest or member of his or her family of any firearms, air rifles, pellet guns, B-B guns, bows and arrows, sling shots, or other similar weapons, projectiles or devices anywhere on or about the Condominium.

Section 11.  Leasing and Rental.  Developer may rent any number of Units at any time, without limitation as to the term of occupancy.  Co-owners, excluding the Developer, may rent

15

Li-37283     Pg-38

any number of Units at any time for any term of occupancy of not less than six (6) months and covering not less than the entire Unit, subject to the following:

(a)    Disclosure of Lease Terms to Association.  A Co-owner, including the Developer, desiring to rent or lease a Unit as permitted above, shall disclose that fact in writing to the Association at least ten (10) days before presenting a lease form to a potential lessee and, at the same time, shall supply the Association with a copy of the exact lease form for its review for compliance with the Condominium Documents.  If Developer desires to rent Units before the Transitional Control Date, it shall notify either the Advisory Committee or each Co-owner in writing.  All leases must be in writing.

(b)    Compliance with Condominium Documents.  Tenants and non-owner occupants shall comply with all of the conditions of the Condominium Documents and all leases and rental agreements shall so state.

(c)    Procedures in the Event of Noncompliance with Condominium Documents. If the Association determines that the tenant or non-owner occupant has failed to comply with the conditions of the Condominium Documents, the Association shall take the following actions:

(i)    The Association shall notify the Co-owner by certified mail advising of the alleged violation by the tenant.

(ii)    The Co-owner shall have fifteen (15) days (or such additional time as may be granted by the Association if the Co-owner is diligently proceeding to cure) after receipt of such notice to investigate and correct the alleged breach by the tenant or advise the Association that a violation has not occurred.

(iii)    If after 15 days the Association believes that the alleged breach is not cured or may be repeated, it may institute an action for eviction against the tenant or non-owner occupant and, in the same action sue the Co-owner and tenant or non-owner occupant for money damages for breach of the conditions of the Condominium Documents. The relief provided for in this subparagraph may be by summary proceeding. The Association may hold both the tenant and the Co-owner liable for any damages to the Common Elements caused by the Co-owner or tenant in connection with the Unit or Condominium.  If the Association is under the control of the Developer, individual Co-owners may pursue the judicial relief provided in this subparagraph (c)(iii) derivatively on behalf of the Association.

(d)    Notice to Co-owner's Tenant Permitted When Co-owner is in Arrears to the Association for Assessments.  When a Co-owner is in arrears to the Association for assessments, the Association may give written notice of the arrearage to a tenant occupying the Residence within the Co-owner's Unit under a lease or rental agreement and the tenant, after receiving the notice, shall deduct from rental payments due the Co-owner the arrearage and further assessments as they fall due and pay them to the Association.  The deductions shall not constitute a breach of the rental agreement or lease by the tenant.  If the tenant, after being notified, fails or refuses to remit rent

16

otherwise due the Co-owner to the Association, then the Association may take the following actions:

(i) The Association may issue a statutory notice to quit for non-payment of rent to the tenant and shall have the right to enforce that notice by summary proceeding.

(ii) The Association may initiate proceedings for eviction and money damages as described in subparagraph (3)(iii) above following the tenant's failure to remit rent otherwise due within fifteen (15) days after issuance of notice by the Association to the tenant by certified mail.

These leasing provisions in this Section 11 may not be revised prior to the Transitional Control Date without the Developer's prior written consent. Any revision to these leasing provisions shall be subject to the limitation set forth in Article VIII, paragraph (d) of the Master Deed.

Section 12. Non-Disturbance of Natural Areas. No Co-owner shall cause or permit any disturbance to such buffer areas as may be installed within the Condominium, whether or not such area is landscaped, nor shall any Co-owner cause or permit any activity that shall cause or contribute to the erosion or crumbling of the banks of any storm water detention area located within the Condominium.

Section 13. Reserved Rights of Developer.

(a) Developer's Rights in Furtherance of Development and Sales. None of the restrictions contained in this Article VI shall apply to the commercial activities or signs or billboards of the Developer with respect to unoccupied Units or model or "spec" Units owned or used by the Developer, or of the Association in furtherance of its powers and purposes. Notwithstanding anything to the contrary elsewhere herein contained, until all Units or dwellings in the entire Condominium are sold by Developer, Developer shall have the right to maintain a sales office, a business office, a construction office, model units, storage areas for supplies and construction materials and reasonable parking incident to the foregoing and such access to, from and over the Condominium as may be reasonable to enable development and sale of the entire Condominium by the Developer.

(b) Enforcement of By-Laws. The Condominium shall at all times be maintained in a manner consistent with the highest standards of a first class, beautiful, serene, private residential community for the benefit of the Co-owners and all persons having an interest in the Condominium. If at any time the Association fails or refuses to carry out its obligation to maintain, replace or landscape in a manner consistent with the maintenance of such high standards, then the Developer or the Architectural Control Committee may, at its option, elect to maintain, repair and or replace any Common Elements and/or do any landscaping required by the By-Laws and charge the cost thereof to the Association as an expense of administration. The Developer or the Architectural Control Committee shall have the right to enforce these By-Laws, which right of enforcement shall include without limitation an action to restrain the Association or any Co-owner from any activity prohibited by these By-Laws.

LI-37283     Pg-40

    (c)    Developer's Assignment Rights.  Any and all rights and powers of the Developer that have been granted or reserved by law or herein (or in any of the other Condominium Documents) to Developer (including, without limitation, any right or power to approve or to disapprove any act, use or proposed action or any other matter or thing) may be assigned by Developer to any person or entity, including, without limitation, the Association.  Any assignment by Developer must be evidenced by a written instrument that must also be signed by the assignee to evidence the assumption by that assignee of the rights of the Developer hereunder.  Notwithstanding the foregoing, as of the expiration of the Development and Sales Period, any and all of the rights hereunder of Developer that have not been theretofore assigned by Developer will be deemed to have been assigned to and assumed by the Architectural Control Committee; provided, however, that in no event will Developer be deemed to have thereby assigned or in any other manner relinquished any real property rights granted or reserved to Developer or its successors and assigns in the Master Deed or in any other Condominium Documents or recorded Declarations, including, without limitation, any access easements, utility easements or any other easements created or reserved in the Master Deed, any of the other Condominium Documents or any recorded Declaration (any of which may only be terminated by a written instrument signed by Developer and recorded with the Wayne County Register of Deeds).

    (d)    Method of Evidencing Developer's Approval.  **ANY APPROVAL, WAIVER, OR OTHER ACTION HEREUNDER BY DEVELOPER WILL <u>NOT</u> BE EFFECTIVE UNLESS THAT APPROVAL, WAIVER, OR OTHER ACTION IS IN WRITING AND IS SIGNED BY DEVELOPER.  CO-OWNERS, THE ASSOCIATION (AND ANY OTHER PERSONS OR ENTITIES) MAY NOT RELY UPON ANY APPROVAL, WAIVER, OR OTHER ACTION HEREUNDER IF THAT APPROVAL, WAIVER, OR OTHER ACTION IS GRANTED OR TAKEN BY ANY PERSON (INCLUDING, WITHOUT LIMITATION, ANY EMPLOYEES OR REPRESENTATIVES OF DEVELOPER) OTHER THAN DEVELOPER. AGENTS, EMPLOYEES, CONSULTANTS, ATTORNEYS AND OTHER REPRESENTATIVES AND ADVISORS OF DEVELOPER ARE NOT LIABLE WITH RESPECT TO ANY APPROVALS, WAIVERS OR OTHER ACTIONS UNDER THE CONDOMINIUM DOCUMENTS.**

    Section 14.   Non-Disturbance of Wetlands.  Portions of the Project are near areas designated as wetlands protected by federal, state or local law.  Any wetlands and any protected buffer zones (as established by the City of Melvindale or the State of Michigan) are deemed to be within a Conservation Easement in which no disturbance will be permitted (including, without limitation, construction activities, dredging, filling, planting and/or any other types of modification), without the prior approval of the Architectural Control Committee, the City, and, if required by law, the Michigan Department of Environmental Quality.  Violation of these restrictions may result in civil and criminal penalties and will give the Association the right to assess substantial fines.  Markers delineating the boundaries of wetlands may have been installed.  Neither the Association nor any Co-owner shall be permitted to remove or tamper in any manner with these markers.  The Association will be required to maintain all of these markers, at the Association's expense, in perpetuity.

18

Li-37283      Pa-41

Section 15.   Fertilizer Use.  No fertilizers may be used within the Project which may, in the estimation of the Architectural Control Committee, damage any wetlands which may be located within or near the Project.  The Association may ban fertilizers which may damage any such wetlands from use in the Project.

Section 16.   Authority of Association re Special Assessment Districts.  The acceptance of a conveyance or the execution of a land contract by any Co-owner or purchaser of a Unit shall constitute the agreement by such Co-owner or purchaser, his or her heirs, executors, administrators, or assigns, that the Board of Directors of the Association shall be vested with full power and authority to obligate all Co-owners to participate in a special assessment district, sign petitions requesting said special assessment, and consider and otherwise act on all special assessment district issues on behalf of the Association and all Co-owners; provided that, prior to signature by the Association on a petition for improvement, the desirability of said improvement shall be approved by an affirmative vote of not less than fifty-one percent (51%) of all Co-owners.  No consent of mortgagees shall be required for approval of said improvement.

Section 17.   Additional Restrictions.   The Developer reserves the right to create additional restrictions and/or to revise or eliminate restrictions in connection with the development of the Project, as deemed necessary by the Developer, in the Developer's sole discretion, by amending this Article VI of the Condominium By-Laws and providing each Co-owner with a copy thereof.

ARTICLE VII
MORTGAGES, MORTGAGE INSURERS
AND MORTGAGE GUARANTORS

Section 1.   Notice to Association.  Any Co-Owner who mortgages his Unit shall notify the Association of the name and address of the mortgagee, and the Association shall maintain such information in a book entitled "Mortgages of Units".  The Association may, at the written request of a mortgagee of any such Unit, report any unpaid assessments due from the Co-owner of such Unit.  The Association shall give to the holder of any first mortgage covering any Unit in the Condominium Project written notification of any default in the performance of the obligations of the Co-owner of such Unit that is not cured within sixty (60) days.

Section 2.   Insurance.  The Association shall notify each mortgagee appearing in said book of the name of each company insuring the Condominium against fire, perils covered by extended coverage, and vandalism and malicious mischief and the amounts of such coverage.

Section 3.   Notification of Meetings.  Upon request submitted to the Association, any institutional holder of a first mortgage lien on any Unit in the Condominium shall be entitled to receive written notification of every meeting of the members of the Association and to designate a representative to attend such meeting.

Section 4.   Applicability to Mortgage Insurers and Guarantors.  Any of the rights in the condominium document which are granted to first mortgagees shall also be extended to insurers and guarantors of such mortgages, provided that they have given the Association notice of their interests.  However, when voting rights are attributed to a mortgagee, only one vote may be cast

19

Li-37283    Pa-42

per mortgage as to the mortgage in question regardless of the number of mortgagees, assignees, insurers and guarantors interested in the mortgage.

Section 5.  Notification of Amendments and Other Matters.  All holders of first mortgages and insurers and guarantors thereof who have requested notice, are entitled to timely written notice of: (a) any amendment affecting a unit in which they have an interest, (b) any amendment affecting a change in the general common elements, or limited common element appurtenant to a unit in which they have an interest, (c) a material change in the voting rights or use of a unit in which they have an interest, (d) any proposed termination of the condominium, (e) any condemnation or casualty loss which affects a material portion of the condominium or a unit in which they have an interest or (f) any lapse, cancellation or material modification of any insurance policy maintained by the Association.

ARTICLE VIII
VOTING

Section 1.  Vote.  Except as limited in these By-Laws, each Co-owner shall be entitled to one vote for each Condominium Unit owned.

Section 2.  Eligibility to Vote.  No Co-owner, other than the Developer, shall be entitled to vote at any meeting of the Association until he has presented evidence of ownership of a Unit in the Condominium Project to the Association.  Except as provided in Article XI, Section 2 of these By-Laws, no Co-owner, other than the Developer, shall be entitled to vote prior to the date of the First Annual Meeting of members held in accordance with Section 2 of Article IX. The vote of each Co-owner may be cast only by the individual representative designated by such Co-owner in the notice required in Section 3 of this Article VIII below or by a proxy given by such individual representative.  As stated above in Article II, Section 5, paragraph (a), Co-owner's in default in the payment of assessments shall not be entitled to vote at meetings of the Association so long as the default continues.  The Developer shall be the only person entitled to vote at a meeting of the Association until the First Annual Meeting of members and shall be entitled to vote during such period notwithstanding the fact that the Developer may own no Units at some time or from time to time during such period.  At and after the First Annual Meeting, the Developer shall be entitled to one vote for each Unit which it owns.

Section 3.  Designation of Voting Representative.  Each Co-owner shall file a written notice with the Association designating the individual representative who shall vote at meetings of the Association and receive all notices and other communications from the Association on behalf of such Co-owner.  Such notice shall state the name and address of the individual representative designated, the number or numbers of the Condominium Unit or Units owned by the Co-owner, and the name and address of each person, firm, corporation, partnership, association, trust or other entity who is the Co-owner.  Such notice shall be signed and dated by the Co-owner.  The individual representative designated may be changed by the Co-owner at any time by filing a new notice in the manner herein provided.

Section 4.  Quorum.  The presence in person or by proxy of thirty-five (35%) percent of the Co-owners qualified to vote shall constitute a quorum for holding a meeting of the members of the Association, except for voting on questions specifically required by the

20

Li-37283     Pa-43

Condominium Documents to require a greater quorum. The written vote of any person furnished at or prior to any duly called meeting at which meeting said person is not otherwise present in person or by proxy shall be counted in determining the presence of a quorum with respect to the question upon which the vote is cast.

Section 5.   Voting. Votes may be cast only in person or in writing duly signed by the designated voting representative not present at a given meeting in person or by proxy. Proxies and any written votes must be filed with the Secretary of the Association at or before the appointed time of each meeting of the members of the Association. Cumulative voting shall not be permitted.

Section 6.   Majority. A majority, except where otherwise provided herein, shall consist of more than fifty (50%) percent of those qualified to vote and present in person or by proxy (or written vote, if applicable) at a given meeting of the members of the Association. Whenever provided specifically herein, a majority may be required to exceed the simple majority hereinabove set forth.

### ARTICLE IX
### MEETINGS

Section 1. _. Place of Meeting. Meetings of the Association shall be held at the principal office of the Association or at such other suitable place convenient to the Co-owners as may be designated by the Board of Directors. Meetings of the Association shall be conducted in accordance with Sturgis Code of Parliamentary Procedure, Roberts Rules of Order or some other generally recognized manual of parliamentary procedure, when not otherwise in conflict with the Condominium Documents (as defined in the Master Deed) or the laws of the State of Michigan.

Section 2.   First Annual Meeting. The First Annual Meeting of members of the Association may be convened only by the Developer and may be called at any time after more than fifty (50%) percent of the total number of Units that may be created in Northpointe Townhomes Condominium have been sold and the purchasers thereof qualified as members of the Association. In no event, however, shall such meeting be called later than one hundred twenty (120) days after the conveyance of legal or equitable title to non-developer Co-owners of seventy five (75%) percent of the total number of Units that may be created in Northpointe Townhomes Condominium, or fifty four (54) months after the first conveyance of legal or equitable title to a non-developer Co-owner of a Unit in the Condominium Project, whichever first occurs. Developer may call meetings of members for informative or other appropriate purposes prior to the First Annual Meeting of members and no such meeting shall be construed as the First Annual Meeting of members. The date, time and place of such meeting shall be set by the Board of Directors, and at least ten (10) days' written notice thereof shall be given to each Co-owner.

Section 3.   Annual Meetings. Annual meetings of members of the Association shall be held on a date chosen by the Board of Directors of the Association in each succeeding year after the year in which the First Annual Meeting is held, at such time and place as shall be determined by the Board of Directors; provided, however, that the second annual meeting shall not be held

21

Li-37283      Pa-44

sooner than eight (8) months after the date of the First Annual Meeting.  At such meetings there shall be elected by ballot of the Co-owners a Board of Directors in accordance with the requirements of Article XI of these By-Laws.  The Co-owners may also transact at annual meetings such other business of the Association as may properly come before them.

Section 4.    Special Meetings.  It shall be the duty of the President to call a special meeting of the Co-owners as directed by resolution of the Board of Directors or upon a petition signed by one third (1/3) of the Co-owners presented to the Secretary of the Association.  Notice of any special meeting shall state the time and place of such meeting and the purposes thereof.  No business shall be transacted at a special meeting except as stated in the notice.

Section 5.    Notice of Meetings.  It shall be the duty of the Secretary (or other Association officer in the Secretary's absence) to serve a notice of each annual or special meeting, stating the purpose thereof as well as the time and place where it is to be held, upon each Co-owner of record, at least ten (10) days but not more than sixty (60) days prior to such meeting.  The mailing, postage prepaid, of a notice to the representative of each Co-owner at the address shown in the notice required to be filed with the Association by Article VIII, Section 3 of these By-Laws shall be deemed notice served.  Any member may, by written waiver of notice signed by such member, waive such notice, and such waiver, when filed in the records of the Association, shall be deemed due notice.

Section 6.    Adjournment.  If any meeting of Co-owners cannot be held because a quorum is not in attendance, the Co-owners who are present may adjourn the meeting to a time not less than forty eight (48) hours from the time the original meeting was called.

Section 7.    Order of Business.  The order of business at all meetings of the members shall be as follows: (a) roll call to determine the voting power represented at the meeting; (b) proof of notice of meeting or waiver of notice; (c) reading of minutes of preceding meeting; (d) reports of officers; (e) reports of committees; (f) appointment of inspectors of election (at annual meetings or special meetings held for the purpose of electing Directors or officers); (g) election of Directors (at annual meeting or special meetings held for such purpose); (h) unfinished business; and (i) new business.  Meetings of members shall be chaired by the most senior officer of the Association present at such meeting.  For purposes of this Section, the order of seniority of officers shall be President, Vice President, Secretary and Treasurer.

Section 8.    Action Without Meeting.  Any action which may be taken at a meeting of the members (except for the election or removal of Directors) may be taken without a meeting by written ballot of the members.  Ballots shall be solicited in the same manner as provided in Section 5 for the giving of notice of meetings of members.  Such solicitations shall specify (a) the number of responses needed to meet the quorum requirements; (b) the percentage of approvals necessary to approve the action; and (c) the time by which ballots must be received in order to be counted.  The form of written ballot shall afford an opportunity to specify a choice between approval and disapproval of each matter and shall provide that, where the member specifies a choice, the vote shall be cast in accordance therewith.  Approval by written ballot shall be constituted by receipt, within the time period specified in the solicitation, of (i) a number of ballots which equals or exceeds the quorum which would be required if the action were taken at a meeting; and (ii) a number of approvals which equals or exceeds the number of votes which

22

Li-37283    Pa-45

would be required for approval if the action were taken at a meeting at which the total number of votes cast was the same as the total number of ballots cast.

Section 9.    Consent of Absentees.  The transactions at any meeting of members, either annual or special, however called and noticed, shall be as valid as though made at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy; and if, either before or after the meeting, each of the members not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of such meeting, or an approval of the minutes thereof.  All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Section 10.  Minutes, Presumption of Notice.   Minutes or a similar record of the proceedings of meetings of members, when signed by the President or Secretary, shall be presumed to evidence the matters set forth therein.  A recitation in the minutes of any such meeting that notice of the meeting was properly given shall be prima facie evidence that such notice was given.

ARTICLE X
ADVISORY COMMITTEE

Within one year after conveyance of legal or equitable title to the first Unit in the Condominium to a purchaser or within one hundred twenty (120) days after conveyance to purchasers of one third (1/3) of the total number of Units which may be created in the Condominium as it may be expanded pursuant to Article X of the Master Deed, whichever first occurs, the Developer shall cause to be established an Advisory Committee consisting of at least three (3) non-developer Co-owners. The Committee shall be established and perpetuated in any manner the Developer deems advisable except that if more than fifty (50%) percent of the non-developer Co-owners petition the Board of Directors for an election to select the Advisory Committee, then an election for such purpose shall be held.  The purpose of the Advisory Committee shall be to facilitate communications between the temporary Board of Directors and the other Co-owners and to aid in the transition of control of the Association from the Developer to purchaser Co-owners. The Advisory Committee shall cease to exist automatically when the non-developer Co-owners have the voting strength to elect a majority of the Board of Directors of the Association.  The Developer may remove and replace at its discretion at any time any member of the Advisory Committee who has not been elected thereto by the Co-owners.

ARTICLE XI
BOARD OF DIRECTORS

Section 1.    Number and Qualification of Directors.  The Board of Directors shall be comprised of five (5) members, all of whom must be members of the Association or officers, partners, trustees, employees or agents of members of the Association, except for the first Board of Directors.  Directors shall serve without compensation.

23

Li-37283      Pa-46

Section 2.    Election of Directors.

(a)    First Board of Directors. The first Board of Directors, or its successors as selected by the Developer, shall manage the affairs of the Association until the appointment of the first non-developer Co-owner to the Board.  Elections for non-developer Co-owner Directors shall be held as provided in subsections (b) and (c) below.

(b)    Appointment of Non Developer Co-owners to Board Prior to First Annual Meeting.  Not later than one hundred twenty (120) days after conveyance of legal or equitable title to non-Developer Co-owners of twenty five (25%) percent in number of the Units that may be created, one of the five (5) Directors shall be selected by non-Developer Co-owners.  Not later than one hundred twenty (120) days after conveyance of legal or equitable title to non-Developer Co-owners of fifty (50%) percent in number of the Units that may be created, two (2) of five (5) directors shall be elected by non-Developer Co-owners.  When the required number of conveyances has been reached, the Developer shall notify the non-Developer Co-owners and request that they hold a meeting and elect the required Director.  Upon certification by the Co-owners to the Developer of the Director so elected, the Developer shall then immediately appoint such Director to the Board to serve until the First Annual Meeting of members unless he is removed pursuant to Section 7 of this Article or he resigns or becomes incapacitated.

(c)    Election of Directors at and After First Annual Meeting.

(i)    Not later than one hundred twenty (120) days after conveyance of legal or equitable title to non-developer Co-owners of seventy five (75%) percent in number of the Units that may be created, the non-Developer Co-owners shall elect all Directors on the Board, except that the Developer shall have the right to designate at least one (1) Director as long the Units that remain to be created and conveyed equal at least ten (10%) of all Units in the Condominium.  Whenever the required conveyance level is achieved, a meeting of Co-owners shall be promptly convened to effectuate this provision, even if the First Annual Meeting has already occurred.

(ii)    Regardless of the percentage of Units which have been conveyed, upon the expiration of fifty four (54) months after the first conveyance of legal or equitable title to a non-Developer Co-owner of a Unit in the Condominium Project, the non-Developer Co-owners have the right to elect a number of members of the Board of Directors equal to the percentage of Units they own, and the Developer has the right to elect a number of members of the Board of Directors equal to the percentage of Units which are owned by the Developer and for which all assessments are payable by the Developer.  This election may increase, but shall not reduce, the minimum election and designation rights otherwise established in subsection (i).  Application of this subsection does not require a change in the size of the Board of Directors.

(iii)    If the calculation of the percentage of members of the Board of Directors that the non-Developer Co-owners have the right to elect under Subsection (ii), or if the product of the number of members of the Board of Directors multiplied by the

24

LI-37283          Pa-47

percentage of Units held by the non-Developer Co-owners under subsection (b) results in a right of non-Developer Co-owners to elect a fractional number of members of the Board of Directors, then a fractional election right of 0.5 or greater shall be rounded up to the nearest whole number, which number shall be the number of members of the Board of Directors that the non-Developer Co-owners have the right to elect.  After application of this formula the Developer shall have the right to elect the remaining members of the Board of Directors.  Application of this subsection shall not eliminate the right of the Developer to designate one (1) Director as provided in subsection (i).

· (iv) At the First Annual Meeting, three (3) Directors shall be elected for a term of two (2) years and two (2) Directors shall be elected for a term of one (1) year. At such meeting all nominees shall stand for election as one slate and the three (3) persons receiving the highest number of votes shall be elected for a term of two (2) years and the two (2) persons receiving the next highest number of votes shall be elected for a term of one (1) year.  At each annual meeting held thereafter, either three (3) or two (2) Directors shall be elected depending upon the number of Directors whose terms expire. After the First Annual Meeting, the term of office or each Director shall be two (2) years, except for the two (2) Directors elected at the First Annual Meeting for one-year terms. The Directors shall hold office until their successors have been elected and hold their first meeting.

(v) Once the Co-owners have acquired the right to elect a majority of the Board of Directors, annual meetings of Co-owners to elect Directors and conduct other business shall be held in accordance with the provisions of Article IX, Section 3 hereof.

Section 3. Powers and Duties. The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Association and may do all acts and things as are not prohibited by the Condominium Documents or required thereby to be exercised and done by the Co-owners.

Section 4. Other Duties. In addition to the foregoing duties imposed by these By-Laws or any further duties which may be imposed by resolution of the members of the Association, the Board of Directors shall be responsible specifically for the following:

(a) To manage and administer the affairs of and to maintain the Condominium Project and the General Common Elements thereof;

(b) To levy and collect assessments from the members of the Association and to use the proceeds thereof for the purposes of the Association;

(c) To carry insurance and collect and allocate the proceeds thereof;

(d) To rebuild improvements after casualty;

(e) To contract for and employ persons, firms, corporations or other agents to assist in the management, operation, maintenance and administration of the Condominium Project;

25

Li-37283      Pa-4B

(f)     To acquire, maintain and improve; and to buy, operate, manage, sell, convey, assign, mortgage or lease any real or personal property (including any Unit in the Condominium and easements, rights-of-way and licenses) on behalf of the Association in furtherance of any of the purposes of the Association;

(g)     To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Association, and to secure the same by mortgage, pledge, or other lien on property owned by the Association; provided, however, that any such action shall also be approved by affirmative vote of seventy five (75%) of all of the members of the Association in number and in value;

(h)     To make rules and regulations in accordance with Article VI, Section 2(b) of these By-Laws;

(i)     To establish such committees as it deems necessary, convenient or desirable and to appoint persons thereto for the purpose of implementing the administration of the Condominium and to delegate to such committees any functions or responsibilities which are not by law or the Condominium Documents required to be performed by the Board; and

(j)     To enforce the provisions of the Condominium Documents.

Section 5.   Management Agent. The Board of Directors may employ for the Association a professional management agent (which may include the Developer or any person or entity related thereto) at reasonable compensation established by the Board to perform such duties and services as the Board shall authorize, including, but not limited to, the duties listed in Sections 3 and 4 of this Article, and the Board may delegate to such management agent any other duties or powers which are not by law or by the Condominium Documents required to be performed by or have the approval of the Board of Directors or the members of the Association. In no event shall the Board be authorized to enter into any contract with a professional management agent, or any other contract providing for services by the Developer, sponsor or builder, in which the maximum term is greater than three (3) years or which is not terminable by the Association upon ninety (90) days written notice thereof to the other party and no such contract shall violate the provisions of Section 55 of the Act.

Section 6.   Vacancies.   Vacancies in the Board of Directors which occur after the Transitional Control Date caused by any reason other than the removal of a Director by a vote of the members of the Association shall be filled by vote of the majority of the remaining Directors, even though they may constitute less than a quorum, except that the Developer shall be solely entitled to fill the vacancy of any Director whom it is permitted in the first instance to designate.  Each person so elected shall be a Director until a successor is elected at the next annual meeting of the members of the Association. Vacancies among non-Developer Co-owner elected Directors which occur prior to the Transitional Control Date may be filled only through election by non-Developer Co-owners and shall be filled in the manner specified in Section 2(b) of this Article.

26

Li-37283    Pa-49

Section 7.   Removal. At any regular or special meeting of the Association duly called with due notice of the removal action proposed to be taken, any one or more of the Directors may be removed with or without cause by the affirmative vote of more than fifty (50%) percent of all of the Co-owners qualified to vote and a successor may then and there be elected to fill any vacancy thus created. The quorum requirement for the purpose of filling such vacancy shall be the normal thirty five (35%) percent requirement set forth in Article VIII, Section 4.  Any Director whose removal has been proposed by the Co-owners shall be given an opportunity to be heard at the meeting.  The Developer may remove and replace any or all of the Directors selected by it at anytime or from time to time in its sole discretion.  Likewise, any Director selected by the non-Developer Co-owners to serve before the First Annual Meeting may be removed before the First Annual Meeting in the same manner set forth in this paragraph for removal of Directors generally.

Section 8.   First Meeting.  The first meeting of a newly elected Board of Directors shall be held within ten (10) days of election at such place as shall be fixed by the Directors at the meeting at which such Directors were elected, and no notice shall be necessary to the newly elected Directors in order legally to constitute such meeting, providing a majority of the whole Board shall be present.

Section 9.   Regular Meetings. Regular meetings of the Board of Directors may be held at such times and places as shall be determined from time to time by a majority of the Directors, but at least two (2) such meetings shall be held during each fiscal year. Notice of regular meetings of the Board of Directors shall be given to each Director personally, by mail, telephone or telegraph, at least ten (10) days prior to the date named for such meeting.

Section 10.   Special Meetings. Special meetings of the Board of Directors may be called by the President on three (3) days notice to each given personally, by mail, telephone or telegraph, which notice shall state the time, place and purpose of the meeting. Special meetings of the Board of Directors shall be called by the President or Secretary in like manner and on like notice on the written request of two (2) Directors.

Section 11.   Waiver of Notice. Before or at any meeting of the Board of Directors, any Director may, in writing, waive notice of such meeting and such waiver shall be deemed equivalent to the giving of such notice. Attendance by a Director at any meetings of the Board shall be deemed a waiver of notice by him of the time and place thereof. If all the Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

Section 12.   Quorum. At all meetings of the Board of Directors, a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of the majority of the Directors present at a meeting at which a quorum is present shall be the acts of the Board of Directors. If, at any meeting of the Board of Directors, there be less than a quorum present, the majority of those present may adjourn the meeting to a subsequent time upon twenty four (24) hours prior written notice delivered to all Directors not present. At any such adjourned meeting, any business which might have been transacted at the meeting as originally called may be transacted without further notice. The joinder of a Director in the action of a meeting by

27

LI-37283        Pa-50

signing and concurring in the minutes thereof, shall constitute the presence of such Director for purposes of determining a quorum.

Section 13.  First Board of Directors.  The actions of the first Board of Directors of the Association or any successors thereto selected before the Transitional Control Date shall be binding upon the Association so long as such actions are within the scope of the powers and duties which may be exercised generally by the Board of Directors as provided in the Condominium Documents.

Section 14.  Fidelity Bonds.  The Board of Directors shall require that all officers and employees of the Association handling or responsible for Association funds shall furnish adequate fidelity bonds.  The premiums on such bonds shall be expenses of administration.

## ARTICLE XII
## OFFICERS

Section 1.  Officers.  The principal officers of the Association shall be a President, who shall be a member of the Board of Directors, a Vice President, a Secretary and a Treasurer.  The Directors may appoint an Assistant Treasurer, and an Assistant Secretary, and such other officers as in their judgment may be necessary.  Any two offices except that of President and Vice President may be held by one (1) person.

(a)  President.  The President shall be the chief executive officer of the Association.  He shall preside at all meetings of the Association and of the Board of Directors.  He shall have all of the general powers and duties which are usually vested in the office of the President of an association, including, but not limited to, the power to appoint committees from among the members of the Association from time to time as he may in his discretion deem appropriate to assist in the conduct of the affairs of the Association.

(b)  Vice President.  The Vice President shall take the place of the President and perform his duties whenever the President shall be absent or unable to act.  If neither the President nor the Vice President is able to act, the Board of Directors shall appoint some other member of the Board to so do on an interim basis.  The Vice President shall also perform such other duties as shall from time to time be imposed upon him by the Board of Directors.

(c)  Secretary.  The Secretary shall keep the minutes of all meetings of the Board of Directors and the minutes of all meetings of the members of the Association; he shall have charge of the corporate seal, if any, and of such books and papers as the Board of Directors may direct; and he shall, in general, perform all duties incident to the office of the Secretary.

(d)  Treasurer.  The Treasurer shall have responsibility for the Association's funds and securities and shall be responsible for keeping full and accurate accounts of all receipts and disbursements in books belonging to the Association.  He shall be responsible for the deposit of all monies and other valuable effects in the name and to

28

L1-37283     Pa-51

the credit of the Association, and in such depositories as may, from time to time, be designated by the Board of Directors.

Section 2.     Election.  The officers of the Association shall be elected annually by the Board of Directors at the organizational meeting of each new Board and shall hold office at the pleasure of the Board.

Section 3.     Removal.  Upon affirmative vote of a majority of the members of the Board of Directors, any officer may be removed either with or without cause, and his successor elected at any regular meeting of the Board of Directors, or at any special meeting of the Board called for such purpose.  No such removal action may be taken, however, unless the matter shall have been included in the notice of such meeting.  The officer who is proposed to be removed shall be given an opportunity to be heard at the meeting.

Section 4.     Duties.     The officers shall have such other duties, powers and responsibilities as shall, from time to time, be authorized by the Board of Directors.

### ARTICLE XIII
### SEAL

The Association may (but need not) have a seal.  If the Board determines that the Association shall have a seal, then it shall have inscribed thereon the name of the Association, the words "corporate seal", and "Michigan".

### ARTICLE XIV
### FINANCES

Section 1.     Records.  The Association shall keep detailed books of account showing all expenditures and receipts of administration, and which shall specify the maintenance and repair expenses of the Common Elements and any other expenses incurred by or on behalf of the Association and the Co-owners.  Such accounts and all other Association records shall be open for inspection by the Co-owners and their mortgagees during reasonable working hours.  The Association shall prepare and distribute to each Co-owner at least once a year a financial statement, the contents of which shall be defined by the Association.  The books of account shall be audited at least annually by qualified independent auditors; provided, however, that such auditors need not be certified public accountants nor does such audit need to be a certified audit.  Any institutional holder of a first mortgage lien on any Unit in the Condominium shall be entitled to receive a copy of such annual audited financial statement within ninety (90) days following the end of the Association's fiscal year upon request therefor.  The costs of any such audit and any accounting expenses shall be expenses of administration.

Section 2.     Fiscal Year.  The fiscal year of the Association shall be an annual period commencing on such date as may be initially determined by the Directors.  The commencement date of the fiscal year shall be subject to change by the Directors for accounting reasons or other good cause.

29

Li-37283       Pa-52

Section 3.   Bank. Funds of the Association shall be initially deposited in such bank or savings association as may be designated by the Directors and shall be withdrawn only upon the check or order of such officers, employees or agents as are designated by resolution of the Board of Directors from time to time. The funds may be invested from time to time in accounts or deposit certificates of such bank or savings association as are insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation or their current statutory successors and may also be invested in interest bearing obligations of the United States Government.

## ARTICLE XV
## INDEMNIFICATION OF OFFICERS AND DIRECTORS

Every Director and officer of the Association shall be indemnified by the Association against all expenses and liabilities, including actual and reasonable counsel fees and amounts paid in settlement, incurred by or imposed upon him in connection with any threatened, pending or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal, to which he may be a party or in which he may become involved by reason of his being or having been a Director or officer of the Association, whether or not he is a Director or officer at the time such expenses are incurred, except as otherwise prohibited by law; provided that, in the event of any claim for reimbursement or indemnification hereunder based upon a settlement by the Director or officer seeking such reimbursement or indemnification, the indemnification herein shall apply only if the Board of Directors (with the Director seeking reimbursement abstaining) approves such settlement and reimbursement as being in the best interest of the Association. The foregoing right of indemnification shall be in addition to and not exclusive of all other rights to which such Director or officer may be entitled. At least ten (10) days prior to payment of any indemnification which it has approved, the Board of Directors shall notify all Co-owners thereof. Further, the Board of Directors is authorized to carry officers' and directors' liability insurance covering acts of the officers and Directors of the Association in such amounts as it shall deem appropriate.

## ARTICLE XVI
## AMENDMENTS

Section 1.   Proposal. Amendments to these By-Laws may be proposed by the Board of Directors of the Association acting upon the vote of the majority of the Directors or may be proposed by one third (1/3) or more of the Co-owners by instrument in writing signed by them.

Section 2.   Meeting. Upon any such amendment being proposed, a meeting for consideration of the same shall be duly called in accordance with the provisions of these By-Laws.

Section 3.   By the Co-owners. These By-Laws may be amended by the Co-owners at any regular annual meeting or a special meeting called for such purpose by an affirmative vote of not less than sixty six and two thirds (66-2/3%) percent of all Co-owners. No consent of mortgagees shall be required to amend these By-Laws unless such amendment would materially alter or change the rights of such mortgagees, in which event the approval of sixty six and two

30

Li-37283      Pa-53

thirds (66-2/3%) percent of the mortgagees shall be required, with each mortgagee to have one vote for each first mortgage held.

Section 4.    By Developer. Prior to the Transitional Control Date, these By-Laws may be amended by the Developer without approval from any other person so long as any such amendment does not materially alter or change the right of a Co-owner or mortgagee.

Section 5.    When Effective. Any amendment to these By-Laws shall become effective upon recording of such amendment in the office of the Wayne County Register of Deeds.

Section 6.    Binding. A copy of each amendment to the By-Laws shall be furnished to every member of the Association after adoption; provided, however, that any amendment to these By-Laws that is adopted in accordance with this Article shall be binding upon all persons who have an interest in the Condominium Project irrespective of whether such persons actually receive a copy of the amendment.

Section 7.    Developer's Approval. No amendment to these By-Laws adopted during the Development and Sales Period shall be effective unless first approved in writing by the Developer.

ARTICLE XVII
COMPLIANCE

The Association and all present or future Co-owners, tenants, future tenants, or any other persons acquiring an interest in or using the Condominium Project in any manner are subject to and shall comply with the Act, as amended, and the mere acquisition, occupancy or rental of any Unit or an interest therein or the utilization of or entry upon the Condominium Premises shall signify that the Condominium Documents are accepted and ratified. In the event the Condominium Documents conflict with the provisions of the Act, the Act shall govern.

ARTICLE XVIII
DEFINITIONS

All terms used herein shall have the same meaning as set forth in the Master Deed to which these By-Laws are attached as an Exhibit or as set forth in the Act.

ARTICLE XIX
REMEDIES FOR DEFAULT

Any default by a Co-owner shall entitle the Association or another Co-owner or Co-owners to the following relief:

Section 1.    Legal Action. Failure to comply with any of the terms or provisions of the Condominium Documents shall be grounds for relief, which may include, without intending to limit the same, an action to recover sums due for damages, injunctive relief, foreclosure of lien (if default in payment of assessment) or any combination thereof, and such relief may be sought by the Association or, if appropriate, by an aggrieved Co-owner or Co-owners.

31

Li-37283     Pa-54

Section 2.   Recovery of Costs. In any proceeding arising because of an alleged default by any Co-owner, the Association, if successful, shall be entitled to recover the costs of the proceeding and such reasonable attorneys' fees (not limited to statutory fees) as may be determined by the court, but in no event shall any Co-owner be entitled to recover such attorney's fees.

Section 3.   Removal and Abatement. The violation of any of the provisions of the Condominium Documents shall also give the Association or its duly authorized agents the right, in addition to the rights set forth above, to enter upon the Common Elements and summarily remove and abate, at the expense of the Co-owner in violation, any structure, thing or condition existing or maintained contrary to the provisions of the Condominium Documents. The Association shall have no liability to any Co-owner arising out of the exercise of its removal and abatement power authorized herein.

Section 4.   Assessment of Fines. The violation of any of the provisions of the Condominium Documents by any Co-owner shall be grounds for assessment by the Association, acting through its duly constituted Board of Directors, of monetary fines for such violations. No fine may be assessed unless in accordance with the provisions of Article XX below.

Section 5.   Non-Waiver of Right. The failure of the Association or of any Co-owner to enforce any right, provision, covenant or condition which may be granted by the Condominium Documents shall not constitute a waiver of the right of the Association or of any such Co-owner to enforce such right, provision, covenant or condition in the future.

Section 6.   Cumulative Rights, Remedies and Privileges. All rights, remedies and privileges granted to the Association or any Co-owner or Co-owners pursuant to any terms, provisions, covenants or conditions of the aforesaid Condominium Documents shall be deemed to be cumulative and the exercise of any one or more shall not be deemed to constitute an election of remedies, nor shall it preclude the party thus exercising the same from exercising such other and additional rights, remedies or privileges as may be available to such party at law or in equity.

Section 7.   Enforcement of Provisions of Condominium Documents. A Co-owner may maintain an action against the Association and its officers and Directors to compel such persons to enforce the terms and provisions of the Condominium Documents. A Co-owner may maintain an action against any other Co-owner for injunctive relief or for damages or any combination thereof for noncompliance with the terms and provisions of the Condominium Documents or the Act.

ARTICLE XX
ASSESSMENT OF FINES

Section 1.   General. The violation by any Co-owner, occupant or guest of any provisions of the Condominium Documents including any duly adopted rules and regulations shall be grounds for assessment by the Association, acting through its duly constituted Board of Directors, of monetary fines against the involved Co-owner. Such Co-owner shall be deemed responsible for such violations whether they occur as a result of his personal actions or the

32

Li-37283     Pa-55

actions of his family, guests, tenants or any other person admitted through such Co-owner to the Condominium Premises.

Section 2.   Procedures.   Upon any such violation being alleged by the Board, the following procedures will be followed:

(a)   Notice.   Notice of the violation, including the Condominium Document provision violated, together with a description of the factual nature of the alleged offense set forth with such reasonable specificity as will place the Co-owner on notice as to the violation, shall be sent by first class mail, postage prepaid, or personally delivered to the representative of said Co-owner at the address as shown in the notice required to be filed with the Association pursuant to Article VIII, Section 3 of these By-Laws.

(b)   Opportunity to Defend.   The offending Co-owner shall have an opportunity to appear before the Board and offer evidence in defense of the alleged violation.  The appearance before the Board shall be at its next scheduled meeting but in no event shall the Co-owner be required to appear less than ten (10) days from the date of the Notice.

(c)   Default.  Failure to respond to the Notice of Violation constitutes a default.

(d)   Hearing and Decision.  Upon appearance by the Co-owner before the Board and presentation of evidence of defense, or, in the event of the Co-owner's default, the Board shall, by majority vote of a quorum of the Board, decide whether a violation has occurred.  The Board's decision is final.

Section 3.   Amounts.   Upon violation of any of the provisions of the Condominium Documents and after default of the offending Co-owner or upon the decision of the Board as recited above, the following fines shall be levied:

(a)   First Violation.  No fine shall be levied.

(b)   Second Violation.  A fine of Seventy-Five Dollars ($75.00).

(c)   Third Violation.  A fine of One Hundred Dollars ($100.00).

(d)   Fourth Violation and Subsequent Violations.  A fine of One Hundred and Fifty Dollars ($150.00) for each violation.

The Association, acting through its Board of Directors, may increase or decrease the fine schedule set forth above by Board resolution after giving prior written notice to the Co-owners of the proposed change.  The resolution and a proof of notice shall then be recorded in the Wayne County Records and the new schedule shall be effective upon recording.

Section 4.   Collection.   Fines levied pursuant to Section 3 above shall be assessed against the Co-owner and shall be due and payable together with the regular Condominium assessment on the first of the next following month.  Failure to pay the fine will subject the Co-owner to all liabilities and remedies set forth in the Condominium Documents including, without

33

Li-37283    Pa-56

limitation, those described in Article II for failure to pay assessments and in this Article XX of these By-Laws. The aforesaid remedies include the right to record notices of lien for the unpaid fines and the right to foreclose such liens in accordance with the procedures set forth in Article II.

ARTICLE XXI
JUDICIAL ACTIONS AND CLAIMS

Actions on behalf of and against the Co-owners shall be brought in the name of the Association. Subject to the express limitations on actions in these By-Laws and in the Association's Articles of Incorporation, the Association may assert, defend or settle claims on behalf of all Co-owners in connection with the Common Elements of the Condominium. As provided in the Articles of Incorporation of the Association, the commencement of any civil action (other than one to enforce these By-Laws or collect delinquent assessments) shall require the approval of a majority in number and in value of the Co-owners, and shall be governed by the requirements of this Article. The requirements of this Article will ensure that the Co-owners are fully informed regarding the prospects and likely costs of any civil actions actually filed by the Association. These requirements are imposed in order to reduce both the cost of litigation and the risk of improvident litigation, and in order to avoid the waste of the Association's assets in litigation where reasonable and prudent alternatives to the litigation exist. Each Co-owner shall have standing to sue to enforce the requirements of this Article. The following procedures and requirements apply to the Association's commencement of any civil action other than an action to enforce these By-Laws or to collect delinquent assessments:

Section 1.   Board of Directors' Recommendation to Co-owners. The Association's Board of Directors shall be responsible in the first instance for recommending to the Co-owners that a civil action be filed, and supervising and directing any civil actions that are filed.

Section 2.   Litigation Evaluation Meeting. Before an attorney is engaged for purposes of filing a civil action on behalf of the Association, the Board of Directors shall call a special meeting of the Co-owners ("litigation evaluation meeting") for the express purpose of evaluating the merits of the proposed civil action. The written notice to the Co-owners of the date, time and place of the litigation evaluation meeting shall be sent to all Co-owners not less than twenty (20) days before the date of the meeting and shall including the following information copied onto 8-1/2" x 11" paper:

(a)   A certified resolution of the Board of Directors setting forth in detail the concerns of the Board of Directors giving rise to the need to file a civil action and further certifying that:

(i)   it is in the best interests of the Association to file a lawsuit;

(ii)   that at least one member of the Board of Directors has personally made a good faith effort to negotiate a settlement with the putative defendant(s) on behalf of the Association, without success;

(iii)   litigation is the only prudent, feasible and reasonable alternative; and

34

Li-37283   Pg-57

(iv)   the Board of Directors' proposed attorney for the civil action is of the written opinion that litigation is the Association's most reasonable and prudent alternative.

(b)   A written summary of the relevant experience of the attorney ("litigation attorney") the Board of Directors recommends be retained to represent the Association in the proposed civil action, including the following information: (i) the number of years the litigation attorney has practiced law; and (ii) the name and address of every condominium and homeowner association for which the attorney has filed a civil action in any court, together with the case number, county and court in which each civil action was filed.

(c)   The litigation attorney's written estimate of the amount of the Association's likely recovery in the proposed lawsuit, net of legal fees, court costs, expert witness fees and all other expenses expected to be incurred in the litigation.

(d)   The litigation attorney's written estimate of the cost of the civil action through a trial on the merits of the case ("total estimated cost"). The total estimated cost of the civil action shall including the litigation attorney's expected fees, court costs, expert witness fees, and all other expenses expected to be incurred in the civil action.

(e)   The litigation attorney's proposed written fee agreement.

(f)   The amount to be specially assessed against each Unit in the Condominium to fund the estimated cost of the civil action both in total and on a monthly per Unit basis, as required by Section 6 of this Article.

Section 3.   Independent Expert Opinion.  If the lawsuit relates to the condition of any of the Common Elements of the Condominium, the Board of Directors shall obtain a written independent expert opinion as to reasonable and practical alternative approaches to repairing the problems with the Common Elements, which shall set forth the estimated costs and expected viability of each alternative.  In obtaining the independent expert opinion required by the preceding sentence, the Board of Directors shall conduct its own investigation as to the qualifications of any expert and shall not retain any expert recommended by the litigation attorney or any other attorney with whom the Board of Directors consults. The purpose of the independent expert opinion is to avoid any potential confusion regarding the condition of the Common Elements that might be created by a report prepared as an instrument of advocacy for use in a civil action. The independent expert opinion will ensure that the Co-owners have a realistic appraisal of the condition of the Common Elements, the likely cost of repairs to or replacement of the same, and the reasonable and prudent repair and replacement alternatives. The independent expert opinion shall be sent to all Co-owners with the written notice of the litigation evaluation meeting.

Section 4.   Fee Agreement with Litigation Attorney.  The Association shall have a written fee agreement with the litigation attorney, and any other attorney retained to handle the proposed civil action.  The Association shall not enter into any fee agreement that is a combination of the retained attorney's hourly rate and a contingent fee arrangement unless the existence of the agreement is disclosed to the Co-owners in the text of the Association's written notice to the Co-owners of the litigation evaluation meeting.

35

Li-37283      Pa-5B

Section 5.   Co-owner Vote Required. At the litigation evaluation meeting the Co-owners shall vote on whether to authorize the Board of Directors to proceed with the proposed civil action and whether the matter should be handled by the litigation attorney. The commencement of any civil action by the Association (other than a suit to enforce these By-Laws or collect delinquent assessments) shall require the approval of a majority in number and in value of the Co-owners. Any proxies to be voted at the litigation evaluation meeting must be signed at least seven (7) days prior to the litigation evaluation meeting. Notwithstanding any other provision of the Condominium Documents, no litigation shall be initiated by the Association against the Developer until such litigation has been approved by an affirmative vote of seventy-five (75%) percent of all members of the Association in number and value attained after a litigation evaluation meeting held specifically for the purpose of approving such action.

Section 6.   Litigation Special Assessment. All legal fees incurred in pursuit of any civil action that is subject to Sections 1 through 10 of this Article shall be paid by special assessment of the Co-owners ("litigation special assessment"). The litigation special assessment shall be approved at the litigation evaluation meeting (or any subsequent duly called and noticed meeting) by a majority in number and in value of all Co-owners in the amount of the estimated total cost of the civil action. If the litigation attorney proposed by the Board of Directors is not retained, the litigation special assessment shall be adjusted to an amount equal to the estimated total cost of the civil action, as estimated by the attorney actually retained by the Association. The litigation special assessment shall be apportioned to the Co-owners in accordance with their respective percentage of value interests in the Condominium and shall be collected from the Co-owners on a monthly basis. The total amount of the litigation special assessment shall be collected monthly over a period not to exceed twenty four (24) months.

Section 7.   Attorney's Written Report. During the course of any civil action authorized by the Co-owners pursuant to this Article, the retained attorney shall submit a written report ("attorney's written report") to the Board of Directors every thirty (30) days setting forth:

(a)   The attorney's fees, the fees of any experts retained by the attorney, and all other costs of the litigation during the thirty (30) day period immediately preceding the date of the attorney's written report ("reporting period").

(b)   All actions taken in the civil action during the reporting period, together with copies of all pleadings, court papers and correspondence filed with the court or sent to opposing counsel during the reporting period.

(c)   A detailed description of all discussions with opposing counsel during the reporting period, written and oral, including, but not limited to, settlement discussions.

(d)   The costs incurred in the civil action through the date of the written report, as compared to the attorney's estimated total cost of the civil action.

(e)   Whether the originally estimated total cost of the civil action remains accurate.

36

Section 8.   Monthly Board Meetings. The Board of Directors shall meet monthly during the course of any civil action to discuss and review:

    (a)   the status of the litigation;

    (b)   the status of settlement efforts, if any; and

    (c)   the attorney's written report.

Section 9.   Changes in the Litigation Special Assessment.  If, at any time during the course of a civil action, the Board of Directors determines that the originally estimated total cost of the civil action or any revision thereof is inaccurate, the Board of Directors shall immediately prepare a revised estimate of the total cost of the civil action.  If the revised estimate exceeds the litigation special assessment previously approved by the Co-owners, the Board of Directors shall call a special meeting of the Co-owners to review the status of the litigation, and to allow the Co-owners to vote on whether to continue the civil action and increase the litigation special assessment.  The meeting shall have the same quorum and voting requirements as a litigation evaluation meeting.

Section 10.   Disclosure of Litigation Expenses.  The attorneys' fees, court costs, expert witness fees and all other expenses of any civil action filed by the Association ("litigation expenses") shall be fully disclosed to Co-owners in the Association's annual budget.  The litigation expenses for each civil action filed by the Association shall be listed as a separate line item captioned "litigation expenses" in the Association's annual budget.

ARTICLE XXII
RIGHTS RESERVED TO DEVELOPER

Any or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or by law, including the right and power to approve or disapprove any act, use, or proposed action or any other matter or thing, may be assigned by it to any other entity or entities or to the Association.  Any such assignment or transfer shall be made by appropriate instrument in writing in which the assignee or transferee shall join for the purpose of evidencing its acceptance of such powers and rights and such assignee or transferee shall thereupon have the same rights and powers as herein given and reserved to the Developer. Any rights and powers reserved or granted to the Developer or its successors shall terminate, if not sooner assigned to the Association, upon expiration of the Development and Sales Period.  The immediately preceding sentence dealing with the termination of certain rights and powers granted or reserved to the Developer is intended to apply, insofar as the Developer is concerned, only to the Developer's rights to approve and control the administration of the Condominium and shall not, under any circumstances, be construed to apply to or cause the termination of any real property rights granted or reserved to the Developer or its successors and assigns in the Master Deed or elsewhere (including, but not limited to, access easements, utility easements and all other interests or easements created, excepted or reserved in such documents which shall not be terminable in any manner hereunder and which shall be governed only in accordance with the terms of their creation, exception or reservation and not hereby).

37

LI-37283        Pa-60

## ARTICLE XXIII
## SEVERABILITY

In the event that any of the terms, provisions or covenants of these By-Laws or the Condominium Documents are held to be partially or wholly invalid or unenforceable for any reason whatsoever, such holding shall not affect, alter, modify or impair in any manner whatsoever any of the other terms, provisions or covenants of such documents or the remaining portions of any terms, provisions or covenants held to be partially invalid or unenforceable.

JS187439.100001559.WPD

38

(Page 1 of 40)



Li-39027         Pa-1
203571208    9/30/2003
Bernard J. Youngblood
Wayne Co. Resister of Deeds

## FIRST AMENDMENT TO MASTER DEED
## OF
## NORTHPOINTE TOWNHOMES CONDOMINIUM

EXAMINED AND APPROVED
DATE SEP 3 0 2003
BY ___D.P.L___    A/L
DANIEL P. LANE    A/u:
PLAT ENGINEER

### A RESIDENTIAL CONDOMINIUM
### WAYNE COUNTY CONDOMINIUM
### SUBDIVISION PLAN NO. 686

$120.00 DEED
Receipt #217764
                    RECORDED
BERNARD J. YOUNGBLOOD, REGISTER OF D
                    WAYNE COUNTY, MI

NORTHPOINTE TOWNHOMES, L.L.C., a Michigan limited liability company, whose address is 37000 W. Twelve Mile Road, Suite 110, Farmington Hills, Michigan 48331 (the "Developer"), being the Developer of NORTHPOINTE TOWNHOMES CONDOMINIUM, a residential condominium project established in the City of Melvindale, Wayne County, Michigan, pursuant to the Master Deed thereof, recorded on January 17, 2003 in Liber 37283, Pages 1 through 82, both inclusive, Wayne County Records, and designated as Wayne County Condominium Subdivision Plan No. 686 (the "Condominium Project"), hereby amends the Master Deed of NORTHPOINTE TOWNHOMES CONDOMINIUM (the "Original Master Deed"), pursuant to the authority reserved in Article XII of the Original Master Deed for the purpose of expanding the Condominium Project from forty-two (42) Units to one hundred and fifty-six (156) Units by the addition of land described in paragraph 1 below, and pursuant to the authority reserved in Article VIII, Paragraph (c) of the Original Master Deed, to amend and restate in its entirety Article VI of the Condominium By-Laws. All capitalized words used but not defined herein shall have the same meaning as used in the Original Master Deed. Upon the recording of this First Amendment to Master Deed ("First Amendment") in the office of the Wayne County Register of Deeds, the Original Master Deed (including the Condominium By-Laws and the Condominium Subdivision Plan which are attached to the Original Master Deed as Exhibits "A" and "B", respectively), will be amended, as follows:

46.00 REMONUMENTATION

1.    The following land shall be added to the Condominium Project by this First Amendment:

A part of Private Claims 32 and 49, City of Melvindale, Wayne County, Michigan, more particularly described as commencing at the Northwesterly Corner of Lot 354 of "Melwood Park Sub. No. 6", as recorded in Liber 87 of Plats, on Page 72 and 73, Wayne County Records; thence North 29°01'15" East, 372.37 feet, along the Easterly right-of-way line of Prospect Ave. (60 feet wide); thence South 82°13'45" East, 468.86 feet, to the POINT OF BEGINNING; thence continuing South 82°13'45" East, 731.99 feet; thence South 07°46'15" West, 316.02 feet; thence

This is to certify that there are no unpaid
in this property, and that taxes are paid for FIVE YEARS
previous to date of this instrument EXCEPT ___7/30/03___
No. ___9898___ E ___64___ Date ___9/30/03___
___ Clerk ___

09-30-2003 11CL9292    DEED'S    8.00
RMDA 120 6238 ppd QQ

L 39027 - P 2

Li-39027          Pa-2

North 82°13'45" West, 330.80 feet; thence South 07°45'00" West, 296.47 feet; thence North 82°15'00" West, 459.93 feet, to the Northerly line of said "Melwood Park Sub. No. 6"; thence North 11°52'32" West, 205.04 feet, along the Northerly line of said "Melwood Park Sub. No. 6"; thence North 33°05'28" East, 64.84 feet; thence North 78°08'40" East, 24.00 feet; thence North 65°26'59" East, 91.39 feet; thence North 07°46'15" East, 304.02 feet to the point of beginning. All of the above containing 8.668 Acres.

One hundred and fourteen (114) additional Units (the "Additional Units") are hereby established upon the land hereby added to the Condominium as shown on Replat No. 1 to the Condominium Subdivision Plan attached hereto. The Condominium shall contain one hundred and fifty-six (156) Units with the recording of this First Amendment.

2.      The percentage of value assigned to each Unit, including each Additional Unit located on the land added to the Condominium Project by this First Amendment, shall be equal. The percentage of value assigned to the forty-two Units initially included in the Condominium Project pursuant to the Original Master Deed shall be adjusted to the extent necessary to provide for the allocation of percentage of value to the Additional Units in accordance with this provision.

3.      Sheets 1, 2, 3, 9, and 15 through 22, both inclusive, of the Condominium Subdivision Plan of NORTHPOINTE Townhomes Condominium (Exhibit "B" to the Original Master Deed) are superseded in their entirety by Sheets 1, 2, 3, 9, and 15 through 22, both inclusive, of Replat No. 1 (which is attached hereto) and Sheets 5A, 5B, 5C, 7A, 7B, 7C, and 23 through 27, both inclusive, of Replat No. 1 are hereby added to and incorporated into the Condominium Subdivision Plan of Northpointe Townhomes Condominium. The legal description contained on the amended Sheet 1 of Replat No. 1 shall replace and supersede the description of the Condominium Project contained in Article II of the Original Master Deed.

4.      Article XII of the Original Master Deed is hereby amended by the revision of the following paragraphs:

(d)      The land which may be added to the Condominium (herein referred to as the "Future Development Area") is referred to in the Plan as the proposed Future Development Area, and is situated in the City of Melvindale, Wayne County, Michigan, being more specifically described as follows:

A part of Private Claim 49, City of Melvindale, Wayne County, Michigan, more particularly described as commencing at the Northwesterly Corner of Lot 354 of "Melwood Park Sub. No. 6", as recorded in Liber 87 of Plats, on Page 72 and 73, Wayne County Records; thence North 29°01'15" East, 372.37 feet, along the Easterly right-of-way line of Prospect Ave. (60 feet wide); thence South 82°13'45" East, 1200.85 feet, to the POINT OF BEGINNING; thence continuing South 82°13'45" East, 532.15 feet; thence South 28°54'15" West, 656.41 feet, along an extension of, and the Westerly line of "Amended Plat of Ford Oaks Subdivision", as recorded in Liber 61 of Plats, on Page 52, Wayne County Records (recorded as N. 28°33'12" E.); thence North 82°15'00" West, 626.18 feet; thence North 07°45'00" East, 296.47 feet; thence South 82°13'45" East, 330.80 feet; thence

2

North 07°46'15" East, 316.02 feet, to the point of beginning. All of the above containing approximately 8.067 Acres. All of the above being subject to all easements and restrictions of record.

and also

A part of Private Claim 49, City of Melvindale, Wayne County, Michigan, being more particularly described as commencing at the Northeasterly Corner of Lot 109 of "Amended Plat of Ford Oaks Subdivision", as recorded in Liber 61 of Plats, on Page 52, Wayne County Records, for a POINT OF COMMENCING; thence North 28°54'15" East, (recorded as N. 28°33'12" E.) 15.67 feet, along the Westerly right-of-way line of Wall Street (60 feet wide Public R.O.W.) to the POINT OF BEGINNING; thence North 61°22'45" West, (recorded as N. 61°43'48" W.) 100 feet, along the Southerly line of a portion of vacated Homestead Avenue; thence North 28°54'15" East, (recorded as N. 28°33'12" E.) 146.73 feet, along an extension of the Westerly line of said plat; thence along the South line of a 50' wide railroad right-of-way, South 82°13'45" East, 117.93 feet; thence South 28°54'15" West, (recorded as S. 28°33'12" W.) 188.70 feet, along the Westerly line of Wall Street (60 feet wide Public R.O.W.) to the point of beginning. All of the above containing approximately 0.42 acres. All of the above being subject to all easements and restrictions of record.

Together described as:

A part of Private Claim 49, City of Melvindale, Wayne County, Michigan, more particularly described as commencing at the Northwesterly Corner of Lot 354 of "Melwood Park Sub. No. 6", as recorded in Liber 87 of Plats, on Page 72 and 73, Wayne County Records; thence North 29°01'15" East, 372.37 feet along the Easterly right-of-way line of Prospect Ave. (60 feet wide); thence South 82°13'45" East, 1200.85 feet, to the POINT OF BEGINNING; thence continuing South 82°13'45" East, 650.08 feet, to the Westerly right-of-way line of Wall St. (60 feet wide); thence South 28°54'15" West, 188.70 feet, along the Westerly right-of-way line of said Wall St., to the Northerly line of "Amended Plat of Ford Oaks Subdivision", as recorded in Liber 61 of Plats, on Page 52, Wayne County Records; thence North 61°22'45" West, 110.00 feet (recorded as S. 61°43'48" E.), along the Northerly line of said "Amended Plat of Ford Oaks Subdivision" to a boundary corner of said "Amended Plat of Ford Oaks Subdivision"; thence South 28°54'15" West, 509.68 feet (recorded as N. 28°33'12" E.), along the Westerly line of said "Amended Plat of Ford Oaks Subdivision"; thence North 82°15'00" West, 626.18 feet; thence North 07°45'00" East, 296.47 feet; thence South 82°13'45" East, 330.80 feet; thence North 07°46'15" East, 316.02 feet, to the point of beginning. All of the above containing approximately 8.491 Acres. All of the above being subject to all easements and restrictions of record.

(g)     The number of Units which Developer reserves the right to establish, all or in part, upon the Future Development Area is up to one hundred and eight (108), for a maximum of up to two hundred and sixty-four (264) Units which may

(Page 4 of 40)

L 39027 - P 4

Li-39027          Pa-4
be included in the Condominium (including the Units now shown on the Plan).

The Developer reserves the right to add to the Future Development Area.

5.      Article VI of the Condominium By-Laws is hereby amended in its entirety to read as follows:

"ARTICLE VI
USE AND OCCUPANCY RESTRICTIONS

Section 1.      Residential Use. Units shall be used exclusively for residential occupancy. No Unit or Common Element shall be used for any purpose other than as a single-family residence or for other purposes customarily incidental to that use, except that professional and quasi-professional Co-owners may use their residences as ancillary facilities to their offices established elsewhere, as long as such use does not generate unreasonable traffic by members of the general public. However, these restrictions on use shall not be construed to prohibit a Co-owner from (a) maintaining a personal professional library, (b) keeping personal business or professional records or accounts, or (c) handling personal business or professional telephone calls or correspondence. Such uses are customarily incidental to principal residential use and not in violation of these restrictions. No part of a Unit may be rented and no transient tenants may be accommodated in a Unit. However, this restriction shall not prevent the rental or sublease of an entire Unit for residential purposes, as approved by the Master deed, these By-Laws, or action of the Association.

Section 2.      Occupancy. No more than five (5) persons may continuously occupy any Unit in the Condominium Project. Continuous occupancy shall mean occupancy for more than thirty (30) nights in any calendar year. In the event that there is a violation of this subparagraph by a Co-owner in occupancy of a Unit resulting from the birth or adoption of a child, this restriction shall be suspended as to such Co-owner for a period of one year to enable the Co-owner a reasonable time within which to vacate such Unit.

Section 3.      Alterations and Modifications. No Co-owner shall make alterations in the exterior appearance of their Unit, including the address plaque placed by the Developer, or make structural modifications (including interior walls through or in which there exist easements for support or utilities), or make changes in any of the Common Elements, without the express written approval of the Board of Directors, including without limitation exterior painting, window treatments, other than those provided by the Developer, including any change of the color of the window treatments, or alteration of windows such as the installation of blinds, or the hanging of sheets or other fabric in the windows, and no windows shall be tinted, colored, and illuminated by colored lights of any type, neon lights installed, or other form of non-incandescent lights placed in windows, other than standard types of lamps using incandescent bulbs of reasonable brightness or wattage on tables or surfaces other than sills, or the erection of antennas and aerials (except

4

Li -39027        Pa-5

as provided herein elsewhere), lights, awnings, doors, shutters, newspaper holders, mailboxes, hose reels, except within the garage of a unit, basketball backboards, bird houses or bird feeders, or other exterior attachments or modifications.  No objects shall be maintained by a Co-owner or other person on a window sill at any time. The Association, at its sole discretion shall have the right to enter a Unit, after reasonable notice to the Co-owner, during normal business hours, to replace the standard window treatment provided by the Developer, and to, if necessary, remove objects from the sills. No Co-owner shall in any way restrict access to any plumbing, water line, water line valves, water meter, sprinkler system valves or any element which affects an Association responsibility in any way.  Should access to any facilities of any sort be required, the Association may remove any coverages or attachments of any nature that restrict such access and will have no responsibility for repairing, replacing or reinstalling any materials, whether or not installation thereof has been approved hereunder, that are damaged in the course of gaining such access, nor shall the Association be responsible for monetary damages of any sort arising out of actions taken to gain necessary access. Co-owners shall not change or modify any exterior lighting or lamps, including changing the color of light bulbs, or adding filters, or other coloring materials to change the appearance of such lighting fixtures.  Spot lights shall not be permitted.  Lights may not be connected to motion-detector activated switches.  No outside claxons or sirens may be maintained on any Units as part of an alarm or security system, or otherwise.  It is understood that the Developer will install one outside light near the entryway of each Unit with a photocell to cause such light to be on during times when it is night or there is low outside light; no Co-owner shall change or tamper with these photocells, or change the wattage of the lights installed by the Developer, for the purpose of maintaining attractive uniformity for the Condominium Project and all Co-owners, their families, and guests.

All holiday decorations may be installed by individual Co-owners, however such decorations shall be limited to the entryway door of the Unit, and such decorations shall not be placed on a Unit more than three weeks before the holiday, and must be removed within one week after the holiday. There shall be no holiday decorations placed on Unit balconies or patios. The Association shall have broad discretion to promulgate rules on appropriate and inappropriate holiday decorations and lighting, including the quantities of such decorations and the types of lighting and brightness of lighting, and whether lights may be flashing, blinking, or intermittent in display characteristics.

Section 4.    Activities. No improper, unlawful, immoral, or offensive activity shall be carried on in any Unit or upon the Common Elements, nor shall anything be done which may be or become an annoyance or nuisance to the Co-owners of the Condominium.  No unreasonably noisy activity shall occur in or on the Common Elements or in any Unit at any time and disputes among Co-owners, arising as a result of this provision which cannot be amicably resolved, shall be arbitrated by the Association.    No nuisances shall be permitted on the Condominium property, nor shall any use or practice that is a source of annoyance

5

Li-39027        Pa-6

to the residents or that interferes with the peaceful possession or proper use of the Condominium Project by its residents be permitted. No work shall be permitted inside garages after 9:00 p.m., and at no time shall there be noise from radios, music players, power tools and equipment. Motorcycles may be stored in garages, but the engines shall not be started in garages, and when taken from the garage, motorcycles shall be started and driven off the project premises along drives as directly as possible, and returned to garages in the same manner, all to limit the potential noise and aggravation to other Co-owners, their families, and guests. Garage doors must be kept shut at all times, except when it is required to open them for purposes of ingress and egress, and no item shall be stored or maintained in a garage which will prohibit the garage door from closing completely to the ground. No gasoline or other flammable or explosive substance shall be maintained or stored in a garage or elsewhere in a Unit, other than fuel actually in the tank of a motor vehicle. No Co-owner shall do or permit anything to be done or keep or permit to be kept in his Unit or on the Common Elements anything that will increase the rate of insurance on the Condominium without the written approval of the Association, and each Co-owner shall pay to the Association the increased cost of insurance premiums resulting from any such activity or the maintenance of any such condition even if approved. Activities which are deemed offensive and are expressly prohibited include, but are not limited to, the following: any activity involving the use of firearms, air rifles, pellet guns, B-B guns, bows and arrows, or other similar dangerous weapons, projectiles or devices. No fireworks shall be used at any time within the Condominium Project.

Section 5.    Pets.  No animals, including household pets, except one (1) dog and/or one (1) cat, neither of which shall exceed twenty (20) pounds in weight, shall be maintained by any Co-owner unless specifically approved in writing by the Association. No animal may be kept or bred for any commercial purpose and shall have such care and restraint so as not to be obnoxious or offensive on account of noise, odor or unsanitary conditions. No animal may be permitted to run loose at any time upon the Common Elements and any animal shall at all times be leashed and attended by some responsible person while on the Common Elements, and the owner of each pet shall be responsible for cleaning up after it. No savage or dangerous animal shall be kept and any Co-owner who causes any animal to be brought or kept upon the premises of the Condominium shall indemnify and hold harmless the Association for any loss, damage or liability which the Association may sustain as the result of the presence of such animal on the premises, whether or not the Association has given permission therefor. No dog which barks that can be heard on any frequent or continuing basis shall be kept in any Unit or on the Common Elements. The Association may charge all Co-Owners maintaining animals a reasonable additional assessment in the event that the Association determines such assessment is necessary to defray the maintenance cost to the Association of accommodating animals within the Condominium. The Association shall have the right to require that any pets be registered with it and may adopt such additional reasonable rules and regulations with respect to animals as it may deem proper. In the event of any violation of this Section, the Board of Directors

6

Li-39027        Pa-7

may assess fines for such violation in accordance with these By-Laws and in accordance with duly adopted rules.

Section 6.    Aesthetics.  The Common Elements shall not be used for storage of supplies, materials, personal property or trash or refuse of any kind, except as provided in duly adopted rules and regulations of the Association. Trash may not be placed outside until after sundown on the evening before trash pick-up day, and all trash shall be in containers either as provided by the Developer or the City (such as recycling containers), or identical in appearance to such containers (which should fit conveniently inside the garage area).  No trash shall be placed outside garages in paper or plastic bags, or in boxes, or other containers than those specified.   Pick-up of large items, such as appliances, furniture, or mattresses, shall be as arranged with the company responsible for trash pick-up and shall be placed out in the manner and time to fully meet that company's specifications. Trash receptacles shall be maintained in areas designed therefor at all times and shall not be permitted to remain elsewhere on the Common Elements except for such short periods of time as may be reasonably necessary to permit periodic collection of trash.  Garage doors shall be kept closed at all times except as may be reasonable necessary to gain access to or from any garage.  No unsightly condition shall be maintained on any patio, balcony, stoop, or entranceway, and only furniture and equipment consistent with normal and reasonable use may be placed on patios and balconies, and no furniture or equipment of any kind shall be placed on stoops, or stored on patios or balconies during the winter season, November 1 to March 31.  The Common Elements shall not be used in any way for the drying, shaking or airing of clothing or other fabrics. In general, no activity shall be carried on or condition maintained by a Co-owner, either in his Unit or upon the Common Elements, which is detrimental to the appearance of the Condominium.  No Co-owner shall display, hang, or store any clothing, sheets, blankets, laundry, or other articles outside a Unit or inside the Unit in a way that is visible from the outside of the Unit, except for window treatments provided by the Developer or adopted by the Association.  Co-owners shall not paint or decorate the outside of a Unit or install window air-conditioning units, snap-in window dividers, awnings, or other equipment, fixtures, or items without written permission from the Board of Directors. These restrictions shall not be construed to prohibit a Co-owner from placing and maintaining outdoor furniture and flower pots with decorative foliage of a customary type and appearance on a patio or balcony that is a limited Common Element appurtenant to a Unit.  No Co-owner shall install any radio or television antenna, solar dish, or similar device on any Unit.  Notwithstanding the foregoing, a Co-owner shall be permitted to install an antenna for reception of direct television broadcasting or reception of video programing by wireless cable (otherwise known a multichannel multipoint distribution) so long as such installation is at the location designed by the Architectural Control Committee for such installations in the roof area, through the attic area, or as it may elsewhere be located, and such installation is not visible from the exterior of the Unit, (Note: no Unit has a rear, and all exterior locations are highly visible to neighbors) except as designated by the Architectural Control Committee, and in conformance with such other reasonable rules and regulations

7

Li-39027      Pa-8
as may be imposed by the Association in support of safety and aesthetic concerns within limits proscribed by the Federal Communications Commission.

Section 7.    Vehicles. No house trailers, mobile homes, vans, temporary structures, commercial vehicles, boat trailers, boats, camping vehicles, camping trailers, motorcycles, all terrain vehicles, snowmobiles, snowmobile trailers or vehicles, other than automobiles or vehicles used primarily for general personal transportation use, may be parked or stored upon the premises of the Condominium, unless parked in an area specifically designated therefor by the Association. The parking or operation of motorcycles is specifically prohibited anywhere in the Condominium, except as provided above.  Parking in General Common Element parking spaces is reserved exclusively for guests on the premises of the Condominium. No inoperable vehicles of any type may be bought or stored upon the Condominium premises either temporarily or permanently. Commercial vehicles and trucks shall not be parked in or about the Condominium (except as above provided) unless while making deliveries or pickups in the normal course of business. Co-owners shall, if the Association should require, register with the Association all cars maintained on the Condominium premises.  No tents, shacks, accessory building, outbuilding, or other temporary structures shall be erected, occupied, or used on the Condominium property without written consent from the Association.   No recreational vehicles, boats, or trailers shall be maintained on the Condominium property, unless stored in the garage, and under no circumstances shall boat motors, snowmobiles, personal water craft, or other motorized recreational equipment be started inside garages, or on the Condominium premises, except vehicles built for highway use, such as motor homes. No maintenance or repair shall be performed on any boat or vehicle except within a garage or Unit where it is totally isolated from public view. No oil, grease, gasoline, or toxic materials of any type, shall be disposed of on the Condominium premises.

Section 8.    Advertising. No signs, banners, or other advertising devices of any kind shall be displayed which are visible from the exterior of a Unit or on the Common Elements, including "For Sale" signs, without written permission from the Association.

Section 9.    Rules and Regulations.  It is intended that the Board of Directors may make rules and regulations from time to time to reflect the needs and desires of the majority of the Co-owners in the Condominium.  Reasonable regulations consistent with the Condominium Act, the Master Deed and these By-Laws concerning the use of the Common Elements may be made and amended from time to time by the Board of Directors, including the first Board of Directors (or its successors) prior to the Transitional Control Date.  Copies of all such rules, regulations and amendments thereto shall be furnished to all Co-owners. Any such regulation or amendment may be revoked at any time by the affirmative vote of 66-2/3% of the Co-owners in number and value, except that the Co-owners may not revoke any regulation or amendment prior to the First Annual Meeting.

8

Li-39027       Pa-9
Section 10.  Right to Access of Association.  The Association or its duly authorized agents shall have access to each Unit and Limited Common Elements appurtenant thereto from time to time, during reasonable working hours, upon notice to the Co-owners thereof, as may be necessary for the maintenance, repair or replacement of any of the Common Elements. The Association or its agents shall have access to each Unit and any Limited Common Elements appurtenant thereto at all times without notice as may be necessary to make emergency repairs to prevent damage to the Common Elements or to another Unit. It shall be the responsibility of each Co-owner to provide the Association means of access to his Unit and any Limited Common Elements appurtenant thereto during all periods of absence, and in the event of the failure of such Co-owner to provide means of access, the Association may gain access in such manner as may be reasonable under the circumstances and shall not be liable to such Co-owners for any necessary damage to his Unit and any Limited Common Elements appurtenant thereto caused thereby or repair or replacement of any doors or windows damaged in gaining such access.

Section 11.  Landscaping.  No Co-owner shall perform any landscaping or plant any trees, shrubs or place any ornamental materials upon the Common Elements without the prior written approval of the Association.

Section 12.  Common Element Maintenance.  Sidewalks, yards, landscaping areas, driveways, drives, and parking areas shall not be obstructed in any way, nor shall they be used for purposes other than for which they are reasonably and obviously intended. No bicycles, vehicles, chairs or benches may be left unattended on or about the Common Elements. No pots, lanterns, statues, decorative ornaments shall be placed around the exterior of any Unit.  No barbeque grilles, or cooking equipment, unless appropriate natural gas or liquid propane fired, shall be used, on any balcony or patio. No barbeque grills, open fires, or other outdoor cooking equipment shall be used or maintained on any Common Element.  A reasonable number of flower pots, or similar floral containers, when they contain healthy and attractive plants or small evergreen type trees, may be maintained on the Limited Common Elements of the balconies and patios only. No such decorative materials shall be kept on door stoops, walkways, or in driveways. No play equipment, other than that which is maintained by the Association, shall be placed on the project grounds. No bicycles, vehicles, chairs or other obstructions may be left unattended on or about the Common Elements. Balconies and other Common Elements, other than patios, shall be cleared of all personal materials, including chairs, other furniture, flower pots (if not containing healthy green plants), during the winter months, November 1 to March 31, of each year.

Section 13.  Co-owner Maintenance.  Each Co-owner shall maintain his Unit and any Limited Common Elements appurtenant thereto for which he has maintenance responsibility in a safe, clean and sanitary condition. Each Co-owner shall also use due care to avoid damaging any of the Common Elements including, but not limited to, the telephone, water, gas, plumbing, electrical or other utility

9

Li-39027          Pa-10

conduits and systems and any other elements in any Unit which are appurtenant to or which may affect any other Unit. Each Co-owner shall be responsible for damages or costs to the Association resulting from negligent damage to or misuse of any of the Common Elements by him, or his family, guests, agents or invitees, unless such damages or costs are covered by insurance carried by the Association (in which case there shall be no such responsibility, unless reimbursement to the Association is excluded by virtue of a deductible provision, in which case the responsible Co-owner shall bear the expense to the extent of the deductible amount). Any cost or damages to the Association may be assessed to and collected from the responsible Co-owner in the manner provided in Article II hereof.

Section 14.  Reserved Rights of Developer.

(a)  Developer's Rights In Furtherance of Development and Sales. None of the restrictions contained in this Article VI shall apply to the commercial activities, signs, or billboards, if any, of the Developer during the Development and Sales Period or of the Association in furtherance of its powers and purposes set forth herein and in its Articles of Incorporation, as the same may be amended from time to time.  Notwithstanding anything to the contrary elsewhere herein contained, Developer shall have the right to maintain a sales office, a business office, a construction office, model units, storage areas and reasonable parking incident to the foregoing and such access to, from and over the Condominium as may be reasonable to enable development and sale of the entire Condominium by Developer.  Developer shall restore the areas so utilized to habitable status upon termination of use.

(b)  Enforcement of By-Laws.  The Condominium shall at all times be maintained in a manner consistent with the highest standards of a beautiful, serene, private, residential community for the benefit of the Co-owners and all persons interested in the Condominium. If at any time the Association fails or refuses to carry out its obligation to maintain, repair, replace and landscape in a manner consistent with the maintenance of such high standards, then the Developer, or any entity to which it may assign this right, at its option, may elect to maintain, repair and/or replace any Common Elements and/or to do any landscaping required by these By-Laws and to charge the cost thereof to the Association as an expense of administration.   The Developer or the Architectural Control Committee shall have the right to enforce these By-Laws notwithstanding that it may no longer own a Unit in the Condominium, which right of enforcement may include (without limitation) an action to restrain the Association or any Co-Owner from any activity prohibited by these By-Laws.

10

Li-39027      Pn-11

(c)    Developer's Assignment Rights. Any and all rights and powers of the Developer that have been granted or reserved by law or herein (or in any of the other Condominium Documents) to Developer (including, without limitation, any right or power to approve or to disapprove any act, use or proposed action or any other matter or thing) may be assigned by Developer to any person or entity, including, without limitation, the Association.    Any assignment by Developer must be evidenced by a written instrument that must also be signed by the assignee to evidence the assumption by that assignee of the rights of the Developer hereunder. Notwithstanding the foregoing, as of the expiration of the Development and Sales Period, any and all of the rights hereunder of Developer that have not been theretofore assigned by Developer will be deemed to have been assigned to and assumed by the Architectural Control Committee; provided, however, that in no event will Developer be deemed to have thereby assigned or in any other manner relinquished any real property rights granted or reserved to Developer or its successors and assigns in the Master Deed or in any other Condominium Documents or recorded declarations, including, without limitation, any access easements, utility easements or any other easements created or reserved in the Master Deed, any of the other Condominium Documents or any recorded Declaration (any of which may only be terminated by a written instrument signed by Developer and recorded with the Wayne County Register of Deeds).

(d)    Method of Evidencing Developer's Approval. **ANY APPROVAL, WAIVER, OR OTHER ACTION HEREUNDER BY DEVELOPER WILL <u>NOT</u> BE EFFECTIVE UNLESS THAT APPROVAL, WAIVER, OR OTHER ACTION IS IN WRITING AND IS SIGNED BY DEVELOPER. CO-OWNERS, THE ASSOCIATION (AND ANY OTHER PERSONS OR ENTITIES) MAY NOT RELY UPON ANY APPROVAL, WAIVER, OR OTHER ACTION HEREUNDER IF THAT APPROVAL, WAIVER, OR OTHER ACTION IS GRANTED OR TAKEN BY ANY PERSON (INCLUDING, WITHOUT LIMITATION, ANY EMPLOYEES OR REPRESENTATIVES OF DEVELOPER) OTHER THAN DEVELOPER.    AGENTS, EMPLOYEES, CONSULTANTS, ATTORNEYS AND OTHER REPRESENTATIVES AND ADVISORS OF DEVELOPER ARE NOT LIABLE WITH RESPECT TO ANY APPROVALS, WAIVERS OR OTHER ACTIONS UNDER THE CONDOMINIUM DOCUMENTS.**

Section 15.  Common Elements.    Only Co-owners of Units in the Condominium and their agents, tenants, family members, invitees, and licensees may use the Common Elements for access to and from the Units and for other purposes incidental to the use of the Units. Any recreational facilities, storage

Li-39027        Pg-12

areas, and other common areas designed for a specific use shall be used only for the purposes approved by the Association. The use, maintenance, and operation of the Common Elements shall not be obstructed or unreasonably interfered with by any Co-owner and shall be subject to any leases, concessions, or easements now or later entered into by the Association.

Section 16.   Non-Disturbance of Natural Areas. No Co-owner shall cause or permit any disturbance to such buffer areas as may be installed within the Condominium, whether or not such area is landscaped, nor shall any Co-owner cause or permit any activity that shall cause or contribute to the erosion or crumbling of the banks of any storm water detention area located within the Condominium.

Section 17.   Fertilizer Use. No fertilizers may be used within the Project which may, in the estimation of the Architectural Control Committee, damage any wetlands which may be located within or near the Project. The Association may ban fertilizers which may damage any such wetlands from use in the Project.

Section 18.   Authority of Association re Special Assessment Districts. The acceptance of a conveyance or the execution of a land contract by any Co-owner or purchaser of a Unit shall constitute the agreement by such Co-owner or purchaser, his or her heirs, executors, administrators, or assigns, that the Board of Directors of the Association shall be vested with full power and authority to obligate all Co-owners to participate in a special assessment district, sign petitions requesting said special assessment, and consider and otherwise act on all special assessment district issues on behalf of the Association and all Co-owners; provided that, prior to signature by the Association on a petition for improvement, the desirability of said improvement shall be approved by an affirmative vote of not less than fifty-one percent (51%) of all Co-owners.  No consent of mortgagees shall be required for approval of said improvement.

Section 19.   Leases.

(a)   Leasing and Rental. Before the Transitional Control Date, during the Development and Sales Period the rights of a Co-owner, including the Developer, to rent any number of Condominium Units shall be controlled by the provisions of the Condominium Documents as recorded by the Developer and shall not be changed without Developer approval. After the Transitional Control Date, the Association may amend the Condominium Documents as to the rental of Condominium Units or terms of occupancy as provided under Article XVI of these By-Laws. The amendment shall not affect the rights of any lessors or lessees under a written lease otherwise in compliance with this Section and executed before the effective date of the amendment, or Condominium Units as long as they are owned or leased by the Developer. All leasing shall comply with all civil rights laws, including, but not limited to the Michigan Elliot-

12

Li-39027       Pa-13

Larsen Civil Rights Act (Act No. 453 of the Public Acts of 1976, as amended) which prohibits discrimination in housing based upon religion, race, color, national origin, age, sex, height, weight, familial status, or marital status.

(b)     Disclosure of Lease Terms to the Association. A Co-owner, including the Developer, desiring to rent or lease a Condominium Unit shall disclose that fact in writing to the Association at least ten (10) days before presenting a lease form or otherwise agreeing to grant possession of a Condominium Unit to a potential lessee and at the same time, shall supply the Association with a copy of the exact lease form for its review for its compliance with the Condominium Documents. If no lease form is to be used, then the Co-owner or Developer shall supply the Association with the name and address of the potential lessee, along with the rental amount and due dates under the proposed agreement.

(c)     Compliance with Condominium Documents. Tenants or non Co-owner occupants shall comply with all of the conditions of the Condominium Documents of the Condominium Project, and all leases and rental agreements shall so state.

(d)     Procedures in the Event of Noncompliance with Condominium Documents. If the Association determines that the tenant or non Co-owner occupant failed to comply with the conditions of the Condominium Documents, the Association shall take the following action:

(i)     The Association shall notify the Co-owner by certified mail, advising of the alleged violation by the tenant. The Co-owner shall have fifteen (15) days after receipt of the notice to investigate and correct the alleged breach by the tenant or advise the Association that a violation has not occurred.

(ii)     If after fifteen (15) days the Association believes that the alleged breach is not cured or may be repeated, it may institute on its behalf or derivatively by the Co-owners on behalf of the Association, if it is under the control of the Developer, an action for both eviction against the tenant or non Co-owner occupant and, simultaneously, for money damages against the Co-owner and tenant or non Co-owner occupant for breach of the conditions of the Condominium Documents. The relief provided for in this Section may be by summary proceeding. The Association may hold both the tenant and the Co-

13

L 39027 - P 14

Li-39027          Pa-14

owner liable for any damages to the General Common Elements caused by the Co-owner or tenant in connection with the Unit or Condominium.

(e)     Notice to Co-owner's Tenant Permitted When Co-owner is in Arrears to the Association for Assessments. When a Co-owner is in arrearage to the Association for assessments, the Association may give written notice of the arrearage to a tenant occupying a Co-owner's Unit under a lease or rental agreement, and the tenant, after receiving the notice, shall deduct from rental payments due the Co-owner the arrearage and future assessments as they fall due and pay them to the Association. The deduction does not constitute a breach of the rental agreement or lease by the tenant. If the tenant, after being notified, fails or refuses to remit rent otherwise due the Co-owner to the Association, then the Association may do the following:

(i)     Issue a statutory notice to quit for non-payment of rent to the tenant and shall have the right to enforce that notice by summary proceeding.

(ii)    Initiate proceedings pursuant to subsection (4)(b).

Section 20.   Additional Restrictions.  The Developer reserves the right to create additional restrictions and/or to revise or eliminate restrictions in connection with the development of the Project, as deemed necessary by the Developer, in the Developer's sole discretion, by amending this Article VI of the Condominium By-Laws and providing each Co-owner with a copy thereof."

6.     Except as set forth in this First Amendment, the Original Master Deed (including the Condominium By-Laws and Condominium Subdivision Plan attached thereto), is hereby ratified and confirmed.

**[SEE FOLLOWING PAGE FOR SIGNATURE]**

14

(Page 15 of 40)

L 39027 - P 15

Li-39027        Pa-15
SIGNED BY:

NORTHPOINTE TOWNHOMES, L.L.C., a Michigan
limited liability company

By:    Hometowne Building Company L.L.C., a
       Michigan limited liability company
Its:   Member

       By:    _____
              Patrick O'Leary, Trustee of the Patrick
              O'Leary Revocable Inter-Vivos Trust
              u/a/d 3/24/97
       Its:   Member

STATE OF MICHIGAN    )
                     : ss
COUNTY OF OAKLAND    )

       The foregoing instrument was acknowledged before me this ___2nd___ day of
___July___, 2003, by Patrick O'Leary, Trustee of the Patrick O'Leary Revocable Inter-Vivos
Trust u/a/d 3/24/97, a Member of Hometowne Building Company L.L.C., a Michigan limited
liability company, a Member of Northpointe Townhomes, L.L.C., a Michigan limited liability
company, on behalf of Northpointe Townhomes, L.L.C.

                                        _____

                                        NOTARY PUBLIC
                                        ___MK STEC___, State of Michigan
                                        My Commission Expires:   7-19-03

**M. K. STEC**
Notary Public, Wayne County, MI
My Commission Expires 07/19/2003

DRAFTED BY AND WHEN RECORDED RETURN TO:

Dean J. Gould, Esq.
Thomas R. August, Esq.
Jackier, Gould, Bean, Upfal & Eizelman
Second Floor, 121 West Long Lake Road
Bloomfield Hills, Michigan 48304-2719
(248) 642-0500

J:\187413\9.1\00009937.WPD

REPLAT NO. 1 TO
WAYNE COUNTY CONDOMINIUM SUBDIVISION PLAN NO. 686
EXHIBIT "B" TO THE MASTER DEED OF

# NORTHPOINTE TOWNHOMES CONDOMINIUM

CITY OF MELVINDALE, WAYNE COUNTY, MICHIGAN

NOTE:
THE ASTERISK (*) AS SHOWN IN THE SHEET INDICATES AMENDED OR NEW SHEETS WHICH A REVISED, DATED JULY 2, 2003. THESE SHEETS THIS SUBMISSION ARE TO REPLACE OR BE SUB SHEETS TO THOSE PREVIOUSLY RECORDED.

INDEX

*1.    TITLE PAGE
*2.    SURVEY PLAN AND FUTURE DEVELOPMENT AREA DETAIL
*3.    SITE PLAN — SHEET INDEX
 4.    SITE PLAN — SHEET 1 OF 5
 5.    SITE PLAN — SHEET 2 OF 5
*5A.   SITE PLAN — SHEET 3 OF 5
*5B.   SITE PLAN — SHEET 4 OF 5
*5C.   SITE PLAN — SHEET 5 OF 5
 6.    EASEMENT PLAN — SHEET 1 OF 5
 7.    EASEMENT PLAN — SHEET 2 OF 5
*7A.   EASEMENT PLAN — SHEET 3 OF 5
*7B.   EASEMENT PLAN — SHEET 4 OF 5
*7C.   EASEMENT PLAN — SHEET 5 OF 5
 8.    EASEMENT PLAN —
       IN AND THROUGH "FUTURE DEVELOPMENT AREA"
*9.    UTILITY PLAN
 10.   PERIMETER PLAN — 6 UNIT BUILDING, TYPE "A"
 11.   FIRST FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "FRONT"
 12.   FIRST FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "BACK"
 13.   SECOND FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "FRONT"
 14.   SECOND FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "BACK"
*15.   PERIMETER PLAN: 6 UNIT BUILDING, TYPE "B"
*16.   FIRST FLOOR PLAN: 6 UNIT BUILDING, TYPE "B"
*17.   SECOND FLOOR PLAN: 6 UNIT BUILDING, TYPE "B"
*18.   PERIMETER PLAN: 12 UNIT BUILDING, TYPE "A"
*19.   FIRST FLOOR PLAN: 12 UNIT BUILDING, TYPE "A"
*20.   SECOND FLOOR PLAN: 12 UNIT BUILDING, TYPE "A"
*21.   PERIMETER PLAN: 12 UNIT BUILDING, TYPE "B"
*22.   FIRST FLOOR PLAN: 12 UNIT BUILDING, TYPE "B" FRONT
*23.   FIRST FLOOR PLAN: 12 UNIT BUILDING, TYPE "B" BACK
*24.   SECOND FLOOR PLAN: 12 UNIT BUILDING, TYPE "B" FRONT
*25.   SECOND FLOOR PLAN: 12 UNIT BUILDING, TYPE "B" BACK
*26.   CROSS SECTIONS: 6 UNIT BUILDING, TYPE "A" AND
                       12 UNIT BUILDING, TYPE "B"
*27.   CROSS SECTIONS: 6 UNIT BUILDING, TYPE "B" AND
                       12 UNIT BUILDING, TYPE "A"

SURVEYOR AND ENGINEER
ROY J. RUSSELL, P.E., P.S.
LAND—TEC CONSULTANTS, INC.
COMMUNITY PLANNING AND ENGINEERING CONSULTANTS
2002 HOGBACK ROAD, SUITE 9
ANN ARBOR, MICHIGAN 48105

DEVELOPER:
NORTHPOINTE TOWNHOMES,
37899 W. TWELVE MILE ROA
BUILDING C
FARMINGTON HILLS, MICHIGAN

## LEGAL DESCRIPTION

A part of Private Claims 32 and 49, City of Melvindale, Wayne County, Michigan being more particularly described as commencing at the Northwesterly Corner of Lot 354 of "Melwood Park Sub. No. 6", as recorded in Liber 87 of Plats, on Pages 72 and 73, Wayne County Records, for a POINT OF BEGINNING; thence North 29°01'15" East, 372.37 feet, along the Easterly right-of-way line Prospect Ave. (60 feet wide); thence South 82°13'45" East, 1200.85 feet; ther South 07°46'15" West, 316.02 feet; thence North 82°13'45" West, 330.80 feet; feet; thence South 07°45'00" West, 296.47 feet; thence North 82°15'00" West, 459.93 feet, to the Northerly line of said "Melwood Park Sub. No. 6"; thence t following courses along the Northerly line of said "Melwood Park Sub. No. 6"; thence North 11°52'32" West, 205.04 feet, and, North 82°13'45" West, 289.85 f and, North 60°58'45" West, 200.00 feet, along the Northerly line of said "Melwood Park Sub. No. 6", to the point of beginning.
All of the above containing 13.578 Acres.

EXAMINED AND APPROVED
DATE SEP 3 0 2003
BY _____
DANIEL P. LANE
PLAT ENGINEER

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

PROJ
JULY

# TITLE PAGE

LAND—TEC CONSULTANTS, INC.
Community Planning and Engineering Cons
2002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (577) 503—8166  Fax (989) 738—

Li-39027    Pa-16





BASIS OF COORDINATES:
SOUTHWEST CORNER
OF SUBJECT PROPERTY
NORTH = 5000.0000
EAST = 5000.0000

BUILDING CORNERS

| PT. NO. | NORTH | EAST |
|---|---|---|
| 70 | N 5204.3694 | E 5647.4018 |
| 71 | N 5192.6503 | E 5733.2790 |
| 72 | N 5133.2013 | E 5725.1663 |
| 73 | N 5144.2204 | E 5639.2892 |
| 74 | N 5192.1967 | E 5773.5813 |
| 75 | N 5168.8687 | E 5944.5270 |
| 76 | N 5109.4197 | E 5936.4143 |
| 77 | N 5132.7477 | E 5765.4687 |
| 94 | N 5048.8263 | E 5840.4144 |
| 95 | N 5035.1072 | E 5926.2916 |
| 96 | N 4975.6583 | E 5918.1789 |
| 97 | N 4987.3774 | E 5832.3017 |
| 98 | N 5070.6105 | E 5629.1485 |
| 99 | N 5047.2809 | E 5800.1057 |
| 100 | N 4987.8319 | E 5791.9930 |
| 101 | N 5011.1615 | E 5621.0358 |

GRAPHIC SCALE

( IN FEET )
1 inch = 20 ft.

SITE PLAN
(SHEET 3 OF 5)

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY L. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

PROPOSED DATED
JULY 2, 2003

LAND—TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
3003 Huntpark Road, Suite D
Ann Arbor, Michigan 48105
Phone (877) 303—8164  Fax (989) 736—5175

NOTE:
BUILDING A (UNITS 1 THRU 8) MUST BE BUILT.
ALL OTHER BUILDINGS/UNITS NEED NOT BE BUILT.
1  DENOTES UNIT NUMBER.
(1) DENOTES COORDINATE POINT NUMBER.
(R) DENOTES ROADWAY.
(W) DENOTES WALK.
(P) DENOTES PARKING.

P1 PORCH AND UNIT NUMBER — LIMITED COMMON ELEMENT
D1 DRIVEWAY AND UNIT NUMBER — LIMITED COMMON ELEMENT
L1 LIMITED COMMON ELEMENT AND UNIT NUMBER
GENERAL COMMON ELEMENT.
LIMITED COMMON ELEMENT.

SEE SHEET 7A FOR EASEMENT DETAILS

REEVES DRIVE  24' WIDE
WHITTAKER DRIVE  24' WIDE
NORTHPOINTE BOULEVARD  24' WIDE
MATCH LINE — SEE SHEET 5C

BLDG. F
BLDG. G
BLDG. O
BLDG. P

U N P L A T T E D
S 8213'45" E  1200.85





SITE PLAN
(SHEET 3 OF 5)

NORTHPOINTE TOWNHOMES CONDOMINIUM

LAND-TEC CONSULTANTS, INC.



EASEMENT PLAN
(SHEET 5 OF 5)





## BUILDINGS: A, F, P, Z, I AND O

86.67'

14.39' 7.67' 25.03' 16.84' 22.74'

SEE FLOOR PLAN SHEETS FOR DETAILED UNIT CONFIGURATION AND SIZES

SEE SITE PLAN SHEETS FOR BUILDING BEARING, COORDINATE LOCATION AND VALUE

NOTE: LOCATION OF WATER METER ROOM VARIES DEPENDING ON BUILDING NUMBER. ALTHOUGH DIMENSIONS SHOWN ARE CONSISTENT, SEE SITE PLAN SHEETS FOR SPECIFIC LOCATION OF ROOM FOR EACH BUILDING.

WATER METER ROOM (GENERAL COMMON ELEMENT)

GRAPHIC SCALE
( IN FEET )
1 inch = 8.0 feet

NOTE:
P     DENOTES PORCH
PA   DENOTES PATIO
----- = CENTERLINE BETWEEN UNITS (APPROXIMATE)
= LIMITED COMMON ELEMENT

### LEGEND : UNIT TYPE*

| UNIT TYPE | UNIT NUMBERS |
|---|---|
| "U.L.I.R. II" = "UPPER LEVEL INTERIOR RANCH II" | 6, 48, 78, 120, 138 AND 144 |
| "F.L.C.R." = "FIRST LEVEL CORNER RANCH" | 3, 47, 77, 119, 137 AND 143 |
| "U.L.C.R." = "UPPER LEVEL CORNER RANCH" | 5, 45, 75, 117, 135 AND 141 |
| "U.L.C.R." = "UPPER LEVEL CORNER RANCH" | 4, 46, 76, 118, 136 AND 142 (R) |
| "F.L.C.R." = "FIRST LEVEL CORNER RANCH" | 1, 44, 74, 116, 134 AND 140 (R) |
| "U.L.I.R. II" = "UPPER LEVEL INTERIOR RANCH II" | 2, 43, 73, 115, 133 AND 139 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE.
*NOTE: UNIT TYPES SHOWN ARE VALID FOR GROUND FLOOR ONLY. SEE FLOOR PLAN SHEETS FOR SECOND STORY CONFIGURATIONS.

NORTHPOINTE TOWNHOMES CONDOMINIUM

PERIMETER PLAN-
6 UNIT BUILDING, TYPE 'B'

PROPOSED DATED JULY 2, 2003

LAND-TEC CONSULTANTS, INC.
Community Planning And Engineering Consultants
3202 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 503-6178 Fax (586) 739-3175

15



FIRST FLOOR PLAN-
6 UNIT BUILDING, TYPE "B"

BUILDINGS: A, F, P, Z, I AND O

BALCONY 83 SQ.FT.

BALCONY 81 SQ.FT.

"U.L.I.R. II" 1,115 SQ.FT.

"U.L.C.R." 1,277 SQ.FT.

"U.L.C.R." 1,277 SQ.FT.

CENTERLINE BETWEEN UNITS

CENTERLINE BETWEEN UNITS

"U.L.I.R. II" 1,115 SQ.FT.

BALCONY 83 SQ.FT.

BALCONY 81 SQ.FT.

13.17'   2.00'   8.24'   0.50'   0.85'   7.16'   14.24'
11.48'   11.90'   0.69'   17.61'   17.42'
31.96'   29.61'   24.31'   1.00'
0.54'   40.99'   0.54'
1.00'   0.50'   0.50'   1.00'
0.54'   0.45'   57.25'   0.54'
1.00'   0.45'   24.31'   0.45'   31.96'   0.54'
17.42'   17.61'   11.90'   11.48'
0.54'   14.24'   7.16'   8.24'   13.17'
1.00'   0.69'   4.82'   0.85'   2.00'

GRAPHIC SCALE
( IN FEET )
1 inch = 4.0 ft.

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP
CENTERLINE BETWEEN UNITS
ALL OWNERSHIP LINES ARE 90° TO EACH OTHER
INTERIOR WALLS ARE AS NOTED
EXTERIOR WALLS ARE 0.37' WIDE UNLESS OTHERWISE NOTED
ALL WALLS ARE GENERAL COMMON ELEMENT

BUILDINGS: A, F, P, Z, I AND O

UNIT NUMBERS

6, 49, 78, 129, 138 AND 144 (P)
5, 45, 75, 117, 135 AND 141 (R)
4, 46, 76, 118, 136 AND 142 (P)
2, 43, 73, 115, 133 AND 139 (R)

LEGEND : UNIT TYPE*
"U.L.I.R. II" = "UPPER LEVEL INTERIOR RANCH II"
"U.L.C.R." = "UPPER LEVEL CORNER RANCH"
"U.L.C.R." = "UPPER LEVEL CORNER RANCH"
"U.L.I.R. II" = "UPPER LEVEL INTERIOR RANCH II"
NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE.

NORTHPOINTE TOWNHOMES CONDOMINIUM

SECOND FLOOR PLAN:
6 UNIT BUILDING, TYPE "B"

PROPOSED DATED
JULY 2, 2003

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 505-8188  Fax (248) 738-3171

17

(Page 28 of 40)   L 39027 - P 28

L-1-39027   Pa-28



NOTE: LOCATION OF WATER METER ROOM
VARIES DEPENDING ON BUILDING NUMBER.
ALTHOUGH DIMENSIONS SHOWN ARE CONSISTENT,
SEE SITE PLAN SHEETS FOR SPECIFIC
LOCATION OF ROOM FOR EACH BUILDING.

WATER METER ROOM
(GENERAL COMMON ELEMENT)

GRAPHIC SCALE

( IN FEET )
1 inch = 8.0 feet

BUILDINGS: C, D, G, R, S, AA AND N

SEE FLOOR PLAN SHEETS FOR UNIT CONFIGURATION AND S

SEE SITE PLAN SHEETS FOR BUILDI COORDINATE LOCATION AND

### LEGEND : UNIT TYPE*

| | UNIT NUMBERS |
|---|---|
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 14, 26, 49, 79, 91, 103 AND 145 |
| "FLCR" = FIRST LEVEL CORNER RANCH | 13, 25, 50, 80, 92, 104 AND 146 (R) |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 16, 28, 51, 81, 93, 105 AND 147 |
| "ULCR" = UPPER LEVEL CORNER RANCH | 20, 32, 52, 82, 94, 106 AND 148 (R) |
| "FLIR" = FIRST LEVEL INTERIOR RANCH | 15, 27, 53, 83, 95, 107 AND 149 |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 21, 33, 54, 84, 96, 108 AND 150 (R) |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 17, 29, 55, 85, 97, 109 AND 151 |
| "FLIR" = FIRST LEVEL INTERIOR RANCH | 22, 34, 56, 86, 98, 110 AND 152 (R) |
| "ULCR" = UPPER LEVEL CORNER RANCH | 19, 31, 57, 87, 99, 111 AND 153 |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 23, 35, 58, 88, 100, 112 AND 154 (R) |
| "FLCR" = FIRST LEVEL CORNER RANCH | 18, 30, 59, 89, 101, 113 AND 155 |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 24, 36, 60, 90, 102, 114 AND 156 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE
*NOTE: UNIT TYPES SHOWN ARE VALID FOR GROUND FLOOR ONLY.
SEE FLOOR PLAN SHEETS FOR SECOND STORY CONFIGURATIONS.

NOTE:

P      DENOTES PORCH

PA     DENOTES PATIO

— — — — — — = CENTERLINE BETW
(APPROXIMATE)

= LIMITED COMMON

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

PERIMETER PL
12 UNIT BUILDING

LAND—TEC CONSULTANTS, IN
Community Planning and Engineerin
2022 Hogback Road, Suite 3
Ann Arbor, Michigan 48105
Phone (877) 503-4100  Fax (989)





## BUILDINGS: C, D, G, R, S, AA AND N

### UNIT NUMBERS

| | |
|---|---|
| /EL INTERIOR RANCH II | 14, 26, 49, 79, 91, 103 AND 145 |
| L CORNER RANCH | 13, 25, 50, 80, 92, 104 AND 146 (R) |
| /EL INTERIOR RANCH | 16, 28, 51, 81, 93, 105 AND 147 |
| /EL CORNER RANCH | 20, 32, 52, 82, 94, 106 AND 148 (R) |
| L INTERIOR RANCH | 15, 27, 53, 83, 95, 107 AND 149 |
| /EL INTERIOR RANCH II | 21, 33, 54, 84, 96, 108 AND 150 (R) |
| /EL INTERIOR RANCH II | 17, 29, 55, 85, 97, 109 AND 151 |
| L INTERIOR RANCH | 22, 34, 56, 86, 98, 110 AND 152 (R) |
| /EL INTERIOR RANCH | 19, 31, 57, 87, 99, 111 AND 153 |
| /EL INTERIOR RANCH | 23, 35, 58, 88, 100, 112 AND 154 (R) |
| L CORNER RANCH | 18, 30, 59, 89, 101, 113 AND 155 |
| /EL INTERIOR RANCH II | 24, 36, 60, 90, 102, 114 AND 156 (R) |

PLAN BUILT IN REVERSE IMAGE

ARE VALID FOR GROUND FLOOR ONLY.
HEETS FOR SECOND STORY CONFIGURATIONS.

SEE FLOOR PLAN SHEETS FOR DETAILED
UNIT CONFIGURATION AND SIZES
SEE SITE PLAN SHEETS FOR BUILDING BEARING,
COORDINATE LOCATION AND VALUE

NOTE:

P      DENOTES PORCH

PA     DENOTES PATIO

---------- = CENTERLINE BETWEEN UNITS
            (APPROXIMATE)

= LIMITED COMMON ELEMENT

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED
JULY 2, 2003

### PERIMETER PLAN:
### 12 UNIT BUILDING, TYPE 'A'

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11192

LAND–TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 0
Ann Arbor, Michigan 48105
Phone (877) 503–8166  Fax (989) 736–5175

18

GENERAL COMMON
ELEMENT

LIMITED COMMON
ELEMENT

- LIMITS OF OWNERSHIP

- CENTERLINE BETWEEN UNITS
NES ARE 90° TO EACH OTHER
RE 0.50' WIDE UNLESS OTHERWISE NOTED
ARE 0.69' WIDE UNLESS OTHERWISE NOTED
ENERAL COMMON ELEMENT
GARAGE

HOMES CONDOMINIUM

PROPOSED DATED
JULY 2, 2003

### FIRST FLOOR PLAN:
### 12 UNIT BUILDING, TYPE 'A'

LAND–TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 0
Ann Arbor, Michigan 48105
Phone (877) 503–8166  Fax (989) 736–5175

19



BUILDINGS: C, D, G, R, S, AA AND N

SEE FLOOR PLAN SHEETS FOR DETAILED
UNIT CONFIGURATION AND SIZES

SEE SITE PLAN SHEETS FOR BUILDING BEARING,
COORDINATE LOCATION AND VALUE

GRAPHIC SCALE

| LEGEND : UNIT TYPE* | UNIT NUMBERS |
|---|---|
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 14, 26, 49, 79, 91, 103 AND 145 |
| "FLCR" = FIRST LEVEL CORNER RANCH | 13, 25, 50, 80, 92, 104 AND 146 (R) |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 16, 28, 51, 81, 93, 105 AND 147 |
| "ULCR" = UPPER LEVEL CORNER RANCH | 20, 32, 52, 82, 94, 106 AND 148 (R) |
| "FLIR" = FIRST LEVEL INTERIOR RANCH | 15, 27, 53, 83, 95, 107 AND 149 |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 21, 33, 54, 84, 96, 108 AND 150 (R) |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 17, 29, 55, 85, 97, 109 AND 151 |
| "FLIR" = FIRST LEVEL INTERIOR RANCH | 22, 34, 56, 86, 98, 110 AND 152 (R) |
| "ULCR" = UPPER LEVEL CORNER RANCH | 19, 31, 57, 87, 99, 111 AND 153 |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 23, 35, 58, 88, 100, 112 AND 154 (R) |
| "FLCR" = FIRST LEVEL CORNER RANCH | 18, 30, 59, 89, 101, 113 AND 155 |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 24, 36, 60, 90, 102, 114 AND 156 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE
*NOTE: UNIT TYPES SHOWN ARE VALID FOR GROUND FLOOR ONLY.
SEE FLOOR PLAN SHEETS FOR SECOND STORY CONFIGURATIONS.

NOTE:

P: DENOTES PORCH

PA DENOTES PATIO

– – – – – – – = CENTERLINE BETWEEN UNITS
(APPROXIMATE)

= LIMITED COMMON ELEMENT

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED
JULY 2, 2003

PERIMETER PLAN-
12 UNIT BUILDING, TYPE 'A'

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11131

LAND-TEC CONSULTANTS, INC.

NOTE: LOCATION OF WATER METER ROOM
VARIES DEPENDING ON BUILDING NUMBER,
ALTHOUGH DIMENSIONS SHOWN ARE CONSISTENT,
SEE SITE PLAN SHEETS FOR SPECIFIC
LOCATION OF ROOM FOR EACH BUILDING.

WATER METER ROOM
(GENERAL COMMON ELEMENT)

L 39027 - P 31

Pg-29

Li-39027

(Page 31 of 40)



BUILDINGS: C, D, G, R, S, AA AND N

GRAPHIC SCALE

( IN FEET )
1 inch = 8.0 feet

LEGEND : UNIT TYPE*

| UNIT TYPE | | UNIT NUMBERS |
|---|---|---|
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 14, 26, 49, 79, 91, 103 AND 145 |
| "FLCR" | = FIRST LEVEL CORNER RANCH | 13, 25, 50, 80, 92, 104 AND 146 (R) |
| "ULIR" | = UPPER LEVEL INTERIOR RANCH | 16, 28, 51, 81, 93, 105 AND 147 |
| "ULCR" | = UPPER LEVEL CORNER RANCH | 20, 32, 52, 82, 94, 106 AND 148 (R) |
| "FLIR" | = FIRST LEVEL INTERIOR RANCH | 15, 27, 53, 83, 95, 107 AND 149 |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 21, 33, 54, 84, 96, 108 AND 150 (R) |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 17, 29, 55, 85, 97, 109 AND 151 |
| "FLIR" | = FIRST LEVEL INTERIOR RANCH | 22, 34, 56, 86, 98, 110 AND 152 (R) |
| "ULCR" | = UPPER LEVEL CORNER RANCH | 19, 31, 57, 87, 99, 111 AND 153 |
| "ULIR" | = UPPER LEVEL INTERIOR RANCH | 23, 35, 58, 88, 100, 112 AND 154 (R) |
| "FLCR" | = FIRST LEVEL CORNER RANCH | 18, 30, 59, 89, 101, 113 AND 155 |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 24, 36, 60, 90, 102, 114 AND 156 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP

CENTERLINE BETWEEN UNITS

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER
INTERIOR WALLS ARE 0.50' WIDE UNLESS OTHERWISE NOTED
EXTERIOR WALLS ARE 0.69' WIDE UNLESS OTHERWISE NOTED
ALL WALLS ARE GENERAL COMMON ELEMENT
"GAR." INDICATES GARAGE

PROPOSED DATED
JULY 2, 2003

FIRST FLOOR PLAN
12 UNIT BUILDING, TYPE "A"

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 503-8166  Fax (989) 736-3175

19

(Page 32 of 40)

L 39027 - P 32

Li-39027    Pa-30



## BUILDINGS: C, D, G, R, S, AA AND N

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

— LIMITS OF OWNERSHIP

— — CENTERLINE BETWEEN UNITS

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER
INTERIOR WALLS ARE AS NOTED

EXTERIOR WALLS ARE 0.37' WIDE UNLESS OTHERWISE NOTED
ALL WALLS ARE GENERAL COMMON ELEMENT

| LEGEND : UNIT TYPE* | UNIT NUMBERS |
|---|---|
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 14, 26, 49, 79, 91, 103 AND 145 |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 16, 28, 51, 81, 93, 105 AND 147 |
| "ULCR" = UPPER LEVEL CORNER RANCH | 20, 32, 52, 82, 94, 106 AND 148 (R) |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 21, 33, 54, 84, 96, 108 AND 150 (R) |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 17, 29, 55, 85, 97, 109 AND 151 |
| "ULCR" = UPPER LEVEL CORNER RANCH | 19, 31, 57, 87, 99, 111 AND 153 |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 23, 35, 58, 88, 100, 112 AND 154 (R) |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 24, 36, 60, 90, 102, 114 AND 156 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE

GRAPHIC SCALE
( IN FEET )
1 inch = 3.0 feet

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED
JULY 2, 2003

LAND—TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
3002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 503-0168  Fax (989) 739-5175

**SECOND FLOOR PLAN-
12 UNIT BUILDING, TYPE "A"**

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11117



**BUILDINGS: Q AND H**

| LEGEND : UNIT TYPE* | UNIT NUMBERS |
|---|---|
| "THA-F" = "TOWNHOME END A – FRONT" | 61 AND 121 |
| "CH-F" = "CARRIAGE HOME – FRONT" | 63 AND 123 |
| "THI-F" = "TOWNHOME INTERIOR – FRONT" | 65 AND 125 |
| "THA-BR" = "TOWNHOME END A – BACK" | 62 AND 122 |
| "CH-BR" = "CARRIAGE HOME – BACK" | 64 AND 124 |
| "THI-BR" = "TOWNHOME INTERIOR – BACK" | 66 AND 126 |
| "THA-FR" = "TOWNHOME END A – FRONT" | 71 AND 131 |
| "CH-FR" = "CARRIAGE HOME – FRONT" | 69 AND 129 |
| "THI-FR" = "TOWNHOME INTERIOR – FRONT" | 67 AND 127 |
| "THA-B" = "TOWNHOME END A – BACK" | 72 AND 132 |
| "CH-B" = "CARRIAGE HOME – BACK" | 70 AND 130 |
| "THI-B" = "TOWNHOME INTERIOR – BACK" | 68 AND 128 |

NOTE: "R" INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE
*NOTE: UNIT TYPES SHOWN ARE VALID FOR GROUND FLOOR ONLY.
       SEE FLOOR PLAN SHEETS FOR SECOND STORY CONFIGURATIONS.

SEE FLOOR PLAN SHEETS FOR DETAILED
UNIT CONFIGURATION AND SIZES

SEE SITE PLAN SHEETS FOR BUILDING BEARING,
COORDINATE LOCATION AND VALUE

NOTE:

P DENOTES PORCH
PA DENOTES PATIO

= CENTERLINE BETWEEN UNITS
  (APPROXIMATE)
= LIMITED COMMON ELEMENT

NORTHEPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11167

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 5
Ann Arbor, Michigan 48105
Phone (877) 505-9188  Fax (205) 758-5175

PROPOSED DATED
JULY 2, 2003

**PERIMETER PLAN:**
**12 UNIT BUILDING, TYPE 'B'**

21

LI-39027    Pa-32

L 39027 - P 35

Pn-33

LI-39027

(Page 35 of 40)



SEE SHEET 17 FOR "BACK" OF BUILDING

SEE SITE PLAN SHEETS FOR COMPLETE BUILDING CONFIGURATION DATA

## BUILDINGS: Q AND H

GRAPHIC SCALE

( IN FEET )
1 inch = 15.0 feet

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER.
ALL WALLS ARE 0.75' WIDE UNLESS OTHERWISE NOTED.
ALL WALLS ARE GENERAL COMMON ELEMENT.

| LEGEND : UNIT TYPE | UNIT NUMBERS |
|---|---|
| "THA–F" = "TOWNHOME END A – FRONT" | 61 AND 121 |
| "CH–F" = "CARRIAGE HOME – FRONT" | 63 AND 123 |
| "THI–F" = "TOWNHOME INTERIOR – FRONT" | 65 AND 125 |
| "THA–FR" = "TOWNHOME END A – FRONT" | 71 AND 131 |
| "CH–FR" = "CARRIAGE HOME – FRONT" | 69 AND 129 |
| "THI–FR" = "TOWNHOME INTERIOR – FRONT" | 67 AND 127 |

NOTE: "R" INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED
JULY 2, 2003

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 17137

FIRST FLOOR PLAN:
12 UNIT BUILDING TYPE "B"
FRONT

LAND–TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2022 Hogback Road, Suite 5
Ann Arbor, Michigan 48105
Phone (877) 553–8563  Fax (989) 739–5175

22



SEE SHEET 16 FOR "FRONT" OF BUILDING

SEE SITE PLAN SHEETS FOR COMPLETE BUILDING CONFIGURATION DATA

## BUILDINGS Q AND H

GRAPHIC SCALE

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER.
ALL WALLS ARE 0.75' WIDE UNLESS OTHERWISE NOTED.
ALL WALLS ARE GENERAL COMMON ELEMENT.

LEGEND : UNIT TYPE                                    UNIT NUMBERS

"THA-BR" = "TOWNHOME END A - BACK"         62 AND 122
"CH-BR" = "CARRIAGE HOME - BACK"            64 AND 124
"THI-BR" = "TOWNHOME INTERIOR - BACK"       66 AND 126
"THA-B" = "TOWNHOME END A - BACK"           72 AND 132
"CH-B" = "CARRIAGE HOME - BACK"             70 AND 130
"THI-B" = "TOWNHOME INTERIOR - BACK"        68 AND 128

NOTE: "R" INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE.

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED
JULY 2, 2003

RON J. RUSSELL
ENGINEER & SURVEYOR
NO. 11592

FIRST FLOOR PLAN:
12 UNIT BUILDING, TYPE "B"
BACK

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 360-8788  Fax (856) 738-5375

23

L 39027 - P 36

(Page 36 of 40)

L 39027 - P 37

P=-35

Li-39027



SEE SHEET 19 FOR "BACK" OF BUILDING

SEE SITE PLAN SHEETS FOR COMPLETE BUILDING CONFIGURATION DATA

## BUILDINGS: Q AND H

GRAPHIC SCALE

( IN FEET )
1 inch = 8.0 feet

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER.
ALL WALLS ARE 0.75' WIDE UNLESS OTHERWISE NOTED.
ALL WALLS ARE GENERAL COMMON ELEMENT.

| LEGEND : UNIT TYPE | UNIT NUMBERS |
|---|---|
| "THA−F" = "TOWNHOME END A − FRONT" | 61 AND 121 |
| "CH−F" = "CARRIAGE HOME − FRONT" | 63 AND 123 |
| "THI−F" = "TOWNHOME INTERIOR − FRONT" | 65 AND 125 |
| "THA−FR" = "TOWNHOME END A − FRONT" | 71 AND 131 |
| "CH−FR" = "CARRIAGE HOME − FRONT" | 69 AND 129 |
| "THI−FR" = "TOWNHOME INTERIOR − FRONT" | 67 AND 127 |

NOTE: "R" INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE

PROPOSED DATED
JULY 2, 2003

NORTHPOINTE TOWNHOMES CONDOMINIUM

SECOND FLOOR PLAN-
12 UNIT BUILDING, TYPE "B"
FRONT

ROY J. RUSSELL
ENGINEER & SURVEYOR
NC. 11157

LAND−TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 563−5108  Fax (989) 736−5178

24

SEE SHEET 18 FOR "FRONT" OF BUILDING

SEE SITE PLAN SHEETS FOR COMPLETE BUILDING CONFIGURATION DATA

## BUILDINGS: Q AND H

GRAPHIC SCALE

( IN FEET )
1 inch = 5.0 feet

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER.
ALL WALLS ARE 0.75' WIDE UNLESS OTHERWISE NOTED.
ALL WALLS ARE GENERAL COMMON ELEMENT.

LEGEND : UNIT TYPE

| | UNIT NUMBERS |
|---|---|
| "THA—BR" = "TOWNHOME END A — BACK" | 62 AND 122 |
| "CH—BR" = "CARRIAGE HOME — BACK" | 64 AND 124 |
| "THI—BR" = "TOWNHOME INTERIOR — BACK" | 66 AND 126 |
| "THA—B" = "TOWNHOME END A — BACK" | 72 AND 132 |
| "CH—B" = "CARRIAGE HOME — BACK" | 70 AND 130 |
| "THI—B" = "TOWNHOME INTERIOR — BACK" | 68 AND 128 |

NOTE: "R" INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE.

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED
JULY 2, 2003

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

### SECOND FLOOR PLAN:
### 12 UNIT BUILDING, TYPE "B"
### BACK

LAND—TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 502—5160  Fax (989) 736—5175

25

Po-26   Lt-39027

L 39027 - P 38A

Fe-37

LI-39027



SECTION B-B

SECTION C-C

SECTION A-A

| BUILDING | UNIT NUMBER | GARAGE FLOOR ELEVATION |
|---|---|---|
| "B" | 7 THRU 12 | 589.00 |
| "E" | 37 THRU 42 | 589.00 |
| "G" | 61 THRU 72 | 589.70 |
| "H" | 121 THRU 132 | 589.70 |

NOTE: ALL FLOOR ELEVATIONS ARE BASED ON U.S.G.S. DATUM

GRAPHIC SCALE

( IN FEET )
1 inch = 4.0 ft.

———— LIMITS OF OWNERSHIP
ALL WALLS ARE GENERAL COMMON ELEMENT.

NORTHPOINTE TOWNHOMES CONDOMINIUM    PROPOSED DATED JULY 2, 2003

**CROSS-SECTIONS:**
**6 UNIT BUILDING, TYPE "A",**
**AND**
**12 UNIT BUILDING, TYPE "B"**

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11597

LAND—TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 5
Ann Arbor, Michigan 48105
Phone (877) 503-5168  Fax (989) 738-5175      26

| BUILDING | UNIT NUMBER | GARAGE FLOOR ELEVATION |
|---|---|---|
| "A" | 1 THRU 6 | 589.30 |
| "C" | 13 THRU 24 | 589.00 |
| "D" | 25 THRU 36 | 589.30 |
| "F" | 43 THRU 48 | 589.70 |
| "G" | 49 THRU 60 | 589.70 |
| "I" | 133 THRU 138 | 589.70 |
| "N" | 145 THRU 156 | 589.70 |
| "O" | 139 THRU 144 | 589.70 |
| "P" | 73 THRU 78 | 589.70 |
| "R" | 79 THRU 90 | 589.70 |
| "S" | 91 THRU 102 | 589.70 |
| "Z" | 115 THRU 120 | 589.70 |
| "AA" | 103 THRU 114 | 589.70 |

NOTE: ALL FLOOR ELEVATIONS ARE BASED ON U.S.G.S. DATUM

GRAPHIC SCALE
( IN FEET )
1 inch = 4.0 ft.

SECTION B-B

SECTION C-C

SECOND FLOOR CEILING
SECOND FLOOR
JOIST
FIRST FLOOR
GARAGE FLOOR

SECTION A-A

LIMITS OF OWNERSHIP
ALL WALLS ARE GENERAL COMMON ELEMENT.

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

PROPOSED DATED
JULY 2, 2003

CROSS-SECTIONS:
6 UNIT BUILDING, TYPE "B",
AND
12 UNIT BUILDING, TYPE "A"

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
2002 Hogback Road, Suite 9
Ann Arbor, Michigan 48105
Phone (877) 303-8168  Fax (692) 756-5175

27

Pg-38
L-39027

C

WAYNE COUNTY CONDOMINIUM SUBDIVISION PLAN NO. 686

EXHIBIT "B" TO THE MASTER DEED OF

# NORTHPOINTE TOWNHOMES CONDOMINIUM

CITY OF MELVINDALE, WAYNE COUNTY, MICHIGAN

THE CONDOMINIUM SUBDIVISION PLAN NUMBER MUST BE ASSIGNED IN CONSECUTIVE SEQUENCE. WHEN A NUMBER HAS BEEN ASSIGNED TO THIS PROJECT, IT MUST BE PROPERLY SHOWN IN THE TITLE, SHEET 1, AND THE SURVEYOR'S CERTIFICATE, SHEET 2.

SURVEYOR AND ENGINEER
ROY J. RUSSELL, P.E., P.S.
LAND-TEC CONSULTANTS, INC.
COMMUNITY PLANNING AND ENGINEERING CONSULTANTS
CARRIAGE TRACE FARM
26740 PONTIAC TRAIL
SOUTH LYON, MICHIGAN  4817B

DEVELOPER:
NORTHPOINTE TOWNHOMES, L.L.C.
37899 W. TWELVE MILE ROAD
BUILDING C
FARMINGTON HILLS, MICHIGAN  48331

INDEX

1. TITLE PAGE
2. SURVEY PLAN AND
   FUTURE DEVELOPMENT AREA DETAIL
3. SITE PLAN — SHEET INDEX
4. SITE PLAN — SHEET 1 OF 2
5. SITE PLAN — SHEET 2 OF 2
6. EASEMENT PLAN — SHEET 1 OF 2
7. EASEMENT PLAN — SHEET 2 OF 2
8. EASEMENT PLAN —
   IN AND THROUGH "FUTURE DEVELOPMENT AREA"
9. UTILITY PLAN
10. PERIMETER PLAN — 6 UNIT BUILDING, TYPE "A"
11. FIRST FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "FRONT"
12. FIRST FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "BACK"
13. SECOND FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "FRONT"
14. SECOND FLOOR PLAN: 6 UNIT BUILDING, TYPE "A" — "BACK"
15. PERIMETER PLAN: BUILDING A
16. FIRST FLOOR PLAN: BUILDING A
17. SECOND FLOOR PLAN: BUILDING A
18. PERIMETER PLAN — 12 UNIT BUILDING
19. FIRST FLOOR PLAN: 12 UNIT BUILDING
20. SECOND FLOOR PLAN: 12 UNIT BUILDING
21. CROSS SECTIONS: 6 UNIT BUILDING, TYPE "A"
22. CROSS SECTIONS: BUILDING A, AND 12 UNIT BUILDINGS

LEGAL DESCRIPTION

A part of Private Claim 32, City of Melvindale, Wayne County, Michigan, being more particularly described as commencing at the Northwesterly Corner of Lot 354 of "Melwood Park Sub. No. 6", as recorded in Liber 87 of Plats, on Pages 72 and 73, Wayne County Records, for a POINT OF BEGINNING; thence North 29°01'15" East, 372.37 feet, along the Easterly right-of-way line of Prospect Ave. (60 feet wide); thence South 82°13'45" East, 468.85 feet; thence South 07°46'15" West, 304.02 feet; thence South 65°26'59" West, 91.39 feet; thence South 78°08'40" West, 24.00 feet; thence South 33°05'28" West, 64.84 feet, to the Northerly line of said "Melwood Park Sub. No. 6"; thence the following courses along the Northerly line of said "Melwood Park Sub. No. 6"; thence North 82°13'45" West, 289.85 feet, and, North 60°58'45" West, 200.00 feet, along the Northerly line of said "Melwood Park Sub. No. 6", to the point of beginning. All of the above containing 4.910 Acres.

EXAMINED AND APPROVED
DATE JAN 1 7 2003
BY XGS
DANIEL P. LANE
PLAT ENGINEER

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

PROPOSED DATED
JANUARY 9, 2003

# TITLE PAGE

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Carriage Trace Farm
26740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446-150V  Fax (248) 446-1513

1

SURVEYOR'S CERTIFICATE

I, Roy J. Russell, Professional Surveyor of the State of Michigan, hereby certify:

That the Subdivision Plan known as Wayne County Condominium Subdivision Plan No. 666, as shown on the accompanying drawings, represents a survey on the ground made under my direction; that there are no existing encroachments upon the lands and property herein described;

That the required monuments and iron markers have been located in the ground as required by rules promulgated under Section 142 of Act Number 59 of the Public Acts of 1978, as amended;

That the accuracy of this survey is within the limits required by rules promulgated under Section 142 of Act Number 59 of the Public Acts of 1978, as amended;

That the bearings as shown are noted on Survey Plan as required by the rules promulgated under Section 142 of Act Number 59 of the Public Acts of 1978, as amended.

Date: January 9, 2003    Roy J. Russell, Professional Surveyor
Registration Number 11197
Land-Tec Consultants, Inc.
Carriage Trace Farm
26740 Pontiac Trail
South Lyon, Michigan 48178

NOTE:
BEARINGS ARE SHOWN IN RELATION TO THE NORTHERLY LINE OF "MELWOOD PARK SUB. NO. 6" (SOUTHERLY BOUNDARY OF THIS PARCEL), AS RECORDED IN LIBER 87 OF PLATS, ON PAGES 72 AND 73, WAYNE CO. RECORDS.

THIS PROPERTY ("DESCRIBED PARCEL" AND "FUTURE DEVELOPMENT AREA") DOES NOT LIE WITHIN A FLOOD PLAIN.

SEE "SITE PLAN" SHEETS AND "EASEMENT PLAN" SHEETS FOR ADDITIONAL EASEMENT DATA.

THE SYMBOL "O" DENOTES A CONCRETE MONUMENT CONSISTING OF A 1/2" DIAMETER STEEL ROD ENCASED IN A 4" DIAMETER CONCRETE CYLINDER, 3' LONG.

THE SYMBOL "•" DENOTES A 1/2" DIAMETER STEEL ROD, 18" LONG WHICH HAS BEEN SET.

VICINITY MAP
NO SCALE

GRAPHIC SCALE
100   0   50  100        200            400
( IN FEET )
1 inch = 100 ft.

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED JANUARY 9, 2003

SURVEY PLAN
AND FUTURE DEVELOPMENT AREA DETAIL

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Carriage Trace Farm
26740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446-1509  Fax (248) 446-1513

















SEE FLOOR PLAN SHEETS FOR DETAILED UNIT CONFIGURATION AND SIZES

SEE SITE PLAN SHEETS FOR BUILDING BEARING, COORDINATE LOCATION AND VALUE

WATER METER ROOM (GENERAL COMMON ELEMENT)

NOTE: LOCATION OF WATER METER ROOM VARIES DEPENDING ON BUILDING NUMBER. ALTHOUGH DIMENSIONS SHOWN ARE CONSISTENT, SEE SITE PLAN SHEETS FOR SPECIFIC LOCATION OF ROOM FOR EACH BUILDING.

**BUILDINGS: B AND E**

| LEGEND : UNIT TYPE* | UNIT NUMBERS |
|---|---|
| "THA-F" = "TOWNHOME END A - FRONT" | 7 AND 37 |
| "CH-F" = "CARRIAGE HOME - FRONT" | 8 AND 38 |
| "THB-F" = "TOWNHOME END B - FRONT" | 9 AND 39 |
| "THA-B" = "TOWNHOME END A - BACK" | 10 AND 40 |
| "CH-B" = "CARRIAGE HOME - BACK" | 11 AND 41 |
| "THB-B" = "TOWNHOME END B - BACK" | 12 AND 42 |

*NOTE: UNIT TYPES SHOWN ARE VALID FOR GROUND FLOOR ONLY.
SEE FLOOR PLAN SHEETS FOR SECOND STORY CONFIGURATIONS.

NOTE:

P    DENOTES PORCH
PA   DENOTES PATIO
= CENTERLINE BETWEEN UNITS (APPROXIMATE)
= LIMITED COMMON ELEMENT

GRAPHIC SCALE

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED JANUARY 9, 2003

**PERIMETER PLAN: 6 UNIT BUILDING, TYPE "A"**

ROY J. RUSSELL ENGINEER & SURVEYOR NO. 11197

LAND—TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Curriage Trace Farms
26740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446-1509  Fax (248) 446-1513

10





SEE SHEET 11 FOR "FRONT" OF BUILDING

LEGEND : UNIT TYPE

| UNIT TYPE | UNIT NOS. |
|---|---|
| "THA-B" – "TOWNHOME END A – BACK" | 10 AND 40 |
| "CH-B" – "CARRIAGE HOME – BACK" | 11 AND 41 |
| "THB-B" – "TOWNHOME END B – BACK" | 12 AND 42 |

SEE SITE PLAN SHEETS FOR
COMPLETE BUILDING CONFIGURATION DATA

GRAPHIC SCALE

( IN FEET )
1 inch = 4.0 ft.

—————— LIMITS OF OWNERSHIP

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER.
ALL WALLS ARE 0.75' WIDE UNLESS OTHERWISE NOTED.
ALL WALLS ARE GENERAL COMMON ELEMENT.

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

PROPOSED DATED
JANUARY 9, 2003

FIRST FLOOR PLAN:
6 UNIT BUILDING, TYPE 'A'
"BACK"

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Carriage Town Farm
26740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446-1509  Fax (248) 446-1513

12

Li-37283    Fb-72

(Page 72 of 82)



SEE SHEET 14 FOR "BACK" OF BUILDING

UNIT TYPE "THA-B"

UNIT TYPE "CH-B"

UNIT TYPE "THB-B"

UNIT TYPE "THA-F"
632 SQ.FT.

UNIT TYPE "CH-F"
1,114 SQ.FT.

UNIT TYPE "THB-F"
632 SQ.FT.

BALCONY
76 SQ.FT.

SEE SITE PLAN SHEETS FOR
COMPLETE BUILDING CONFIGURATION DATA

| LEGEND : UNIT TYPE | UNIT NOS. |
|---|---|
| "THA-F" - "TOWNHOME END A - FRONT" | 7 AND 37 |
| "CH-F" - "CARRIAGE HOME - FRONT" | 8 AND 38 |
| "THB-F" - "TOWNHOME END B - FRONT" | 9 AND 39 |

GRAPHIC SCALE
( IN FEET )
1 inch = 4.0 ft.

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP
ALL OWNERSHIP LINES ARE 90° TO EACH OTHER.
ALL WALLS ARE 0.37' WIDE UNLESS OTHERWISE NOTED.
ALL WALLS ARE GENERAL COMMON ELEMENT.

NORTHPOINTE TOWNHOMES CONDOMINIUM

PROPOSED DATED
JANUARY 9, 2003

SECOND FLOOR PLAN:
6 UNIT BUILDING, TYPE 'A'
"FRONT"

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Carriage Trace Farm
26740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446-1509  Fax (248) 446-1513

Pa-73

LL-37283

(Page 73  of  82)





SEE FLOOR PLAN SHEETS FOR DETAILED
UNIT CONFIGURATION AND SIZES

SEE SITE PLAN SHEETS FOR BUILDING BEARING,
COORDINATE LOCATION AND VALUE

NOTE:

P     DENOTES PORCH
PA    DENOTES PATIO

- - - - - - - = CENTERLINE BETWEEN UNITS
              (APPROXIMATE)

= LIMITED COMMON ELEMENT

| LEGEND : UNIT TYPE* | UNIT NO. |
|---|---|
| UPPER LEVEL INTERIOR RANCH II | 6 |
| FIRST LEVEL CORNER RANCH | 3 |
| UPPER LEVEL CORNER RANCH | 5 |
| UPPER LEVEL CORNER RANCH | 4  (R) |
| FIRST LEVEL CORNER RANCH | 1  (R) |
| UPPER LEVEL INTERIOR RANCH II | 2  (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE.

*NOTE: UNIT TYPES SHOWN ARE VALID FOR GROUND FLOOR ONLY.
        SEE FLOOR PLAN SHEETS FOR SECOND STORY CONFIGURATIONS.

GRAPHIC SCALE

PROPOSED DATED
JANUARY 8, 2003

NORTHPOINTE TOWNHOMES CONDOMINIUM

PERIMETER PLAN
BUILDING A (only)

LAND–TEC CONSULTANTS, INC.

15



FIRST FLOOR PLAN:
BUILDING A (only)





BUILDINGS: C AND D

SEE FLOOR PLAN SHEETS FOR DETAILED
UNIT CONFIGURATION AND SIZES

SEE SITE PLAN SHEETS FOR BUILDING BEARING,
COORDINATE LOCATION AND VALUE

NOTE:

P    DENOTES PORCH

PA   DENOTES PATIO

– – – – – – – = CENTERLINE BETWEEN UNITS
(APPROXIMATE)

= LIMITED COMMON ELEMENT

| LEGEND : UNIT TYPE* | | UNIT NUMBERS |
|---|---|---|
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 13 AND 25 |
| "FLCR" | = FIRST LEVEL CORNER RANCH | 14 AND 26 (R) |
| "ULIR" | = UPPER LEVEL INTERIOR RANCH | 15 AND 27 |
| "ULCR" | = UPPER LEVEL CORNER RANCH | 16 AND 28 (R) |
| "FLIR" | = FIRST LEVEL INTERIOR RANCH | 17 AND 29 |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 18 AND 30 (R) |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 19 AND 31 |
| "FLIR" | = FIRST LEVEL INTERIOR RANCH | 20 AND 32 (R) |
| "ULCR" | = UPPER LEVEL CORNER RANCH | 21 AND 33 |
| "ULIR" | = UPPER LEVEL INTERIOR RANCH | 22 AND 34 (R) |
| "FLCR" | = FIRST LEVEL CORNER RANCH | 23 AND 35 |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 24 AND 36 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE

*NOTE: UNIT TYPES SHOWN ARE VALID FOR GROUND FLOOR ONLY.
SEE FLOOR PLAN SHEETS FOR SECOND STORY CONFIGURATIONS.

GRAPHIC SCALE

( IN FEET )
1 inch = 8.0 feet

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11707

LAND–TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Carriage Trace Farm
35740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446–1509  Fax (248) 446–1513

PROPOSED DATE:
JANUARY 9, 2003

PERIMETER PLAN:
12 UNIT BUILDING

15

LI-27283      Ph-78

(Page 78  of  82)



BUILDINGS: C AND D

| | GENERAL COMMON ELEMENT |
| | LIMITED COMMON ELEMENT |
| | LIMITS OF OWNERSHIP |
| | CENTERLINE BETWEEN UNITS |

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER
INTERIOR WALLS ARE 0.50' WIDE UNLESS OTHERWISE NOTED
EXTERIOR WALLS ARE 0.69' WIDE UNLESS OTHERWISE NOTED
ALL WALLS ARE GENERAL COMMON ELEMENT
"GAR." INDICATES GARAGE

LEGEND : UNIT TYPE*

| UNIT TYPE | UNIT NUMBERS |
|---|---|
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 13 AND 25 |
| "FLCR" = FIRST LEVEL CORNER RANCH | 14 AND 26 (R) |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 15 AND 27 |
| "ULCR" = UPPER LEVEL CORNER RANCH | 16 AND 28 (R) |
| "FLIR" = FIRST LEVEL INTERIOR RANCH | 17 AND 29 |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 18 AND 30 (R) |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 19 AND 31 |
| "FLIR" = FIRST LEVEL INTERIOR RANCH | 20 AND 32 (R) |
| "ULCR" = UPPER LEVEL CORNER RANCH | 21 AND 33 |
| "ULIR" = UPPER LEVEL INTERIOR RANCH | 22 AND 34 (R) |
| "FLCR" = FIRST LEVEL CORNER RANCH | 23 AND 35 |
| "ULIR II" = UPPER LEVEL INTERIOR RANCH II | 24 AND 36 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE

GRAPHIC SCALE
( IN FEET )
1 inch = 8.0 feet

NORTHPOINTE TOWNHOMES CONDOMINIUM

ROY J. RUSSELL
CHANGER & SURVEYOR
NO 11197

PROPOSED DATED
JANUARY 9, 2003

FIRST FLOOR PLAN:
12 UNIT BUILDING

LAND-TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Carriage Trace Farm
28740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446-1509 Fax (248) 446-1513

19

**BUILDINGS: C AND D**

GENERAL COMMON ELEMENT

LIMITED COMMON ELEMENT

LIMITS OF OWNERSHIP

CENTERLINE BETWEEN UNITS

ALL OWNERSHIP LINES ARE 90° TO EACH OTHER
INTERIOR WALLS ARE AS NOTED
EXTERIOR WALLS ARE 0.37' WIDE UNLESS OTHERWISE NOTED
ALL WALLS ARE GENERAL COMMON ELEMENT

| LEGEND : UNIT TYPE* | | UNIT NUMBERS |
|---|---|---|
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 13 AND 25 |
| "FLCR" | = FIRST LEVEL CORNER RANCH | 14 AND 26 (R) |
| "UUR" | = UPPER LEVEL INTERIOR RANCH | 15 AND 27 |
| "ULCR" | = UPPER LEVEL CORNER RANCH | 16 AND 28 (R) |
| "FLIR" | = FIRST LEVEL INTERIOR RANCH | 17 AND 29 |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 18 AND 30 (R) |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 19 AND 31 |
| "FLIR" | = FIRST LEVEL INTERIOR RANCH | 20 AND 32 (R) |
| "ULCR" | = UPPER LEVEL CORNER RANCH | 21 AND 33 |
| "ULIR" | = UPPER LEVEL INTERIOR RANCH | 22 AND 34 (R) |
| "FLCR" | = FIRST LEVEL CORNER RANCH | 23 AND 35 |
| "ULIR II" | = UPPER LEVEL INTERIOR RANCH II | 24 AND 36 (R) |

NOTE: (R) INDICATES FLOOR PLAN BUILT IN REVERSE IMAGE

**SECOND FLOOR PLAN: 12 UNIT BUILDING**

NORTHPOINTE TOWNHOMES CONDOMINIUM



SECTION B—B

SECTION C—C

SECTION A—A

| UNIT NUMBER | GARAGE FLOOR ELEVATION |
|---|---|
| 7 THRU 12 | 589.00 |
| 37 THRU 42 | 589.00 |

NOTE: ALL FLOOR ELEVATIONS ARE BASED ON U.S.G.S. DATUM

GRAPHIC SCALE

( IN FEET )
1 inch = 4.0 ft.

LIMITS OF OWNERSHIP

ALL WALLS ARE GENERAL COMMON ELEMENT.

NORTHPOINTE TOWNHOMES CONDOMINIUM

CROSS-SECTIONS:
6 UNIT BUILDING, TYPE 'A'

PROPOSED DATED
JANUARY 2, 2003

ROY J. RUSSELL
ENGINEER & SURVEYOR
NO. 11197

LAND—TEC CONSULTANTS, INC.
Community Planning and Engineering Consultants
Contiga Snake Farm
39740 Pontiac Trail
South Lyon, Michigan 48178
Phone (248) 446-1905  Fax (248) 446-1513



D















































E

(Page 1 of 82)

EXAMINED AND APPROVED
DATE JAN 1 7 2003  JAN 17 2003
BY _____
DANIEL P. LANE
PLAT ENGINEER.

$252.00 DEED
Receipt #170539
        RECORDED
BERNARD J. YOUNGBLOOD, REGISTER OF DEED
WAYNE COUNTY, MI

Li-37283        Pa-1
203017391   1/17/2003
Bernard J. Youngblood
Wayne Co. Register of Deeds

**MASTER DEED**
**OF**
**NORTHPOINTE TOWNHOMES CONDOMINIUM**

**A RESIDENTIAL CONDOMINIUM**
**WAYNE COUNTY CONDOMINIUM**
**SUBDIVISION PLAN NO. _1086_**

This Master Deed is made and executed this 9TH day of January, 2003, by Northpointe Townhomes, L.L.C., a Michigan limited liability company (hereinafter referred to as "the Developer"), whose address is 37899 W. Twelve Mile Road, Building C, Farmington Hills, MI 48331.

$4.00 REMONUMENTATION

WITNESSETH:

WHEREAS, Developer desires, by recording this Master Deed, together with the Condominium By-Laws attached hereto as Exhibit A and the Condominium Subdivision Plan attached hereto as Exhibit B (both of which are hereby incorporated by reference and made a part hereof), to establish the real property described in Article II below, together with the improvements located thereon, and the appurtenances thereto, as a condominium under the provisions of the Michigan Condominium Act (being MCLA 559.101 et. seq.)

NOW, THEREFORE, upon the recording hereof, Developer establishes Northpointe Townhomes Condominium as a Condominium under the Condominium Act and declares that the Condominium shall be held, conveyed, hypothecated, encumbered, leased, rented, occupied, improved, or in any other manner utilized, subject to the provisions of said Act, and to the covenants, conditions, restrictions, uses, limitations, and affirmative obligations set forth in this Master Deed and the Exhibits hereto, all of which shall be deemed to run with the land and shall be a burden and a benefit to the Developer, its successors and assigns, and any persons acquiring or owning an interest in the said real property, their grantees, successors, heirs, executors, administrators and assigns.

This is to certify that there are no tax liens or titles on this property and that taxes are paid for FIVE YEARS previous to date of this instrument EXCEPT _2002_
No. _6151_    _____ Data _1-17-03_
WAYNE COUNTY TREASURER   Clerk _____

**ARTICLE I**
**TITLE AND NATURE**

The Condominium shall be known as Northpointe Townhomes Condominium, Wayne County Condominium Subdivision Plan No. _1086_. The architectural plans and specifications
01-17-2003 44CL6151          DEED'S        4.00

R MDC 2524R 82pm (A) PR

for the improvements constructed within the Condominium will be filed with the City of Melvindale. The buildings and units contained in the Condominium, including the number, boundaries, dimensions and volume of each Unit therein, are set forth in the Condominium Subdivision Plan attached hereto as Exhibit B. Each building contains individual Units for residential purposes only and each Unit is capable of individual use, having its own access to a Common Element of the Condominium. Each Co-owner in the Condominium shall have an exclusive right to his or her Unit and shall have undivided and inseparable rights to share with the other Co-owners the Common Elements of the Condominium as designated by the Master Deed. Co-owners shall have voting rights in the Northpointe Townhomes Condominium Association as set forth herein and in the By-Laws and Articles of Incorporation of such Association. Nothing in this Master Deed shall be construed to impose upon Developer any legal obligation to build, install or deliver any structure or improvement which is labeled "need not be built" on the Condominium Subdivision Plan attached as Exhibit B.

<h3 style="text-align:center">ARTICLE II<br>LEGAL DESCRIPTION</h3>

The land which comprises the Condominium established by this Master Deed is a parcel of land in the City of Melvindale, Wayne County, Michigan, described as follows:

A part of Private Claim 32, City of Melvindale, Wayne County, Michigan, being more particularly described as commencing at the Northwesterly Corner of Lot 354 of "Melwood Park Sub. No. 6", as recorded in Liber 87 of Plats, on Pages 72 and 73, Wayne County Records, for a POINT OF BEGINNING; thence North 29°01'15" East, 372.37 feet, along the Easterly right-of-way line of Prospect Ave. (60 feet wide); thence South 82°13'45" East, 468.86 feet; thence South 07°46'15" West, 304.02 feet; thence South 65°26'59" West, 91.39 feet; thence South 78°08'40" West, 24.00 feet; thence South 33°05'28" West, 64.84 feet, to the Northerly line of said "Melwood Park Sub. No. 6"; thence on the following courses along the Northerly line of said "Melwood Park Sub. No. 6": North 82°13'45" West, 289.85 feet, and, North 60°58'45" West, 200.00 feet to the point of beginning. All of the above containing 4.910 acres.

Subject to an access ingress, egress easement 30 feet either side of the center line of proposed Northpointe Boulevard to benefit the parcel immediately to the east and running from Prospect Avenue to the easterly line hereof, as recorded in Liber 37118, Page 292 Wayne County Records.

Part of Tax Parcel No. 47-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-000

<h3 style="text-align:center">ARTICLE III<br>DEFINITIONS</h3>

Certain terms used in this Master Deed and the Exhibits hereto, and in the Articles of Incorporation and By-Laws of Northpointe Townhomes Condominium Association are defined as follows:

<p style="text-align:center">2</p>

Li-37283    Pa-3

(a)    The "Act" or "Condominium Act" means Act 59 of the Public Acts of Michigan of 1978, as amended.

(b)    The "Architectural Control Committee" or "Committee" shall mean the Committee appointed in accordance with the provisions of Article XV, below.

(c)    "Association" means Northpointe Townhomes Condominium Association, the Michigan nonprofit corporation, of which all Co-owners shall be members, which Association shall administer, operate, manage and maintain the Condominium.  Any action required of or permitted to the Association shall be exercisable by its Board of Directors unless specifically reserved to its members by the Condominium Documents or the laws of the State of Michigan.

(d)    "By-Laws" means Exhibit A hereto, which are the By-Laws required for the Condominium and also the By-Laws required for the Association as a non-profit corporation.

(e)    "City" means the City of Melvindale.

(f)    "Common Elements" means the portions of the Condominium other than the Condominium Units.

(g)    "Condominium" or "Condominium Project" means Northpointe Townhomes Condominium as a Condominium established pursuant to the provisions of the Act, and includes the land and the buildings, all improvements and structures thereon, and all easements, rights and appurtenances belonging to the Condominium.

(h)    "Condominium Documents", wherever used, means and includes this Master Deed and the Exhibits hereto and the Articles of Incorporation of the Association.

(i)    "Condominium Unit" or "Unit" means the enclosed space constituting a single complete residential Unit designed and intended for separate ownership and use in the Condominium as such space may be described on Exhibit B hereto.

(j)    "Condominium Subdivision Plan" or "Plan" means the Plan attached to this Master Deed as Exhibit B.  The Plan assigns a number to each Condominium Unit and includes a description of the nature, location and approximate size of certain Common Elements.

(k)    "Consolidating Master Deed" means the final amended master deed for a contractible condominium project, an expandable condominium project, or a condominium project containing convertible land or convertible space, which final amended master deed fully describes the condominium project as completed.

(l)    "Co-owner" or "Owner" means a person, firm, corporation, partnership, association, trust or other legal entity or any combination thereof who or which owns one or more Units in the Condominium.  Developer is a Co-owner as long as Developer owns one or more Units.  In the event of the conveyance of a Unit by land contract, the land contract vendees shall be the "Co-owners" of the Unit and shall bear sole liability for all obligations arising with respect to the Unit to the exclusion of the land contract vendors; provided that the Developer or an affiliate of the

3

Li-37283     Pg-4

Developer shall retain the rights and obligations of a Co-owner with respect to any Unit sold under land contract by the Developer or an affiliate of the Developer. The foregoing provision regarding the rights and obligations of land contract vendors and vendees shall apply notwithstanding the definition of "Co-owner" set forth in Section 6 of the Act, as amended by Public Act 379 of 2000.

(m)     "Developer" means Northpointe Townhomes, L.L.C., a Michigan limited liability company, and its successors or assigns. All development rights reserved to Developer herein are assignable in writing; provided, however, that conveyances of Units by Developer, including the conveyance of Units to a "successor developer" pursuant to Section 135 of the Act, shall not serve to assign Developer's development rights unless the instrument of conveyance expressly so states.

(n)     "Development and Sales Period" means the period beginning on the date this Master Deed is recorded and continuing for as long as Developer or any "successor developer" as defined by Act holds for sale any Unit within the Condominium.

(o)     "Future Development Area" means the land described in Article XII, below, some or all of which may be added to the Condominium in one or more amendments of this Master Deed.

(p)     "General Common Elements" means the Common Elements other than the Limited Common Elements.

(q)     "Limited Common Elements" means a portion of the Common Elements reserved in this Master Deed for the exclusive use of less than all of the Co-owners.

(r)     "Master Deed" means this document to which the Condominium By-Laws and Condominium Subdivision Plan are attached as exhibits.

(s)     "Mortgagee" means the named mortgagee or owner of any mortgage on all or any portion of this Condominium.

(t)     "Percentage of Value" means the percentage assigned to each Condominium Unit in this Master Deed. The Percentages of Value of all Units shall total one hundred (100%) percent. Percentages of Value shall be determinative only with respect to those matters to which they are specifically deemed to relate either in the Condominium Documents or in the Act.

(u)     "Person" means an individual, firm, corporation, partnership, association, trust, the state or an agency of the state or other legal entity, or any combination thereof.

(v)     "Transitional Control Date" means the date on which the Board of Directors of the Association takes office pursuant to an election in which the votes which may be cast by eligible Co-owners unaffiliated with the Developer exceed the votes which may be cast by the Developer.

4

Li-37283          Pa-5

## ARTICLE IV
## COMMON ELEMENTS

The Common Elements of the Condominium described in Exhibit B attached hereto and the respective responsibilities for maintenance, decoration, repair, replacement, restoration or renovation thereof are as follows:

(a)     The General Common Elements are:

(1)     The land and beneficial easements, if any, described in Article VII hereof, including any storm water detention areas, recreational areas, parking areas, walks, entrance facilities, and landscaped and open areas; except to the extent any of the foregoing are designated herein or in the Plan as Limited Common Elements.

(2)     The roads throughout the Condominium, designated on the Plan so long as neither the Developer nor the Association has dedicated the roads to public use through the acceptance of such a dedication by the City.

(3)     The electrical system throughout the Condominium, including that contained within Unit walls up to the point of connection with electrical outlets within any Unit.

(4)     The gas transmission lines throughout the Condominium, including that contained within Unit walls up to the point of connection with gas fixtures within any Unit.

(5)     The water distribution system throughout the Condominium up to the point where service is connected or enters each Unit, including all common sprinkling system fixtures and connections, as well as all common sprinkling system controls; and all fire hydrants and attendant equipment.

(6)     The sanitary sewer system throughout the Condominium up to the point where service enters or is connected with each Unit.

(7)     The storm sewer system throughout the Condominium.

(8)     The plumbing network throughout the Condominium, including that contained within Unit walls up to the point of connection with plumbing fixtures within any Unit.

(9)     The cable television transmission system throughout the Condominium (if any) and any telephone or other communication lines, including that part of such system and lines contained within Unit walls up to the point of connection with outlets within any Unit.

(10)   The structural members, materials and components which comprise the exterior walls, the roof, furnace chimneys, the foundations (including support components), the basement foundations, walls and floors, the ceilings and the floors which envelop the air space within the Unit and the air space within the attics, if any, the

5

Li-37283       Pa-6

crawl spaces, if any, outside of a Unit, and Unit perimeter walls (including window and door frames therein, excluding the glass within the frames and glass sliding doors including the frames). The air space outside of a Unit but within the structural items which envelop a Unit is a General Common Element.

(11)    The site lighting, including all wiring, fixtures, posts and meters throughout the Condominium.

(12)    All beneficial utility and drainage easements.

(13)    Such other elements of the Condominium not herein designated as Limited Common Elements which are not enclosed within the boundaries of a Unit.

Some or all of the utility lines, systems (including mains and service leads) and equipment and the telecommunications system, described above may be owned by a local public authority, municipality or a utility company or other private company that is providing the pertinent service. Accordingly, such utility lines, systems and equipment, and the telecommunications system, shall be General Common Elements only to the extent of the Co-owners' interest therein and the Developer makes no warranty whatsoever with respect to the nature or extent of such interest.

(b)    The Limited Common Elements are:

(1)    The balconies, patios, porches and deck areas, if any, designated on the Condominium Subdivision Plan as limited common elements are appurtenant to the Units which open onto the aforesaid balconies, patios and deck areas and are limited to the sole use of the Co-owners of the Units to which they are appurtenant.

(2)    The glass in a window and the glass sliding doors, including the frames which comprise the glass sliding doors, which are located at or on the perimeter of a Unit.

(3)    The fireplace combustion chamber, if any, in each individual Unit.

(4)    Each driveway extending from the private roadway within the Condominium to an attached garage comprising a part of a Unit is designated on the plan as a limited common element and is limited to the sole use of the Co-owners of the Units that gain access to their garages over those driveways.

(5)    The entire heating, ventilation and air conditioning systems and its component parts serving each Unit to the point of connection with the outside walls of the Unit shall be appurtenant to and limited to the sole use of the Co-owners of the Unit served by the system.

(6)    Any other amenity or appurtenance, if any, outside of a Unit, that is identified as a Limited Common Element in the Condominium Subdivision Plan attached as Exhibit B, unless otherwise described in this Master Deed.

6

Li-37283     Pa-7

(c)    The responsibility for the full cost of maintenance, decoration, repair and replacement of the General and Limited Common Elements shall be the sole responsibility of the Association, except where specific exceptions are stated in the Condominium Documents and are to be paid for according to the provisions of these Condominium Documents. The full responsibility for the Unit shall be borne by the Co-owners of the Unit.

The respective responsibilities for the maintenance, decoration, repair and replacement of the Common Elements are as follows:

The common expenses associated with the maintenance, repair, renovation, restoration or replacement of a Limited Common Element shall be specially assessed against the Unit or Units to which that Limited Common Element was assigned at the time the expenses were incurred. Any other unusual common expenses benefitting less than all of the Units or any expenses incurred as a result of the conduct of less than all of those entitled to occupy the Condominium Project or by their licensees or invitees shall be specially assessed against the Unit or Units involved, as set forth in Section 69(2) of the Act.

The amount of all common expenses not specially assessed in accordance with the foregoing shall be assessed against the Units in proportion to the assigned percentage of value appertaining to each Unit as provided in Section 69(3) of the Act.

(d)    The Association shall have specific responsibility to decorate, maintain, repair and replace the following items relating to Units and the costs for these items shall be considered expenses of administration:

(1)    All landscaped areas (excluding such landscaping as may be installed and maintained by a Co-owner upon a patio, porch or deck in accordance with the By-Laws attached hereto as Exhibit A).

(2)    All sidewalks, driveways, roadways and boundary fences.

(3)    Snow removal from the roads, driveways, parking areas and any sidewalks (including driveways designated as Limited Common Elements).

(4)    The exterior of all buildings (excluding individual balconies, patios, decks, glass windows and glass sliding doors) including trim and hardware and the concrete pads upon which air conditioning compressors are situated.

(5)    The exterior of entry doors and garage doors (but excluding any electric garage door openers).

(6)    All mailboxes and stands. The mailbox and mailbox stands assigned to each Unit shall initially be installed by the Developer and may not be changed without the approval of the Architectural Control Committee or the United States Postal Service.

(7)    Rubbish removal systems, if any.

7

Li-37283     Pa-8

(8)     Common site lighting, if any.

(9)     All other items identified above in subparagraph (a) of this Article IV as General Common Elements; including, without limitation, the storm water detention areas and related storm water drainage lines and facilities.

(e)     Each Co-owner of a Unit shall have the responsibility to decorate, maintain, repair and replace the following items:

(1)     All appliances within a Unit and supporting hardware, including, but not limited to, garbage disposals, dishwashers, ranges and ovens, vent fans, duct work, vent covers and filters, hot water heaters, furnaces, humidifiers, air cleaners, and air conditioners and compressors (whether located within or outside of a Unit, but excluding the concrete pad, which shall be the Association's responsibility).

(2)     The interior of entry doors, all doors, windows, doorwalls (including all glass doorwall frames and tracks), screens and related hardware within or leading to the individual Unit.

(3)     Any landscaping installed upon a patio or deck in accordance with the By-Laws attached hereto as Exhibit A.

(4)     The fireplace combustion chamber, if any, located within the individual Unit.

(5)     All electrical fixtures or appliances within an individual Unit including, but not limited to, lighting fixtures, switches, outlets, antenna outlets and circuit breakers. (Note: Any modification to the existing electrical system must be approved in writing by the Board of Directors and must be completed by a licensed electrician.)

(6)     Any electrical outlets connected to an individual Unit's electrical meter, but located on the exterior of the Unit; including, without limitation, the exterior porch lights to be installed near the road on the garage of each Unit. All such porch lights shall be operated by a photocell or timer so that they remain on through the night.

(7)     All plumbing fixtures, including shut-off valves, rings and washers located on or within an individual Unit's perimeter walls.

(8)     All cabinets, counters, interior doors, closet doors, sinks, tile and wood, either floor or wall, and related hardware.

(9)     All improvements or decorations including, but not limited to, paint, wallpaper, carpeting and trim.

(10)    Individual Unit drain lines located within Unit perimeter walls.

(11)    All individual decks and patios and stairs or steps leading to such individual decks or patios.

8

Li-37283      Pa-9

(12)    All electric garage door openers.

(13)    All other items not specifically enumerated above which may be located within an individual Unit's perimeter walls.

## ARTICLE V
## USE OF PREMISES

Each Unit shall only be used for residential purposes. No Co-owner shall use his or her Unit or the Common Elements in any manner inconsistent with the purposes of the Condominium or in any manner which will interfere with or impair the rights of any other Co-owner in the use and enjoyment of his or her Unit or any Common Element. Notwithstanding the foregoing, each Unit is an attached condominium Unit located in a building containing multiple units. The Unit may share one or more walls with other Units, including, without limitation, walls separating the floor of the Unit from the ceiling of another Unit and walls separating parts of one Unit from the garage of another Unit. As a result of this type of design and construction, occupants of the Unit may be subject to noise from adjoining units, including, without limitation, noise from water and plumbing systems (i.e.: toilets flushing, running dishwashers, showers, washing machines, etc.), garage doors opening and closing, cars driving in and out of garages, and noise from the inside of neighboring Units (i.e.: conversations, music, television, moving furniture, etc.). By accepting a deed to the Unit being purchased, each Co-owner releases the Developer, any builder, and their respective agents, employees, managers, and officers from any and all claims arising from a claim of harm or damage from any noise that is audible in or near the Unit being purchased from any other Unit adjacent to, above, below, next to, in front of, or behind the Unit being purchased.

Additionally, at certain times, and in some cases, in any Unit, there may be noise which can be heard from adjacent Units and/or garages. The regulation of noise levels caused by the playing of music, from parties or gatherings of people, the operation of tools, and other sources will be regulated by the Association.

## ARTICLE VI
## CONDOMINIUM UNIT DESCRIPTION AND PERCENTAGE OF VALUE

The Condominium consists of forty-two (42) residential Units. Each Unit is described in this paragraph with reference to the Condominium Subdivision Plan as prepared by Land-Tec Consultants, Inc., a copy of which is attached hereto as Exhibit B. Each Unit shall consist of the interior air space measured from the entire interior surface enveloping the Unit air space, including basement and garage areas; including (i) interior unpainted surfaces of inside walls; (ii) the inside surfaces of windows, doorwalls, doors and access panels; (iii) the unpainted interior surfaces of ceilings; and (iv) the interior and unfinished surfaces of the sub/floors and/or basement floor. In addition to the above described air space, each Unit shall also include all items, components, fixtures and mechanisms, from the point of connection inward, which provide the Unit with its plumbing, electrical, waste disposal, water, heating and air conditioning services. For all purposes, individual Units may hereafter be defined and described by reference to this

9

Li-37283    Pa-10

Master Deed and the individual number assigned to the Unit in the Condominium Subdivision Plan.

The Percentage of Value assigned to each Unit shall be determinative of the proportionate share of each respective Co-owner in the proceeds and expenses of the Association and the Value of such Co-owner's vote at meetings of the Association and the undivided interest of the Co-owner in the Common Elements. Rights to use the General Common Elements shall not be increased or decreased as between Co-owners as a result of disparate assigned values; nor shall the assigned value of ownership in the Limited Common Elements increase or decrease the right to use Limited Common Elements as prescribed in this Master Deed and the Act. The total percentage value of the Condominium is one hundred (100%) percent.

Based on the nature of the Condominium Project and the fact that the Association's responsibility for maintenance of Common Elements will not be substantially different among all of the Units, the Percentages of Value assigned to the 42 Units are equal.

## ARTICLE VII
## EASEMENTS AND ENCUMBRANCES

The Condominium is subject to the following easements, restrictions, and agreements:

(a)    By recordation of this Master Deed, Developer reserves the right and power to dedicate all the roads in the Condominium to public use, and all persons acquiring any interest in the Condominium, including without limitation all Co-owners and Mortgagees, shall be deemed irrevocably to have appointed Developer and its successors or assigns as agent and attorney-in-fact to make such dedication and to act on behalf of all Co-owners and their Mortgagees in any statutory or special assessment proceedings with respect to the dedicated roads. After certificates of occupancy are issued for one hundred (100%) percent of the Units in the Condominium, the foregoing rights and powers may be exercised by the Association. Nothing herein shall be deemed to impose any obligation upon the Developer or the Association to dedicate any or all of the roads within the Condominium to public use and, in fact, Developer intends that the roads within the Condominium shall be private roads.

(b)    Upon approval by an affirmative vote of not less than fifty one (51%) percent of all Co-owners, in number and in value, the Association shall be empowered to sign petitions requesting establishment of a special assessment district pursuant to the provisions of applicable Michigan statutes providing for improvements financed by special assessments. In the event that a special assessment road project is established pursuant to applicable Michigan law, the collective costs assessable to the Condominium premises as a whole shall be borne equally by all Co-owners.

(c)    Developer reserves the right and power to grant easements over, or dedicate portions of any of the Common Elements for utility, drainage, street, safety or construction purposes, and all persons acquiring any interest in the Condominium, including without limitation all Co-owners and Mortgagees shall be deemed to have appointed Developer and its successors or assigns as agent and attorney-in-fact to make such easements or dedications. After

10

Li-37283      Pa-11

certificates of occupancy are issued for one hundred (100%) percent of the Units in the Condominium, the foregoing right and power may be exercised by the Association. The right to grant easements that is reserved in this paragraph (c) shall include the right to grant such easements as may reasonably be required by the City of Melvindale or such other governmental agencies as shall have jurisdiction over the Condominium.

(d)     If any portion of a Unit or Common Element encroaches upon another Unit or Common Element due to shifting, settling, or moving of a building, or due to survey errors or construction deviations, reconstruction or repair, reciprocal easements shall exist for the maintenance of such encroachment for as long as such encroachment exists, and for maintenance thereof after rebuilding in the event of any destruction. There shall be permanent, non-exclusive easements to, through and over those portions of the Units and Common Elements for the installation, maintenance and servicing of all utilities in the Condominium, including, but not limited to, lighting, heating, power, sewer, water, communications, telephone and cable television lines. There shall exist easements of support with respect to any Unit interior wall which supports a common element.

(e)     There shall be easements to and in favor of the Association, and its officers, directors, agents and designees (and the Developer prior to the First Annual Meeting), in, on and over all Units, for access to the Units to conduct any activities authorized by this Master Deed or the Condominium By-Laws.

(f)     The Developer, the Association and all public and private utility companies shall have such easements over, under, across and through the Condominium, including all Units and Common Elements, as may be necessary to develop, construct, market and operate any Units within the land described in Article II hereof, to fulfill their responsibilities of maintenance, repair and replacement of common amenities or improvements (whether or not such common amenities or improvements are integrated into the Condominium) and also to fulfill any responsibilities of maintenance, repair, decoration or replacement which they or any of them are required or permitted to perform under the Condominium Documents or by law or to respond to any emergency or common need of the Condominium.

(g)     Developer (on its behalf and on behalf of its successors or assigns) hereby reserves permanent easements for ingress and egress over the roads and walks in the Condominium and permanent easements to use, tap into, enlarge or extend all roads, walks and utility lines in the Condominium, including, without limitation, all communications, water, gas, electric, storm and sanitary sewer lines, and any pumps, sprinklers or water detention areas, all of which easements shall be for the benefit of the Future Development Area, whether or not such Future Development Area is hereafter added to the Condominium and for the benefit of any other land adjoining the Condominium (or any expansion thereof) if now owned or hereafter acquired by the Developer or its successors or assigns. These easements shall run with the land in perpetuity and shall survive the six (6) year period for adding the Future Development Area to the Condominium. Developer shall have no financial obligation to support such easements, except that any dwelling or commercial unit using the facilities constructed within the Condominium, including any such dwelling or commercial unit not included in the Condominium, shall pay a pro rata share of the expense of maintenance, repair, or replacement

11

L1-37283        Pg-12

of the used facility, which share shall be determined pro rata according to the total number of dwelling units using such facility.

(h)    Easements for the construction, installation and maintenance of public utilities, and for drainage facilities, are reserved as shown on the Plan. Within all of the foregoing easements, unless the necessary approvals are obtained from the City and any other applicable governmental entity and the Developer (during the Development and Sales Period), no improvement of any kind (including, without limitation, plantings or other materials, shall be placed or permitted to remain which may damage or interfere with the installation and maintenance of such service facilities and utilities, including underground electrical and telephone local distribution systems, or which may change, obstruct or retard the flow or direction of water in and through drainage in the easements, nor shall any change, which may obstruct or retard the flow of surface water or be detrimental to the property of others, be made by the occupant in the finished grade of any Unit or building containing any Unit(s) once such finished grade is established.

(i)    With respect to the roads constructed within the Condominium, to the fullest extent permitted by law, the Association and its heirs, successors, personal representatives and assigns, agree to defend, pay on behalf of, indemnify, and hold harmless the City its elected and appointed officials, employees, and volunteers and others working on behalf of the City against any and all claims, demands, suits, or losses, including all costs connected therewith, and for any damages which may be asserted, claimed, or recovered against them, by reason of personal injury, including bodily injury or death and/or property damage, including loss of use thereof, which arise out of or are in any way connected or associated with the private roads within the Condominium including the use thereof or the maintenance, repair, and/or replacement thereof.

(j)    The roadways within the Condominium as shown on the Condominium Subdivision Plan will be maintained (including, without limitation, snow removal), replaced, repaired and resurfaced as necessary by the Association. It is the Association's responsibility to inspect and to perform preventative maintenance of the roadways in the Condominium on a regular basis in order to maximize their useful life and minimize repair and replacement costs. In the event that the Association fails to provide adequate maintenance, repair, or replacement of the herein mentioned roadways, the City may serve written notice of such failure upon the Association. Such written notice shall contain a demand that the deficiencies in maintenance, repair, or replacement be cured within a stated reasonable time period. If such deficiencies are not cured, the City may undertake such maintenance, repair, or replacement and the costs thereof plus a twenty-five (25%) administrative fee may be assessed against the Co-owners and collected as a special assessment on the next annual City tax roll.

(k)    There shall exist for the benefit of the City or any emergency service agency, an easement over all roads and driveways in the Condominium for use by the City and/or emergency vehicles. Said easement shall be for purposes of ingress and egress to provide, without limitation, fire and police protection, ambulance and rescue services and other lawful governmental or private emergency services to the Condominium Project and Co-Owners thereof. The U.S. Postal Service shall also have an easement over the roads in the

12

Condominium for its vehicles for delivery of mail. The granting of these easements shall not be construed as a dedication of any streets, roads or driveways to the public.

(l) The Condominium is subject to an Pipeline Easement in favor of Wolverine Pipe Line Company recorded in Liber 11972, Page 152, Wayne County Records. The easement is for the purposes of laying and constructing a pipeline and reconstructing, replacing, renewing, operating, maintaining, repairing, changing the size of and removing such pipes for the transportation of oil, petroleum, gas, water and other substances. The easement includes the right of ingress and egress to and from the pipeline from dedicated highways, alleys and other public rights of way. This easement runs in an east-west direction along the northern edge of the Condominium, as more fully shown on the Plan. With the exception of improvements installed by the Developer, no improvements (including without limitation landscaping) may be installed over the easement area or within ten (10.0') feet of the easement area without the prior written consent of Wolverine Pipe Line Company (or its successors or assigns) and the Developer as long as the Developer owns at least one unit within the Condominium.

(m) The Condominium is subject to an easement recorded in Liber 12966, Page 194, Wayne County Records which, although illegible, is believed to be easement granting rights to underground oil, gas and minerals. Due the fact that the recorded instrument is illegible, the Developer expressly disclaims any warranty regarding the contents of this easement.

(n) The Condominium is subject to a twenty foot (20.0') wide easement for sanitary sewer recorded at Liber 37118, Page 279, Wayne County Records, which easement runs in several directions across the Condominium, as more fully shown on the Plan. This easement is in favor of the City of Melvindale, and includes the right to install and maintain sanitary sewer lines and connections and equipment. No structures or improvements may be built on, over, across, in through or under the easement, except that sidewalks, driveways and roadways may be built in accordance with approved site plans.

(o) The Condominium is subject to a twelve foot (12.0') wide easement for water main recorded at Liber 37118, Page 283, Wayne County Records, which easement runs throughout the Condominium, as more fully shown on the Plan. This easement is in favor of the City of Melvindale, and includes the right to install and maintain a water main connections and equipment. No structures or improvements may be built on, over, across, in through or under the easement, except that sidewalks, driveways and roadways may be built in accordance with approved site plans.

(p) The Condominium is subject to a sixty (60.0') foot wide easement for ingress and egress recorded at Liber 37118, Page 292, Wayne County Records, which easement runs throughout the Condominium, as more fully shown on the Plan. The easement is in favor of the Association, and benefits the owners and tenants of certain land adjacent to the Condominium.

(q) The private rights of the Developer, the Co-owners and the Association in any road rights-of-way shall terminate upon conveyance of the rights-of-way to the City for public road purposes if and when such conveyance should occur.

Li-37283        Pa-14

®)        Developer reserves the right to expand and enlarge the easements described above by amending this Master Deed and the Plan attached as Exhibit "B" pursuant to the right of amendment reserved in Article VIII, subparagraph (c) without the consent of any Co-Owner or Mortgagee.

## ARTICLE VIII
## AMENDMENTS

This Master Deed and any Exhibit hereto may be amended in the following manner:

(a)        Amendments may be made and recorded by Developer or by the Association; provided that any amendment or modification to this Master Deed shall require the prior written consent of the Developer during the Development and Sales Period.

(b)        If the amendment will materially change the rights of the Co-owners or Mortgagees, then such amendment requires the consent of not less than two-thirds (2/3) in value of the votes of the Co-owners and Mortgagees of the Units (unless a greater majority is specified in the Condominium By-Laws).  A Mortgagee shall have one vote for each mortgage held.

(c)        Notwithstanding subparagraph (b) above, but subject to the limitation of subparagraph (d) below, Developer reserves the right to amend this Master Deed or any of its Exhibits for any of the following purposes without the consent of Co-owners or Mortgagees:

(1)        To delete unsold Units and to modify the locations, types and sizes of unsold Units and the General and/or Limited Common Elements adjoining or appurtenant to unsold Units;

(2)        To amend the Condominium By-Laws, subject to any restrictions on amendments stated therein;

(3)        To correct arithmetic errors, typographical errors, survey errors, or any similar errors in the Master Deed, Plan or Condominium By-Laws;

(4)        To clarify or explain the provisions of the Master Deed or its exhibits;

(5)        To comply with the Acts or rules promulgated thereunder or with any requirements of any governmental or quasi-governmental agency or any financing institution providing or proposing to provide a mortgage on any Unit or to satisfy the title requirements of any title insurer insuring or proposing to insure title to any Unit;

(6)        To convert the Convertible Areas of the Condominium and to redefine Common Elements and Units and adjust Percentages of Value in connection therewith;

(7)        To contract the Condominium and to redefine Common Elements and adjust Percentages of Value in connection therewith and to make any other amendment expressly permitted by this Master Deed;

14

Li-37283     Pa-15

(8)    To make, define or limit easements affecting the Condominium;

(9)    To bring Units as shown in the Condominium Subdivision Plan into conformance with the Units actually constructed since alternate Unit floor plans may be offered to prospective buyers;

(10)   To record an "as-built" Condominium Subdivision Plan;

(11)   To amend the description of land included in the Condominium as set forth in Article II of this Master Deed and on the Plan in the event the roads in the Condominium are dedicated to public use to the City or any other governmental agency or to comply with the requirements of any governmental agency; provided, however, that no such amendment may alter the size of any Unit without the consent of the Co-owner and Mortgagee of the affected Unit.

(d)    Notwithstanding any other provisions of this Article VIII, the method or formula used to determine the Percentages of Value for Units in the Condominium, as described above, and any provisions relating to the ability or terms under which a Co-owner may rent a Unit to others, may not be modified without the consent of each affected Co-owner and Mortgagee. A Co-owner's Condominium Unit dimensions or appurtenant Limited Common Elements may not be modified without the Co-owner's consent.

## ARTICLE IX
## CONVERTIBLE AREAS

(a)    The Common Elements and all Units have been designated on the Condominium Subdivision Plan as Convertible Areas within which the Units and Common Elements may be modified and within which Units may be expanded, moved, deleted and created as provided in this Article IX. The Developer reserves the right, but not an obligation, to convert the Convertible Areas.

(b)    The Developer reserves the right, in its sole discretion, during a period ending six (6) years from the date of recording this Master Deed, to modify the size, location, and configuration of any Unit that it owns in the Condominium, as the same may be expanded pursuant to Article XII below, and to make corresponding changes to the Common Elements, subject to the requirements of local ordinances and building authorities. The changes could include (by way of illustration and not limitation) the deletion of Units from the Condominium and the substitution of General and Limited Common Elements therefor. The maximum number of units in the Condominium, as it may be expanded, may not exceed two hundred and sixty-four (264) units.

(c)    All improvements constructed or installed within the Convertible Areas described above shall be restricted exclusively to residential use and to such Common Elements as are compatible with residential use. There are no other restrictions upon such improvements except those which are imposed by state law, local ordinances or building authorities.

15

Li-37283        Pa-16

(d)     The consent of any Co-owner shall not be required to convert the Convertible Areas. All of the Co-owners and Mortgagees and other persons interested or to become interested in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such conversion of the Convertible Areas and any amendment or amendments to this Master Deed to effectuate the conversion and to any reallocation of Percentages of Value of existing Units which Developer may determine necessary in connection with such amendment or amendments. All such interested persons irrevocably appoint the Developer or its successors or assigns, as agent and attorney for the purpose of execution of such amendment or amendments to the Master Deed and all other documents necessary to effectuate the foregoing. Such amendments may be effected without the necessity of rerecording an entire Master Deed or the Exhibits thereto and may incorporate by reference all or any pertinent portions of this Master Deed and the Exhibits hereto. Nothing herein contained, however, shall in any way obligate Developer to convert the Convertible Areas. These provisions give notice to all Co-owners, Mortgagees and other persons acquiring interests in the Condominium that such amendments of this Master Deed may be made and recorded, and no further notice of such amendment shall be required.

(e)     All modifications to Units and Common Elements made pursuant to this Article IX shall be given effect by appropriate amendments to this Master Deed in the manner provided by law, which amendments shall be prepared by and at the discretion of the Developer and in which the Percentages of Value set forth in Article VI hereof shall be proportionately readjusted, if the Developer deems it to be applicable, in order to preserve a total value of one hundred (100%) percent for the entire Condominium resulting from such amendments to this Master Deed. The precise determination of the readjustments in Percentages of Value shall be made within the sole judgment of Developer. Such readjustments, however, shall reflect a continuing reasonable relationship among Percentages of Value based upon the original method and formula described in Article VI of this Master Deed. Such amendments to the Master Deed shall also contain such further definitions and redefinitions of General or Limited Common Elements as may be necessary to adequately describe and service the Units and Common Elements being modified by such amendments. In connection with any such amendments, Developer shall have the right to change the nature of any Common Element previously included in the Condominium for any purpose reasonably necessary to achieve the purposes of this Article IX.

## ARTICLE X
## CONTRACTION OF CONDOMINIUM

(a)     As of the date this Master Deed is recorded, the Developer intends to establish a Condominium Project consisting of 42 Units on the land described in Article II, all as shown on the Condominium Subdivision Plan. Developer reserves the right, however, to establish a Condominium Project consisting of fewer Units than described above and to withdraw from the Condominium all or some portion of the land described in Article II, except that in no event may the project consist of fewer than two (2) Units (to be contained in a single building).

(b)     Pursuant to the above and notwithstanding any other provision in this Master Deed to the contrary, the number of Units in this Condominium Project may, at the option of the Developer, from time to time, within a period ending no later than six (6) years from the date of recording of this Master Deed, be contracted to any number determined by the Developer in its

16

L1-37283          Pg-17

sole judgment, but in no event shall the number of Units be less than two (2). There is no obligation on the part of the Developer to withdraw from the Condominium all or any portion of the Contractible Area, nor is there any obligation to withdraw portions thereof in any particular order.

(c)     In connection with such contraction, the Developer unconditionally reserves the right to withdraw from the Condominium Project such portion or portions of the land described in this Article X as is not reasonably necessary to provide access to or otherwise serve the Units included in the Condominium Project as so contracted. Developer reserves the right to use the portion of the land so withdrawn to establish, in its sole discretion, a rental development, a separate condominium project or projects (apartment-type or "site" condominium) or any other form of development. Developer further reserves the right, subsequent to such withdrawal but prior to six years from the date of recording this Master Deed, to expand the Project as so reduced to include all or any portion of the land so withdrawn.

## ARTICLE XI
## SUBDIVISION, CONSOLIDATION
## AND OTHER MODIFICATIONS OF UNITS

Notwithstanding any other provision of the Master Deed or the By-Laws, Units in the Condominium may be subdivided, consolidated, modified and the boundaries relocated, in accordance with Sections 48 and 49 of the Act and this Article XI. Such changes in the affected Unit or Units shall be promptly reflected in a duly recorded amendment or amendments to this Master Deed.

(a)     By Developer. Until the First Annual Meeting, Developer reserves the sole right, (without the consent of any other Co-owner or any mortgagee of any Unit) to take the following actions:

(1)     Consolidate Contiguous Units. Consolidate under single ownership two or more Units. Such consolidation of Units shall be given effect by an appropriate amendment or amendments to this Master Deed in the manner provided by Law, which amendment or amendments shall be prepared by the Developer, its successors or assigns.

(2)     Relocate Boundaries. Relocate any boundaries between adjoining Units, separated only by Unit perimeters or other Common Elements not necessary for the reasonable use of Units other than those subject to the relocation. The relocation of such boundaries shall be given effect by an appropriate amendment or amendments to this Master Deed in the manner provided by law, which amendment or amendments shall be prepared by the Developer, its successors or assigns.

(3)     Amendments to Effectuate Modifications.     In any amendment or amendments resulting from the exercise of the rights reserved to Developer above, each

17

Li-37283        Pg-18

portion of the Unit or Units resulting from such consolidation or relocation of boundaries shall be separately identified by number. Such amendment or amendments to the Master Deed shall also contain such further definitions of General or Limited Common Elements as may be necessary to adequately describe the Units in the Condominium Project as so modified. All of the Co-owners and mortgagees of Units and other persons interested or to become interested in the Project from time to time shall be deemed to have irrevocably and unanimously consented to such amendment or amendments of this Master Deed to effectuate the foregoing.

(4)     Conformity with Laws and Ordinances. All actions taken under this Article XI must comply with all applicable laws and ordinances, including, without limitation, any approvals required by the City or any other governmental agency having jurisdiction thereover.

(b)     Limited Common Elements. Limited Common Elements, if any are created, shall be subject to assignment and reassignment in accordance with Section 39 of the Act and in furtherance of the rights to consolidate Units or relocate boundaries described in this Article.

## ARTICLE XII
## FUTURE DEVELOPMENT OF CONDOMINIUM

The Condominium is established as an expandable Condominium in accordance with the provisions of this Article.

(a)     Developer (on its behalf and on behalf of its successors and assigns, and no other third party, unless assigned in writing by the Developer), reserves the right, but does not undertake any obligation, to expand the Condominium. Except as set forth herein, no other person or entity may exercise the right to expand the Condominium.

(b)     There are no restrictions or limitations on Developer's right to expand the Condominium except as stated in this Article XII. The consent of any Co-owner shall not be required to expand the Condominium. All of the Co-owners and Mortgagees of Units and persons interested or to become interested in the Condominium from time to time shall be deemed to have irrevocably and unanimously consented to such expansion of the Condominium and any amendment or amendments to this Master Deed to effectuate the expansion and to any reallocation of Percentages of Value of existing Units which Developer may determine necessary in conjunction with such amendment or amendments. All such interested persons irrevocably appoint Developer or its successors as agent and attorney for the purpose of executing such amendment or amendments to the Master Deed and all other documents necessary to effectuate the foregoing. Such amendments may be made without the necessity of rerecording an entire Master Deed or the Exhibits thereto and may incorporate by reference all or any pertinent portions of this Master Deed or the Exhibits hereto. Nothing herein contained, however, shall in any way obligate Developer to enlarge the Condominium and Developer may, in its discretion, establish all or a portion of the Future Development Area described below as a rental development, a separate condominium, or any other form of development. These provisions give notice to all persons acquiring interests in the Condominium that such

18

Li-37283          Pa-19

amendments of this Master Deed may be made and recorded, and no further notice of amendment shall be required.

(c)     The Developer's right to expand the Condominium shall expire six (6) years after the initial recording of this Master Deed.

(d)     The land which may be added to the Condominium (herein referred to as the "Future Development Area") is referred to in the Plan as the proposed Future Development Area, and is situated in the City of Melvindale, Wayne County, Michigan, being more specifically described as follows:

A part of Private Claims 32 and 49, City of Melvindale, Wayne County, Michigan, being more particularly described as commencing at the Northwesterly Corner of Lot 354 of "Melwood Park Sub. No. 6", as recorded in Liber 87 of Plats, on Pages 72 and 73, Wayne County Records, for a POINT OF COMMENCING; thence North 29°01'15" East, 372.37 feet, along the Easterly right-of-way line of Prospect Ave. (60 feet wide Public R.O.W.); thence South 82°13'45" East, 468.86 feet to the POINT OF BEGINNING; thence continuing South 82°13'45" East, 1264.14 feet; thence South 28°54'15" West, 656.41 feet, along an extension of, and the Westerly line of "Amended Plat of Ford Oaks Subdivision", as recorded in Liber 61 of Plats, on Page 52, Wayne County Records (recorded as N. 28°33'12" E.); thence North 82°15'00" West, 1086.11 feet, to the Northerly line of said "Melwood Park Sub. No. 6"; thence North 11°52'32" West, 205.04 feet, along the Northerly line of said "Melwood Park Sub. No. 6"; thence North 33°05'28" East, 64.84 feet; thence North 78°08'40" East, 24.00 feet; thence North 65°26'59" East, 91.39 feet, and, North 07°46'15" East, 304.02 feet to the point of beginning. All of the above containing 16.735 acres.

Part of Tax Parcel No. 47-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-000

The Developer reserves the right to add to the Future Development Area.

(e)     The Future Development Area may be added to the Condominium in its entirety or in parcels, in one amendment to this Master Deed or in separate amendments, at the same time or at different times, all in Developer's discretion. There are no restrictions upon the order in which portions of the Future Development Area may be added to the Condominium.

(f)     There are no restrictions upon the locations of any improvements that may be made on any portions of the Future Development Area, and Developer reserves the right to locate such improvements in Developer's sole discretion subject only to such applicable laws and ordinances which may affect the Condominium, and the approved site plan for the Project, as the same may be amended.

(g)     The number of Units which Developer reserves the right to establish, all or in part, upon the Future Development Area is up to two hundred and twenty-two (222), for a maximum of up to two hundred and sixty-four (264) Units which may be included in the Condominium (including the Units now shown on the Plan).

19

Li-37283     Pa-20

(h)     All land and improvements added to the Condominium shall be restricted exclusively to residential units and to such Common Elements as may be consistent and compatible with residential use. There are no other restrictions upon such improvements except those which are imposed by state law, local ordinances or building authorities.

(i)     The extent to which any structure erected on any portion of the Future Development Area added to the Condominium are compatible with structures on land included in the original Master Deed is solely within the discretion of the Developer, subject only to the requirements of local ordinances and building authorities, and is not limited by this Master Deed.

(j)     There are no restrictions as to types of Condominium Units which may be created upon the Future Development Area except that such Units must comply with state law, local ordinances and the requirements of building authorities.

(k)     Developer may create Limited Common Elements upon the Future Development Area and designate Common Elements thereon which may be subsequently assigned as Limited Common Elements. The nature of any such Limited Common Elements to be added to the Condominium is exclusively within the discretion of the Developer.

(l)     If the Condominium is expanded, it shall be expanded by an amendment to the Master Deed or by a series of successive amendments to the Master Deed, each adding Future Development Area and/or improvements to the Condominium.

(m)     Any amendment to the Master Deed which alters the number of Units in the Condominium shall proportionately readjust the existing Percentages of Value of Condominium Units to preserve a total value of one hundred (100%) percent for the entire Condominium. Percentages of Value shall be readjusted and determined in accordance with the method and formula described in Article VI of this Master Deed.

(n)     Any expansion shall be deemed to have occurred at the time of the recording of an amendment to this Master Deed embodying all essential elements of the expansion. At the conclusion of expansion of the Condominium, not later than one hundred eighty (180) days after completion of construction, a Consolidating Master Deed and plans showing the Condominium "as built" shall be prepared and recorded by the Developer. A copy of the recorded Consolidating Master Deed shall be provided to the Association.

## ARTICLE XIII
## DEVELOPER'S RIGHT TO USE FACILITIES

Until the end of the Development and Sales Period, the Developer, its successors and assigns, agents and employees may maintain such offices, model units, reasonable parking, storage areas and other facilities on the Condominium as it deems necessary to facilitate the development and sale of the Condominium Project. Throughout the entire duration of the Development and Sales Period, Developer, its successors and assigns, agents and employees shall have such access to, from and over the Condominium as may be reasonable to enable the development and sale of the Condominium Project. Developer shall pay the cost related to such use and restore the facilities to habitable status upon termination for such use.

20

Li-37283     Pa-21

## ARTICLE XIV
## ASSIGNMENT

Any or all of the rights and powers granted or reserved to the Developer in the Condominium Documents or by law, including the power to approve or disapprove any act, use or proposed action or any other matter or thing, may be assigned by it to any other entity or to the Association. Any such assignment or transfer shall be made by appropriate instrument in writing duly recorded in the office of the Wayne County Register of Deeds.

## ARTICLE XV
## ARCHITECTURAL CONTROL COMMITTEE

Except as otherwise expressly provided herein, the Architectural Control Committee (the "Committee") shall have exclusive jurisdiction over the rights of approval and enforcement set forth in this Master Deed and the Condominium By-Laws. The Developer shall have the exclusive right to appoint and remove all members of the Committee, in its sole discretion, until such time as certificates of occupancy have been issued for Residences on 100% of the Units in the Condominium Project. There shall be no surrender of this right prior to the issuance of certificates of occupancy of Residences in 100% of the Units in the Condominium Project, except in a written instrument in recordable form executed by Developer and specifically assigning to the Association the power to appoint and remove the members of the Committee. From and after the date of such assignment or later expiration of Developer's exclusive power of appointment and removal, the Committee shall be appointed by the Board of Directors of the Association, and Developer shall have no further responsibilities with respect to any matters of approval or enforcement set forth herein. The Architectural Control Committee shall consist of at least one but no more than three persons. Neither Developer nor any member of the Committee shall be compensated from assessments collected from the members of the Association for the time expended in architectural control activities. The Developer shall be permitted to assign its right to appoint the members of the Architectural Control Committee by a written assignment, in recordable form, signed by the Developer and recorded with the Wayne County Register of Deeds.

## ARTICLE XVI
## FLOODPLAIN

The Condominium does not lie within a flood plain.

SIGNATURE ON THE FOLLOWING PAGE.

21

Li-37283     Pg-22

IN WITNESS WHEREOF, Developer has caused this Master Deed to be executed the day and year first above written.

WITNESSES:

SIGNED BY:

NORTHPOINTE TOWNHOMES, L.L.C., a Michigan limited liability company

By:     Hometowne Building Company L.L.C., a Michigan limited liability company

Its:     Member

*Evelyn M. Michalske*

Evelyn M. Michalske

By:

PATRICK O'LEARY, Trustee of the Patrick O'Leary Revocable Inter-Vivos Trust u/a/d 3/24/97

*Donna M. Plichta*

Donna M. Plichta

Its:     Member

STATE OF MICHIGAN     )
                                           : ss
COUNTY OF OAKLAND   )

The foregoing instrument was acknowledged before me this 9th day of January, 2003, by Patrick O'Leary, Trustee of the Patrick O'Leary Revocable Inter-Vivos Trust u/a/d 3/24/97, a Member of Hometowne Building Company L.L.C., a Michigan limited liability company, a Member of Northpointe Townhomes, L.L.C., a Michigan limited liability company, on behalf of Northpointe Townhomes, L.L.C.

NOTARY PUBLIC
County of Oakland, State of Michigan
My Commission Expires: _____ **CATHERINE A. DUNNE**
**Notary Public, Wayne County, MI**
**My Commission Expires Sep 3, 2004**

PREPARED BY AND WHEN RECORDED RETURN TO:

Dean J. Gould, Esq.
Thomas R. August, Esq.
Jackier, Gould, Bean, Upfal & Eizelman
Second Floor, 121 West Long Lake Road
Bloomfield Hills, Michigan 48304-2719
(248) 642-0500

JA1187409.1\00001551.WPD

22

F

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

NORTHPOINTE TOWNHOMES CONDOMINIUM
ASSOCIATION,
 a Michigan nonprofit corporation,

           Plaintiff,                         Case No. 22-       -CH

v.                                            Hon.

MEGMAD FAMILY TRUST,

           Defendant.
_____/

MAKOWER ABBATE GUERRA WEGNER
VOLLMER PLLC
Todd Skowronski    P74301
Attorneys for Plaintiff
30140 Orchard Lake Road,
Farmington Hills, MI 48334
248 671 0140
_____/

## TEMPORARY RESTRAINING ORDER & ORDER TO SHOW CAUSE

At a session of said Court, held in the
City of Detroit, County of Wayne, State
of Michigan,

on _____

Present: _____
Circuit Court Judge

THIS MATTER having come before the Court on Plaintiff NORTHPOINTE
TOWNHOMES CONDOMINIUM ASSOCIATION (the "Association") Verified Complaint for
Injunctive Relief and Money Damages, and *Ex Parte* Emergency Motion for
Temporary Restraining Order to Winterize Unit and Halt Unapproved Construction,
and the Court having reviewed the pleadings submitted herein and being otherwise
fully informed in the premises; and

IT FURTHER APPEARING to the Court that Plaintiff would be irreparably harmed in the absence of the issuance of the instant Temporary Restraining Order; and

Plaintiff having established pursuant to MCR 3.310(B)(1)(b) that it is entitled to the entry of the instant Temporary Restraining Order without further notice to the Defendant because: There is urgent need to have the Unit winterized; the prior written notice from the Association demanding cease of all work, voluntary access, and that the Defendant apply for approval before performing any further work in the Unit has been ignored; MCL 559.206(a) provides that "[f]ailure to comply with any of the terms or provisions of the condominium documents, **shall** be grounds for relief, which may include without limitations . . . , injunctive relief"; and because the Association's right to enter into the Defendant's Unit for the purpose of repairs to common elements system is specified in Master Deed, Article VII, Sections (e)-(f) (access easements "in, on and over all Units, for access to the Units to conduct any activities authorized by this Master Deed or the Condominium By-laws"), and in Bylaws, Article XIX, Section 3 (Association may access common elements and summarily abate any condition or thing existing maintained contrary to the Condominium Documents);

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1. Plaintiff's *Ex Parte* Emergency Motion for Temporary Restraining Order is hereby GRANTED.

2

2.  Defendant is hereby enjoined from further violations of the Condominium Documents for Northpointe Townhomes Condominium, including cessation of any and all construction work within the interior of the Unit or upon Common Elements.

3.  The Defendant shall refrain from interference with the Association or any of its agents or contractors as they gain entry to the Unit for the purpose of ensuing the Unit is winterized, including but not limited to closing any exposed ceilings or walls and if necessary, arranging for and powering temporary heat;

4.      If Defendant does not immediately provide the Association with a key for access so the Association can perform the required winterization work, then the Association may either have a key copy made or replace the locks and place upon the front door a "realtor" style lock box, which code shall be immediately provided to the Defendant via first class mail to their last known address.

5.  IT IS FURTHER ORDERED that Defendant shall appear before the Hon. _____ of this Court on _____, 2022, to show cause as to why a preliminary and/or permanent injunction shall not issue against it

6.  IT IS FURTHER ORDERED that the instant Temporary Restraining Order shall be filed forthwith in the Clerk's Office and entered into the court records, and that Plaintiff shall serve a copy of Plaintiff's Verified Complaint and Motion for Temporary Restraining Order, together with all supporting documents and this Temporary Restraining Order, upon Defendant by regular and certified mail no later than 14 days from the date of this Order and by immediately posting a copy of same in a conspicuous place on or near the Defendant's Unit.

7. IT IS FURTHER ORDERED that in view of Plaintiff's likelihood of success on the merits, stability in the community as a nonprofit corporation not easily likely to evade process, and statutory ability to raise funds in the event the Court determines temporary injunctive relief was obtained improperly, no bond shall be required of Plaintiff.

8. IT IS FURTHER ORDERED that this Temporary Restraining Order shall expire fourteen (14) days after its issuance unless otherwise ordered by this Court. THIS IS NOT A FINAL ORDER AND DOES NOT CLOSE THE CASE.

_____
CIRCUIT COURT JUDGE

4

Jacqueline Ruff    11/29/2022 12:08 PM    WAYNE COUNTY CLERK    Cathy M. Garrett    IN MY OFFICE    22-014146-CH FILED

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

NORTHPOINTE TOWNHOMES CONDOMINIUM
ASSOCIATION,
a Michigan nonprofit corporation,

        Plaintiff,                          Case No. 22-     -CH

v.                                       Hon.

MEGMAD FAMILY TRUST,

        Defendant.
_____/

MAKOWER ABBATE GUERRA WEGNER
VOLLMER PLLC
Todd Skowronski     P74301
Attorneys for Plaintiff
30140 Orchard Lake Road,
Farmington Hills, MI 48334
248 671 0140
_____/

## EX PARTE EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER TO WINTERIZE UNIT AND HALT UNAPPROVED CONSTRUCTION

Plaintiff, NORTHPOINTE TOWNHOMES CONDOMINIUM ASSOCIATION (the "Association"), states for its *Ex Parte* Emergency Motion for Temporary Restraining Order to Winterize Unit and Halt Unapproved Construction against the Defendant as follows:

1. An action has been instituted between the parties related to Defendant's ongoing and unapproved substantial structural modifications to a Condominium Unit at the Northpointe Townhomes Condominium ("Condominium").

2. There is imminent risk of harm due to freezing as the Defendant has opened a hole in the ceiling that opens into a shared Common Element attic space that is not subject to climate control.  See, e.g., **Exhibit A** (pictures),

3. It is necessary that a restraining order on *ex parte* application be issued on behalf of the Association to grant the Association a Temporary Restraining Order enjoining the Defendant from further violations of the Condominium Documents and **allowing the Association to undertake construction work within the Unit to seal the currently open attic space and ensure proper winterization and heating until this case can be resolved on the merits**.

4. The reason for *ex parte* application for a temporary restraining order is because, as shown in the Verified Complaint, **Defendants have performed substantial work upon Condominium Common Elements which they are NOT allowed to perform absent the Association's prior written approval and have ignored communications from the undersigned.**

5. As shown, the shared attic space – in which there is no direct heat provided generally – is currently exposed inside the Unit while the Defendant was working to apparently install a furnace within the shared General Common Element attic space that (A) does not belong to the Defendant in the first place, and (B) is not a place the Association would approve installation of a furnace.

6. The Association has imminent concerns over freezing of pipes and other damage caused by this gaping, uninsulated hole between the Unit and the

2

attic, including but not limited to concerns that the Co-owners have also opened holes in the subfloor to their Unit where other water pipes exist serving other Units.

7. Moreover, the Association has no knowledge as to whether all necessary permits were pulled or whether the contractors doing work on general common elements are licensed, which is not to say the Association would approve the work if they were, but just to note the Defendant's blatant and utter disregard for the rights of their neighbors and the Association.

8. Counsel notes that he sent the Defendant a letter dated October 18, 2022, advising the Defendant of the Association's immediate demand that all work cease and for immediate voluntary access, but that demand was completely ignored.

9. Instead, and as detailed in the Verified Complaint, on or about November 11, 2022, pursuant to its easement and abatement authority, the Association entered the Unit to inspect what turned out to be substantial unapproved modifications of Common Elements. **Exhibit A** (pictures).

10. Defendant should be ordered to provide the Association with a key or other means of access per Bylaws, Article VI, Section 10 as more thoroughly discussed in the Verified Complaint at para. 13, and absent that, the Association may for the purpose of ensuring contractor access either have a key copy made or replace the locks and place upon the front door a "realtor"

3

style lock box, which code shall be immediately provided to the Defendant via first class mail to their last known address.

11. This motion is supported by the Verified Complaint filed in this matter in accordance with MCR 3.310(B)(1)(a).

WHEREFORE, the Association respectfully requests that this Honorable Court enter the Temporary Restraining Order attached here as **Exhibit B**, and which has been filed separately as a proposed order.

Dated: November, 23, 2022        Respectfully submitted,
                                    MAKOWER ABBATE GUERRA
                                    WEGNER VOLLMER PLLC

                          By: */s/ Todd J. Skowronski*
                                 Todd J. Skowronski (P74301)
                                 Attorneys for Plaintiff
                                 30140 Orchard Lake Road
                                 Farmington Hills, MI 483334
                                 (248) 254-7600

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

NORTHPOINTE TOWNHOMES CONDOMINIUM
ASSOCIATION,
 a Michigan nonprofit corporation,

        Plaintiff,                     Case No. 22-      -CH

v.                                           Hon.

MEGMAD FAMILY TRUST,

        Defendant.

_____/

MAKOWER ABBATE GUERRA WEGNER
VOLLMER PLLC
Todd Skowronski     P74301
Attorneys for Plaintiff
30140 Orchard Lake Road,
Farmington Hills, MI 48334
248 671 0140

_____/

**CERTIFICATION OF ATTORNEY PURSUANT TO MCR 3.310(B)(1)(b)**
**FOR EX PARTE TEMPORARY RESTRAINING ORDER**

     Pursuant to MCR 3.310(B)(1)(b), with regard to a temporary restraining order granted without notice to the adverse party, I, Todd J. Skowronski, attorney for Plaintiff, certify that the following efforts have been made to give notice of Plaintiff's request for an ex parte temporary restraining order:

     1.    I provided the Defendant written notice of the immediate need for access to their Unit via letter dated October 18, 2022, which further listed the legal justifications for the request and further demanding cessation of all unapproved work therein.

     2.    Defendant did not respond to that letter.

3.     Concurrent with the filing of this lawsuit, the undersigned is sending correspondence to Defendant demanding agreement on a Preliminary Injunction halting all work and authorizing the Association to perform all work necessary to close the hole in the ceiling and install, as needed, adequate if temporary heating to ensure the Unit is properly heated, and all other steps to properly winterize the Unit will be undertaken as well.  If Defendant agrees to entry of the Preliminary Injunction, Plaintiff will withdraw this Motion.

4.     Plaintiff and the undersigned believe that if this Honorable Court requires that notice be given to Defendant before an injunctive order is entered, **there is risk of harm from freezing pipes not only within the Defendant's Unit but surrounding Units as well, as this building was not designed to have Units openly exposed to un-climate controlled attic space.**  All of this is a result of the Defendant's unapproved modifications of common elements.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

Todd J. Skowronski (P74301)

Sworn to and subscribed before me
this November, 23, 2022:

_Tesyana    Begerhys_

_Tesyana Begersby_ Notary Public
_Oakland_ County, Michigan
Acting in _Oakland_ County, Michigan
My Commission Expires: _10/19/2027_

7

A















































B

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

NORTHPOINTE TOWNHOMES CONDOMINIUM
ASSOCIATION,
a Michigan nonprofit corporation,

        Plaintiff,

v.

MEGMAD FAMILY TRUST,


        Defendant.

Case No. 22-     -CH
Hon.

_____/

MAKOWER ABBATE GUERRA WEGNER
VOLLMER PLLC
Todd Skowronski    P74301
Attorneys for Plaintiff
30140 Orchard Lake Road,
Farmington Hills, MI 48334
248 671 0140

_____/

## TEMPORARY RESTRAINING ORDER & ORDER TO SHOW CAUSE

        At a session of said Court, held in the
        City of Detroit, County of Wayne, State
        of Michigan,

        on _____

        Present: _____
        Circuit Court Judge

THIS MATTER having come before the Court on Plaintiff NORTHPOINTE TOWNHOMES CONDOMINIUM ASSOCIATION (the "Association") Verified Complaint for Injunctive Relief and Money Damages, and *Ex Parte* Emergency Motion for Temporary Restraining Order to Winterize Unit and Halt Unapproved Construction, and the Court having reviewed the pleadings submitted herein and being otherwise fully informed in the premises; and

IT FURTHER APPEARING to the Court that Plaintiff would be irreparably harmed in the absence of the issuance of the instant Temporary Restraining Order; and

Plaintiff having established pursuant to MCR 3.310(B)(1)(b) that it is entitled to the entry of the instant Temporary Restraining Order without further notice to the Defendant because: There is urgent need to have the Unit winterized; the prior written notice from the Association demanding cease of all work, voluntary access, and that the Defendant apply for approval before performing any further work in the Unit has been ignored; MCL 559.206(a) provides that "[f]ailure to comply with any of the terms or provisions of the condominium documents, **shall** be grounds for relief, which may include without limitations . . . , injunctive relief"; and because the Association's right to enter into the Defendant's Unit for the purpose of repairs to common elements system is specified in Master Deed, Article VII, Sections (e)-(f) (access easements "in, on and over all Units, for access to the Units to conduct any activities authorized by this Master Deed or the Condominium By-laws"), and in Bylaws, Article XIX, Section 3 (Association may access common elements and summarily abate any condition or thing existing maintained contrary to the Condominium Documents);

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1. Plaintiff's *Ex Parte* Emergency Motion for Temporary Restraining Order is hereby GRANTED.

2

2. Defendant is hereby enjoined from further violations of the Condominium Documents for Northpointe Townhomes Condominium, including cessation of any and all construction work within the interior of the Unit or upon Common Elements.

3. The Defendant shall refrain from interference with the Association or any of its agents or contractors as they gain entry to the Unit for the purpose of ensuing the Unit is winterized, including but not limited to closing any exposed ceilings or walls and if necessary, arranging for and powering temporary heat;

4.     If Defendant does not immediately provide the Association with a key for access so the Association can perform the required winterization work, then the Association may either have a key copy made or replace the locks and place upon the front door a "realtor" style lock box, which code shall be immediately provided to the Defendant via first class mail to their last known address.

5. IT IS FURTHER ORDERED that Defendant shall appear before the Hon. _____ of this Court on _____, 2022, to show cause as to why a preliminary and/or permanent injunction shall not issue against it

6. IT IS FURTHER ORDERED that the instant Temporary Restraining Order shall be filed forthwith in the Clerk's Office and entered into the court records, and that Plaintiff shall serve a copy of Plaintiff's Verified Complaint and Motion for Temporary Restraining Order, together with all supporting documents and this Temporary Restraining Order, upon Defendant by regular and certified mail no later than 14 days from the date of this Order and by immediately posting a copy of same in a conspicuous place on or near the Defendant's Unit.

3

7. IT IS FURTHER ORDERED that in view of Plaintiff's likelihood of success on the merits, stability in the community as a nonprofit corporation not easily likely to evade process, and statutory ability to raise funds in the event the Court determines temporary injunctive relief was obtained improperly, no bond shall be required of Plaintiff.

8. IT IS FURTHER ORDERED that this Temporary Restraining Order shall expire fourteen (14) days after its issuance unless otherwise ordered by this Court. THIS IS NOT A FINAL ORDER AND DOES NOT CLOSE THE CASE.

_____

CIRCUIT COURT JUDGE

4

| Approved, SCAO | Original - Court<br>1st Copy- Defendant | 2nd Copy - Plaintiff<br>3rd Copy -Return |
|---|---|---|

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | SUMMONS | CASE NO.<br>22-014146-CH<br>Hon.Patricia Perez Fresard |
|---|---|---|

Court address  2 Woodward Ave., Detroit MI 48226                                        Court telephone no.: 313-224-5173

| Plaintiff's name(s), address(es), and telephone no(s)<br>Northpointe Townhomes Condominium<br>Association | v | Defendant's name(s), address(es), and telephone no(s).<br>MegMad Family Trust<br>c/o Julie Goldberg<br>5586 Broadway 3rd Floor<br>Bronx, NY 10463<br>310-975-9844 |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no<br>Makower Abbate Guerra Wegner Vollmer PLLC<br>Todd Jennings Skowronski 74301<br>30140 Orchard Lake Rd<br>Farmington Hills, MI 48334-2254<br>DP | | |

Instructions: Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or  family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving  the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving  the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035

☐ MDHHS  and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the  complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court,  ☐ _____ Court,

where it was given case number _____ and assigned to Judge _____.

The action ☐ remains  ☐ is no longer  pending.

Summons section completed by court clerk.                     | SUMMONS |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons  and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>11/29/2022 | Expiration date*<br>2/28/2023 | Court clerk<br>Jacqueline Ruff |
|---|---|---|

Cathy M. Garrett- Wayne County Clerk.

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (9/19)              **SUMMONS**              MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105



**SUMMONS**
Case No. : **22-014146-CH**

## PROOF OF SERVICE

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | **OR** | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint.

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint, together with _____
List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled $ | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled $ | Fee $ | Total fee $ | Name (type or print) |

Title

Subscribed and sworn to before me on _____, _____ County, Michigan.
Date

My commission expires: _____  Signature: _____
Date                                                        Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments
_____ on _____
Day, date, time

_____ on behalf of _____
Signature

2022341536  L: 57976 P: 1237  LP
11/29/2022 03:16:49 PM Total Pages: 1
Bernard J. Youngblood, Register of Deeds - Wayne County, MI
ELECTRONICALLY RECORDED

**NOTICE OF LIS PENDENS**
**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

NORTHPOINTE TOWNHOMES CONDOMINIUM
ASSOCIATION,
a Michigan nonprofit corporation,

          Plaintiff,

v.

                          Case No. 22-014146-CH
                          Hon. Patricia Perez Fresard

MEGMAD FAMILY TRUST,

          Defendant.

MAKOWER ABBATE GUERRA WEGNER
VOLLMER PLLC
Todd Skowronski     P74301
John L. Finkelmann    P66054
Attorneys for Plaintiff
30140 Orchard Lake Road
Farmington Hills, MI 48334
248 671 0140

Notice is hereby given that a suit has been commenced and is pending in Wayne County Circuit Court, upon a Complaint filed by Northpointe Townhomes Condominium Association against the above-named Defendant, regarding alleged violations of the Master Deed for Northpointe Townhomes Condominium and that the premises affected by said action is situated in the City of Melvindale, County of Wayne, State of Michigan, and is more particularly described as follows:

> Unit 58, of Northpointe Townhomes Condominium, a Condominium according to the Master Deed recorded in Liber 37283, Page 1 et seq., Wayne County Records, as amended, and designated as Wayne County Condominium Subdivision Plan No. 686.

> Sidwell No. 47-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-000
> Commonly known as: 3373 Reeves Dr., Melvindale, Michigan 48122

Dated: November 29, 2022        Northpointe Townhomes Condominium Association

                            By:
                            John L. Finkelmann, authorized representative

STATE OF MICHIGAN     }
                     }SS.
COUNTY OF MACOMB  }

    On this November 29, 2022, before me appeared John L. Finkelmann, authorized representative for Northpointe Townhomes Condominium Association, a Michigan nonprofit corporation, known to me to be the person who executed the above Notice of Lis Pendens on behalf of the Corporation.

Drafted by and when recorded return to:    Deborah A. Pomber, Notary Public
John L. Finkelmann                    Macomb County, State of Michigan
30140 Orchard Lake Road           Acting in the County of Macomb
Farmington Hills, MI 48334         My Commission Expires: January 9, 2026
248 671 0140

47654-1001-26905 (BV)